IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

In re:

| | | |
|---|---|---|
| WC 56 EAST AVENUE, LLC, | § | |
| | § | Case No. 1:19-bk-11649 |
| Debtor-in-Possession. | § | |
| | § | |

_____

| | | |
|---|---|---|
| WC 56 EAST AVENUE, LLC | § | |
| | § | |
| Plaintiff, | § | Adversary Proc. No. 20-01020 |
| | § | |
| v. | § | |
| | § | |
| PENNYBACKER CAPITAL | § | |
| MANAGEMENT, LLC, | § | |
| PENNYBACKER V, LP, | § | |
| PENNYBACKER V GP, LLC, MARK | § | |
| HAWKINS, U.S. REAL ESTATE | § | |
| CREDIT HOLDINGS III-A, LP, 56 | § | |
| EAST AVENUE, LP, 56 EAST | § | |
| AVENUE, GP, LLC and 56 EAST | § | |
| AVENUE GP OWNERSHIP TRUST, | § | |
| AND CALMWATER ASSET | § | |
| MANAGEMENT, LLC, | § | |

Defendants.

## **AMENDED COMPLAINT**

Plaintiff WC 56 East Avenue, LLC ("Plaintiff" or "Borrower") files this Complaint against

U.S. Real Estate Credit Holdings III-A, LP ("Original Lender") and Calmwater Asset

Management, LLC ("Calmwater" and together with Original Lender, "the Calmwater Entities")

and Pennybacker Capital Management, LLC ("Pennybacker"), Pennybacker V, LP, Pennybacker

V GP, LLC, 56 East Avenue, LP ("Noteholder"), 56 East Avenue GP, LLC, 56 East Avenue GP

Ownership Trust (collectively, "the Pennybacker Entities"), and Mark Hawkins ("M. Hawkins,"

and collectively with the Calmwater Entities, and the Pennybacker Entities, the "Defendants") and

in support thereof alleges the following:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C §§ 151, 157 and

1334.

2.      Venue in this Court is proper pursuant to 28 U.S.C. § 1408 and 1409.  This is a core

proceeding as defined by 28 U.S.C. § 157(b)(2)(A) and (O).

## PARTIES

3.      Plaintiff is a Delaware limited liability company, authorized to conduct business

in the State of Texas.

4.      Original Lender is an Irish limited partnership and may be served with process

through its registered agent, Corporation Service Company, 2710 Gateway Oaks Drive, Suite

150N, Sacramento, California 95833.

5.      Calmwater is a Delaware limited liability company with a principal place of

business at 11755 Wilshire Boulevard, Suite 1400, Los Angeles, California 90025. Upon

information and belief, at all times herein, Calmwater was and continues to be the Investment

Manager of Original Lender.

6.      Noteholder is a Texas limited partnership with a principal place of business at

3800 North Lamar Blvd., Suite 350, Austin, Texas 78756.

7.      Defendant 56 East Avenue GP, LLC is a Texas limited liability company with a

principal place of business at 3800 North Lamar Blvd., Suite 350, Austin, Texas 78756.

8.      Defendant 56 East Avenue GP Ownership Trust is a trust that may be served

with process through its Trustee, Mark L. Hawkins, with a place of business at Armbrust &

Brown, PLLC, 100 Congress Avenue, Suite 1300, Austin, Texas 78701-2744.

9.      Defendant Pennybacker Capital Management, LLC is a Texas limited liability

company with a principal place of business at 3800 North Lamar Blvd., Suite 350, Austin, Texas 78756.

10.    Defendant Pennybacker V GP, LLC is a Delaware limited liability company with a principal place of business at 3800 North Lamar Blvd., Suite 350, Austin, Texas 78756.

11.    Defendant Pennybacker V, LP is a Delaware limited partnership with a principal place of business at 3800 North Lamar Blvd., Suite 350, Austin, Texas 78756.

12.    Defendant M. Hawkins is an individual with a principal place of business at Armbrust & Brown, PLLC, 100 Congress Avenue, Suite 1300, Austin, Texas 78701.

## FACTS

### A.    The Loan Documents

13.    Plaintiff executed that certain Loan Agreement executed as of December 12, 2017 (the "Loan Agreement") in favor of Original Lender.  A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A** and is incorporated herein as though set forth in full.

14.    Pursuant to the Loan Agreement, Plaintiff executed that certain Promissory Note dated December 12, 2017 in the original principal amount of $15,000,000.00 (the "Note") in favor of Original Lender.  A true and correct copy of the Note is attached hereto as **Exhibit B** and is incorporated herein as though set forth in full.

15.    To secure payment of the Note, Plaintiff executed that certain Deed of Trust, Security Agreement, and Financing Statement (the "Deed of Trust") in favor of Cyrus N. Ansari, Esq. as Trustee for the benefit of Original Lender.  The Deed of Trust grants Original Lender a security interest in, inter alia, the real property commonly known as 50-56 East Avenue, Austin, Texas as more fully described in the Deed of Trust (the "Property").  A true and correct copy of the Deed of Trust is attached hereto as **Exhibit C** and is incorporated herein as though set forth in full.

16.     To further secure payment of the Note, Plaintiff executed that certain Assignment of Leases and Rents dated December 12, 2017 (the "ALR") in favor of Original Lender pursuant to which Plaintiff assigned and transferred all rights, title, and interest in the Leases and Rents (as those terms are defined in the ALR).  A true and correct copy of the ALR is attached hereto as **Exhibit D** and is incorporated herein as though set forth in full.  The Loan Agreement, the Note, the Deed of Trust, the ALR, and all other documents executed in connection therewith shall hereinafter be collectively referred to as the "Loan Documents." All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Documents.

17.     The Maturity Date of the Note was January 1, 2019 and was extended to January 1, 2020 by Plaintiff pursuant to the terms of the Loan Agreement.

### B.     The Real Property

18.     The Property consists of a 1.12-acre parcel located in the Rainey Street District in downtown Austin, Texas, which is considered one of the hottest real estate markets in the United States.

19.      The Real Property is unique given the entitlements associated with the Real Property, and it is zoned as of right, for a 15:1 FAR development with no height restriction, enabling an over 700,000 SF high-rise tower to be built thereon.

20.     The value of the Property is approximately $33,000,000 and greatly exceeds the approximate $15,000,000 owed by Plaintiff pursuant to the Loan Documents.

### C.     The Alleged Event of Default

21.     On or about October 15, 2019, Borrower received a letter dated October 9, 2019 from Original Lender (the "Default Notice"), alleging, inter alia, an Event of Default occurred under the Loan Documents because Borrower "violated Section 9.10 (a), (b) and (c) of the

4

Loan Agreement by acquiring additional property other than the Property as described in the Loan Documents . . ."  (the "<u>Alleged Event of Default</u>").

22.     The Default Notice does not identify the "additional property" Original Lender alleges Borrower acquired in contravention of the Loan Documents.

23.     The Default Notice also provides, *inter alia*, that based on the Alleged Event of Default, Original Lender was immediately exercising its right to accelerate the Maturity Date of the Note and declare the outstanding balance under the Loan Documents immediately due and payable.  A true and correct copy of the Default Notice is attached hereto as **Exhibit E** and is incorporated herein as though set forth in full.

24.     Prior to sending the Default Notice, no representative or agent of Original Lender had any contact with any representative or agent of Borrower regarding the Alleged Event of Default.

25.     Original Lender also sent Borrower, among others, a Notice of Foreclosure dated October 15, 2019 (the "<u>Notice of Foreclosure</u>") advising Borrower, inter alia, that a trustee's sale of the Real Property was scheduled for November 9, 2019.  A true and correct copy of the Notice of Foreclosure is attached hereto as **Exhibit F** and is incorporated herein by reference as though set forth in full.

26.     On October 16, 2019, Borrower sent Original Lender a letter titled "Demand to Rescind and Withdraw Wrongful Acceleration and Foreclosure" (the "<u>First Rescission Demand</u>").  A true and correct copy of the First Rescission Demand is attached hereto as **Exhibit G** and is incorporated herein by reference as though set forth in full.

27.     Pursuant to the First Rescission Demand, Borrower, *inter alia*, demanded that Original Lender rescind the Default Notice and withdraw the Notice of Foreclosure.

28.     After Original Lender failed to rescind the Default Notice and withdraw the

Notice of Foreclosure, Borrower sent Original Lender another letter dated October 22, 2019 titled "Second Demand to Rescind and Withdraw Wrongful Acceleration and Foreclosure" (the "Second Rescission Demand"). A true and correct copy of the Second Rescission Demand is attached hereto as **Exhibit H** and is incorporated herein by reference as though set forth in full.

29.     Pursuant to the Second Rescission Demand, Borrower, inter alia, again demanded that Original Lender rescind the Default Notice and withdraw the Notice of Foreclosure.

30.     Despite the repeated demand, Original Lender refused and failed to rescind the Default Notice and withdraw the Notice of Foreclosure.

31.     Despite repeated requests, Original Lender also did not produce any document that establishes that Borrower "acquired any additional property other than the Property as described in the Loan Documents" as alleged in the Default Notice.

32.     Original Lender instead relied on that certain Deed Without Warranty dated March 20, 2019.  A true and correct copy of the Deed Without Warranty is attached hereto as **Exhibit I** and is incorporated herein by reference as though set forth in full.

33.     The Deed Without Warranty relates to a certain 0.252 acres of land which is a portion of 0.9702 acres of land owned by the City of Austin to which the City of Austin believes Plaintiff may have an interest in, but Plaintiff does not own (the "Alleged Additional Property").

34.     The Deed Without Warranty is not a valid conveyance of the Alleged Additional Property to Plaintiff.  The Grantor (as that term is defined in the Deed Without Warranty) under the Deed Without Warranty is not and was not the fee owner of the Alleged Additional Property, as of March 2019 (the date of the supposed transfer) and therefore could not have transferred anything to Borrower in March 2019. The Grantor is listed as Austin-Travis County Mental Health Mental

Retardation d/b/a Integral Care and f/d/b/a Austin Travis County Integral Care but the title records show that the actual fee owner of the property is the City of Austin, and has been since 1953.

35.     The Deed Without Warranty does not clearly purport to convey real property or indicate that the Grantor has a right to any real property.

36.      The Deed Without Warranty uses the following conditional granting language "*all of Grantor's right, title and interest, **if any,** in and to the* [Alleged Real Property]". This conditional language does not create a proper conveyance of real property.

37.     The Deed Without Warranty was not delivered to Borrower by the Grantor, Borrower did not accept the Deed Without Warranty from the Grantor, and no consideration was exchanged for this purported conveyance.  Borrower did not consent to, and had no knowledge of the recording of the Deed Without Warranty. No sale was conducted, and no bill of sale or other closing document related to this Alleged Additional Property is known by Borrower to exist.

38.     Borrower did not purchase the Alleged Additional  Property.

39.     Borrower did not acquire, and has not acquired, the Alleged Additional Property, or any additional property, to cause an Event of Default under the Loan Documents to occur.

40.     Prior to Original Lender declaring the Alleged Event of Default, Borrower was current on all monetary obligations under the Loan Documents and no Event of Default existed under the Loan Documents.

**D.     Communications Between Noteholder Entities and Borrower Prior to The Alleged Event of Default**

41.     On September 13, 2019, Alexander Zabik, Managing Director and Portfolio Manager of Pennybacker ("Zabik"), contacted Jeremy Stoler ("Stoler") of World Class, a corporate affiliate of Plaintiff ("World Class"), to discuss opportunities to lend to World Class and explore other opportunities for the entities to do business together.

7

42.     On September 15, 2019, Zabik and Stoler had a telephone call during which Zabik represented to Stoler that Pennybacker would like to find a way to lend to World Class on real estate projects (presumably to include 56 East Avenue which was maturing in three months) and that the Principals of Pennybacker "would not want to be in an adversarial position with Nate Paul," the publicly known principal of World Class.

43.     Based on the representations made by Zabik to Stoler during the September 15, 2019 telephone call, Stoler agreed to a subsequent call on September 18, 2019 with Zabik and Vince Reyna, Principal and Chief Investment Officer of Pennybacker ("Reyna").

44.     During the September 18, 2019 telephone call, Reyna reassured Stoler that Pennybacker had an interest in lending to World Class but only in "situations that would be helpful and not in an adversarial position to Nate [Paul]."

### E.     Noteholder's Acquisition of the Loan Documents

45.     Upon information and belief, Noteholder was formed by the Pennybacker Entities on or about October 29, 2019.

46.     Upon information and belief, on October 30, 2019, Noteholder purchased and acquired Original Lender's rights and interest in the Loan Documents.

47.     Upon information and belief, based on the declared alleged default under the Loan Documents, the Maturity Date of the Note, and the significant equity in the Property, Original Lender's interest in the Loan Documents was sold to Noteholder at a premium price.

48.     Upon information and belief, Original Lender declared the Alleged Event of Default and accelerated the obligations due and owing under the performing Note, so that it could sell its interest in the Loan Documents at a premium price and exit its position.

49.     Unbeknownst to Stoler and World Class during the September 15 and September 18, 2019 telephone calls, Pennybacker was, upon information and belief, simultaneously in

discussions with Original Lender to purchase Original Lender's interest in the Loan Documents.

50.     On November 6, 2019, after Noteholder acquired the Loan Documents, Zabik and Stoler had another telephone call during which Zabik again expressed a desire to work with World Class and inquired as to the status of certain properties in World Class' portfolio. During the November 6, 2019 call, Zabik did not inform Stoler of Noteholder's acquisition of the Loan Documents, or the Pennybacker Entities' interest in Noteholder.

51.     Plaintiff only became aware of the Pennybacker Entities' interest in Noteholder on January 13, 2020, after an Order compelling disclosure was entered in response to Debtor's Motion to Compel Lender to Disclose Identity and Affiliations [ECF 29].

52.     Upon information and belief, despite Original Lender improperly declaring the Alleged Event of Default, Noteholder insists on proceeding with the foreclosure of the Property so Noteholder can either: (i) obtain ownership of the prime and irreplaceable Property via foreclosure, or (ii) continue to charge interest at the Default Rate to avoid any loss on its investment based on it paying a premium price for acquiring Original Lender's interest in the Loan Documents.

### F.     The Filing of the Bankruptcy Case

53.     Defendants' scheme for Original Lender to manufacture and declare an improper default resulted in the obligations under the Loan Documents being accelerated and a foreclosure being commenced against the Property.

54.     Defendants' action in persisting with an improper foreclosure of the Property, despite Plaintiff providing evidence that the Alleged Event of Default did not occur, forced Plaintiff to file its Voluntary Petition on December 2, 2019, commencing the within bankruptcy case. Plaintiff's filing of its bankruptcy case was necessary to protect its substantial equity in

the Property.

55.    Defendants' actions in conspiring to manufacture a non-existent event of

default and forcing Plaintiff to file this bankruptcy case caused (i) great reputational damage to

Plaintiff in the business community, and (ii) has detrimentally effected Plaintiff's ability to

refinance the obligations owed under the Loan Documents.

56.    Upon information and belief, the Pennybacker Entities persisted with the

improper foreclosure of the Property to force Plaintiff to file its bankruptcy case to make it more

difficult and expensive to refinance the obligations under the Loan Documents in order to

capitalize on the substantial equity in the Property.

## FIRST CLAIM FOR RELIEF

**BREACH OF CONTRACT**
(As to the Calmwater Entities and Noteholder)

57.    Plaintiff hereby incorporates by reference each of the factual allegations

contained in the preceding paragraphs.

58.    The Calmwater Entities breached the terms of the Loan Documents, including,

without limitation, Sections 11.1 and 11.2 of the Loan Agreement by improperly declaring the

Alleged Event of Default and accelerating the amounts due under the Loan Documents.

59.    The Calmwater Entities and Noteholder breached the terms of the Loan

Documents by ratifying the improperly declared Alleged Event of Default through refusing to

rescind the Default Notice and Notice of Trustee's Sale, and proceeding with the foreclosure

sale of the Property up until Plaintiff filed its bankruptcy case, which stayed the foreclosure

sale.

60.    Plaintiff has suffered and continues to suffer damages, which are within the

jurisdictional limits of this Court and in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### CIVIL CONSPIRACY
(As to All Defendants)

61.     Plaintiff hereby incorporates by reference each of the factual allegations contained in the paragraphs 1 through 56 above.

62.     Defendants acted in concert with each other to accomplish the objective of improperly declaring the Alleged Event of Default by Original Lender and the sale of Original Lender's interest in the Loan Documents to Noteholder to allow Noteholder to execute and benefit from a non-judicial foreclosure with less than thirty days remaining until Maturity Date of the Note.  Defendants together pursued this course of action to allow the charging of the Default Rate under the Note, the improper foreclosure of the Property, and deprive Borrower of the substantial equity in the Property.

63.     Upon information and belief,  the conspiracy between the Defendants was concocted for Original Lender to exit its position with respect to the Loan Documents on a more favorable basis and the Pennybacker Entities reaping the benefits of acquiring a loan under an alleged default and secured by real property with substantial equity.

64.     As a result, Plaintiff has suffered and continues to suffer injury within the jurisdictional limits of this Court and in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION
(As to Pennybacker)

65.     Plaintiff hereby incorporates by reference each of the factual allegations contained in the paragraphs 1 through 56 above.

66.     Pennybacker misrepresented to Plaintiff that it wanted to develop business opportunities with Plaintiff and that the Principals of Pennybacker "would not want to be in an adversarial position with Nate Paul."

67.     Pennybacker knew this representation was false as it was in discussions with Original Lender to acquire Original Lender's interest in the Loan Documents.

68.     Pennybacker made the representation with the intention that Plaintiff would reveal confidential information regarding the real properties in its portfolio, including the Property.

69.     Plaintiff in fact justifiably relied on the representations made by Pennybacker and revealed confidential information to Pennybacker regarding its portfolio, including the Property. Plaintiff revealed said information with the acknowledgement that the information would only be used in furtherance of a lending relationship, and instead, Pennybacker used said information for its own hidden agenda and pecuniary advantage.

70.     Plaintiff has suffered damages as a result of the breach in an amount within the jurisdictional limits of this Court and to be proven at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in favor of Plaintiff as follows:

1.     Actual damages in an amount to be proven at trial in connection with the First, Second, and Third Claims for Relief;

2.     Punitive damages in an amount to be proven at trial in connection with the Third Claim for Relief;

3.     For attorneys' fees and costs; and

4.     For such other relief as this Court may deem just and proper.

12

Dated: April 9, 2020

CIARDI CIARDI & ASTIN

Walter W. Gouldsbury III
Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
(*Pro Hac Vice* Applications pending)
One Commerce Square
2005 Market Street, Suite 3500
Philadelphia, PA 19103
Tel:  (215) 557-3550
Fax:  (215) 557-3551
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

-and-

Joseph J. McMahon Jr., Esquire
Daniel K. Astin, Esquire
(*Pro Hac Vice* Applications pending)
1204 N. King Street
Wilmington, DE 19801
Tel:  (302) 658-1100

*Attorneys for Plaintiff*

# **EXHIBIT A**

# LOAN AGREEMENT

between

**WC 56 EAST AVENUE LLC,**
**a Delaware limited liability company**

**AS BORROWER**

and

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**
**an Irish limited partnership**

**AS LENDER**

**Executed as of December 12, 2017**

**TABLE OF CONTENTS** *(continued)*

## TABLE OF CONTENTS

Page

**ARTICLE 1. DEFINITIONS**................................................................................... **1**
    1.1       INCORPORATION OF EXHIBITS AND SCHEDULE ....................................... 1
    1.2       DEFINED TERMS ............................................................................... 1

**ARTICLE 2. LOAN**............................................................................................ **6**
    2.1       LOAN ................................................................................................. 6
    2.2       MATURITY DATE .............................................................................. 7
    2.3       FUNDING OF LOAN .......................................................................... 7
    2.4       ADDITIONAL RESERVES .................................................................. 8
    2.5       DISTRIBUTION OF CASH FLOW. .................................................... 10

**ARTICLE 3. DISBURSEMENT** ........................................................................ **10**
    3.1       CONDITIONS PRECEDENT TO DISBURSEMENTS................................. 10

**ARTICLE 4. [Omitted]** ..................................................................................... **15**

**ARTICLE 5. INSURANCE**................................................................................. **15**
    5.1       PROPERTY INSURANCE ................................................................. 15
    5.1       BOILER AND MACHINERY INSURANCE. ........................................ 15
    5.2       FLOOD INSURANCE. ...................................................................... 16
    5.3       EARTHQUAKE INSURANCE. ............................................................ 16
    5.4       TERRORISM INSURANCE. ............................................................... 16
    5.5       LIABILITY INSURANCE. ................................................................. 16
    5.6       CONSTRUCTION. ............................................................................ 16
    5.7       GENERAL. ...................................................................................... 17

**ARTICLE 6. REPRESENTATIONS AND WARRANTIES**.................................. **17**
    6.1       AUTHORITY/ENFORCEABILITY ....................................................... 17
    6.2       BINDING OBLIGATIONS.................................................................. 17
    6.3       FORMATION AND ORGANIZATIONAL DOCUMENTS ........................... 17
    6.4       NO VIOLATION. .............................................................................. 17
    6.5       COMPLIANCE WITH LAWS.............................................................. 18
    6.6       LITIGATION. .................................................................................. 18
    6.7       FINANCIAL CONDITION.................................................................. 18
    6.8       NO MATERIAL ADVERSE CHANGE ................................................. 18
    6.9       ACCURACY .................................................................................... 18
    6.10      TAX LIABILITY ............................................................................. 18
    6.11      COMPLIANCE................................................................................. 18
    6.12      ERISA ........................................................................................... 18
    6.13      BUSINESS LOAN............................................................................ 19

## TABLE OF CONTENTS *(continued)*

Page

| | | |
|---|---|---|
| 6.14 | PROPERTY MANAGEMENT AGREEMENT | 19 |
| 6.15 | MATERIAL AGREEMENTS. | 19 |
| 6.16 | LEASES | 19 |
| 6.17 | PATRIOT ACT AND RELATED MATTERS | 19 |
| 6.18 | NO BANKRUPTCY | 20 |
| 6.19 | NOT FOREIGN PERSON | 20 |

**ARTICLE 7. HAZARDOUS MATERIALS** ........................................................ **20**
| | | |
|---|---|---|
| 7.1 | SPECIAL REPRESENTATIONS, WARRANTIES | 20 |
| 7.2 | LEGAL EFFECT OF SECTION | 23 |

**ARTICLE 8. RECONVEYANCE** ................................................................. **23**
| | | |
|---|---|---|
| 8.1 | FULL REPAYMENT AND RECONVEYANCE | 23 |

**ARTICLE 9. COVENANTS OF BORROWER** ................................................ **24**
| | | |
|---|---|---|
| 9.1 | EXPENSES | 24 |
| 9.2 | ERISA COMPLIANCE | 24 |
| 9.3 | LEASING | 25 |
| 9.4 | APPLICATION OF GROSS OPERATING INCOME | 25 |
| 9.5 | SUBDIVISION MAPS | 25 |
| 9.6 | FURTHER ASSURANCES | 25 |
| 9.7 | ASSIGNMENT | 25 |
| 9.8 | [RESERVED.] | 26 |
| 9.9 | TRANSFERS | 26 |
| 9.10 | SINGLE PURPOSE ENTITY | 26 |
| 9.11 | MATERIAL AGREEMENTS. | 28 |
| 9.12 | COMPLETION OF REQUIRED CAPITAL IMPROVEMENTS AND TENANT IMPROVEMENTS COMMENCED BY BORROWER | 29 |
| 9.13 | [OMITTED]. | 29 |
| 9.14 | LOAN TO VALUE RATIO. | 29 |
| 9.15 | PROPERTY MANAGEMENT AGREEMENT | 29 |
| 9.16 | MAINTENANCE | 29 |
| 9.17 | UTILITIES | 29 |
| 9.18 | NO CHANGE IN USE | 30 |
| 9.19 | PATRIOT ACT AND RELATED MATTERS | 30 |

**ARTICLE 10. REPORTING COVENANTS** ................................................... **30**
| | | |
|---|---|---|
| 10.1 | FINANCIAL INFORMATION | 30 |
| 10.2 | BOOKS AND RECORDS | 30 |
| 10.3 | MONTHLY PROGRESS REPORTS ON RENOVATION TIMELINE | 30 |
| 10.4 | LEASING REPORTS | 31 |
| 10.5 | OPERATING STATEMENTS FOR PROPERTY AND IMPROVEMENTS | 31 |

## TABLE OF CONTENTS *(continued)*

Page

10.6     BUDGET ................................................................................................ 31

**ARTICLE 11. EVENTS OF DEFAULT AND REMEDIES**.................................... **32**
11.1     EVENT OF DEFAULT .......................................................................... 32
11.2     ACCELERATION UPON EVENT OF DEFAULT; REMEDIES ..................... 33
11.3     DISBURSEMENTS TO THIRD PARTIES ................................................. 34
11.4     LENDER'S COMPLETION OF CONSTRUCTION ...................................... 34
11.5     REPAYMENT OF FUNDS ADVANCED ................................................... 34
11.6     RIGHTS CUMULATIVE, NO WAIVER .................................................... 34

**ARTICLE 12. MISCELLANEOUS PROVISIONS** ................................................ **34**
12.1     INDEMNITY ......................................................................................... 34
12.2     FORM OF DOCUMENTS ....................................................................... 35
12.3     NO THIRD PARTIES BENEFITED .......................................................... 35
12.4     NOTICES ............................................................................................. 35
12.5     ATTORNEY-IN-FACT ........................................................................... 36
12.6     ACTIONS ............................................................................................. 36
12.7     RIGHT OF CONTEST ........................................................................... 36
12.8     RELATIONSHIP OF PARTIES ................................................................ 36
12.9     DELAY OUTSIDE LENDER'S CONTROL ................................................ 36
12.10    ATTORNEYS' FEES AND EXPENSES; ENFORCEMENT ........................... 36
12.11    IMMEDIATELY AVAILABLE FUNDS ...................................................... 37
12.12    LENDER'S CONSENT ........................................................................... 37
12.13    LOAN SALES AND PARTICIPATIONS; DISCLOSURE OF
         INFORMATION .................................................................................... 37
12.14    SECONDARY MARKET TRANSACTION; DISCLOSURE OF
         INFORMATION .................................................................................... 37
12.15    RESERVED. .......................................................................................... 38
12.16    LENDER'S AGENTS ............................................................................. 38
12.17    TAX SERVICE ...................................................................................... 38
12.18    WAIVER OF RIGHT TO TRIAL BY JURY ............................................... 38
12.19    SEVERABILITY .................................................................................... 39
12.20    HEIRS, SUCCESSORS AND ASSIGNS .................................................... 39
12.21    TIME ................................................................................................... 39
12.22    HEADINGS ........................................................................................... 39
12.23    GOVERNING LAW ............................................................................... 39
12.24    INTEGRATION; INTERPRETATION ....................................................... 39
12.25    JOINT AND SEVERAL LIABILITY ......................................................... 39
12.26    COUNTERPARTS .................................................................................. 39
12.27    CONFIDENTIALITY AND PUBLICITY .................................................... 40
12.28    BROKERS ............................................................................................ 40
12.29    OFFSETS AND COUNTERCLAIMS ......................................................... 40
12.30    REMEDIES OF BORROWER .................................................................. 40
12.31    PRINCIPLES OF CONSTRUCTION ......................................................... 40

## TABLE OF CONTENTS *(continued)*

Page

**SCHEDULES**

Schedule I            Borrower's Organizational Chart

**EXHIBITS**

Exhibit A            Description of the Property

Exhibit B            Documents

Exhibit C            Omitted

Exhibit D            Omitted

Exhibit E            Omitted

Exhibit F            Rent Roll and List of Leases

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") is dated as of December 12, 2017, by and between **WC 56 EAST AVENUE LLC**, a Delaware limited liability company ("Borrower"), and **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership (together with its successors and assigns, "Lender").

## R E C I T A L S

A.     Borrower is or on the closing date will be the owner in fee simple of land located 50-56 East Avenue, in the City of Austin, County of Travis, State of Texas, and legally described on <u>Exhibit A</u> attached hereto and incorporated herein by reference (the "Real Property"). The Real Property consists of approximately 48,787 square feet and contains improvements generally consisting of an office project containing in the aggregate approximately 16,832 net rentable square feet of space (together with all "Improvements" referenced in the Security Instrument (defined below), collectively, the "Improvements"). As used herein, the term "Property" shall collectively mean the Real Property and the Improvements, all related personal property, and all "Property" described in the Security Instrument.

B.     Borrower has applied to Lender for a loan in the amount of up to FIFTEEN MILLION AND NO/100 DOLLARS ($15,000,000.00) (the "Loan") for the refinancing of the Real Property and for certain costs related thereto, and Lender is willing to make the Loan on the terms and conditions hereinafter set forth. The Loan is evidenced by, among other things, that certain Promissory Note, dated as of the date hereof made by Borrower in the original principal amount of $15,000,000.00 and payable to Lender (such Promissory Note, together with all amendments, modifications and/or supplements thereto are hereinafter collectively referred to as the "Note"). The terms and provisions of the Note are hereby incorporated by reference in this Agreement.

C.     Borrower's obligations under the Loan will be secured by, among other items, a first priority Deed of Trust, Security Agreement and Financing Statement dated as of the date hereof, from Borrower to the trustee named therein for the benefit of Lender encumbering the Property, and granting Lender a first priority lien in the Property (such Deed of Trust, Security Agreement and Financing Statement, together with amendments, modifications and/or supplements thereto is hereinafter referred to as the "Security Instrument").

NOW, THEREFORE, Borrower and Lender agree as follows:

## ARTICLE 1.
## DEFINITIONS

**1.1     INCORPORATION OF EXHIBITS AND SCHEDULE**. Schedule I and Exhibits A through F to this Agreement, attached hereto are incorporated in this Agreement and expressly made a part hereof by this reference.

**1.2     DEFINED TERMS**. The following capitalized terms generally used in this Agreement shall have the meanings defined or referenced below. Certain other capitalized terms used only in specific sections of this Agreement are defined in such sections.

"ADA" means the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq. as now or hereafter amended or modified.

"Affiliate" of any Person means (a) any other Person which directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person, (b) any other Person with five percent (5%) or more of the equity interest of which is held beneficially or of record by such Person (in each case, directly or indirectly), (c) with respect to Borrower or any Guarantor, any partner or member in Borrower or any Guarantor (other than partners or members that obtain an interest in Borrower or Guarantor in violation of the terms of the Loan Documents), and (d) any Guarantor or Borrower.

"Affiliate Fees" shall have the meaning ascribed to such term in Section 3.1.1(z) hereof.

"Agreement" shall have the meaning ascribed to such term in the preamble hereto.

"Applicable Laws" shall have the meaning ascribed to such term in Section 6.17 hereof.

"Approved Budget" shall have the meaning ascribed to such term in Section 10.6 hereof.

"Approved Leases" means (i) executed Leases, each of which must be with non-Affiliated third parties and comply with the terms and conditions of Section 9.3, and (ii) Leases otherwise approved, in writing, by Lender (to the extent required under this Agreement), and, in any case, as of the date of determination, the tenant under each Lease must be in occupancy of the leased premises, must have commenced rent payments to Borrower, and must not have materially defaulted or made a claim that Borrower has defaulted under the Lease.

"Approved Plans and Specifications" shall have the meaning ascribed to such term in Section 3.1.2(l)(b) hereof.

"Bankruptcy" means with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged a bankrupt or insolvent, or has entered against itself an order for relief, in any bankruptcy or insolvency proceeding, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment, without such Person's consent or acquiescence, of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978 (11 USC § 101-1330) as now or hereafter amended or recodified.

"Borrower" shall have the meaning ascribed to such term in the preamble hereto.

"Business Day" means a day of the week (but not a Saturday, Sunday or public holiday on which the banking institutions in California or Texas are authorized or required by law to be closed) on which the offices of Lender are open to the public for carrying on substantially all of Lender's business functions. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"Capital Improvement Budget" means the capital budget, if any, delivered to, as may be amended or updated from time to time pursuant to Section 10.6.

"Carveout Guaranty" means the Indemnity and Guaranty Agreement dated as of the date hereof, made by Guarantor in favor of Lender, as modified, amended and/or supplemented from time to time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" shall have the meaning ascribed to such term in the Security Instrument.

"Control" means the possession, directly or indirectly, of the power to cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, family relationship or otherwise. Controlled and Controlling shall have correlative meanings.

"Default" means an event, omission or condition, that, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"Effective Date" means the first date Lender disburses any funds into escrow (and, in all events, interest or amounts funded and deemed funded shall begin to accrue interest on the date Lender disburses any funds into escrow).

"Environmental Indemnity Agreement" means that certain Hazardous Substances Indemnity Agreement dated as of the date hereof, executed by Borrower and Guarantor, collectively, in favor of Lender , as modified, amended and/or supplemented from time to time.

"Environmental Laws" shall have the meaning ascribed to such term in Section 7.1(a) hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, and any regulations issued pursuant thereto, as now or from time to time hereafter in effect.

"Event of Default" shall have the meaning ascribed to such term in Section 11.1 hereof.

"GAAP" means generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Governmental Authority" means any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, or any court or administrative tribunal.

"Gross Operating Income" shall have the meaning ascribed to such term in Section 10.5(a).

"Gross Rents" means an amount equal to the scheduled rent payments from the Property.

"Guarantor" means Natin Paul, an individual, and with respect to any other guaranty now or hereafter executed in connection with the Loan, any other Person who, or which, in any manner, is or becomes obligated to Lender thereunder (collectively or jointly and severally as the context thereof may suggest or require).

"Hazardous Substances" shall have the meaning ascribed to such term in Section 7.1(a) hereof.

"Improvements" shall have the meaning ascribed to such term in Recital A hereof.

"Initial Funding Amount" shall have the meaning ascribed to such term in <u>Section 2.3(a)</u>.

"Investment Party" means any actual or potential purchaser, transferee, assignee, lender, secured party, servicer, participant or investor in a Secondary Market Transaction.

"Leases" means any lease, occupancy agreement, sublease or other agreement creating possessory rights in all or any portion of the Property.

"Lender" shall have the meaning ascribed to such term in the preamble hereto.

"Lender Expenses" shall have the meaning ascribed to such term in <u>Section 2.3(a)</u> hereof.

"Loan" shall have the meaning ascribed to such term in Recital B hereof.

"Loan Commitment Fee" shall have the meaning ascribed to such term in the Note.

"Loan Documents" means those documents, as hereafter modified, amended and/or supplemented from time to time, properly executed and in recordable form, if necessary, listed in <u>Exhibit B</u> hereof as Loan Documents.

"Loan-to-Value Ratio" means the ratio of (a) the outstanding principal amount of the Loan as of the date in question, to (b) the appraised value of the Property as of such date, as determined by Lender in its sole but good faith discretion whether pursuant to its underwriting practices or an updated appraisal, which determination shall be conclusive absent manifest error.

"Material Agreements" means (i) each Lease, (ii) each management, brokerage or leasing agreement, and (iii) any agreement of any kind (other than the Leases) of a material nature (materiality for purposes of this definition shall mean any contract with a term longer than one year or any contract that is not cancelable on thirty (30) days' or less notice without the payment of any termination fee or payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of the Property, whether written or oral.

"Maturity Date" shall have the meaning ascribed to such term in the Note.

"Net Operating Income" means: an amount equal to the Gross Rents for the period being measured, based on Approved Leases (hereinafter defined); plus the expense reimbursements for the period in question pursuant to such Approved Leases; minus the sum of (x) an adjustment for vacancy/collection losses equal to the greater of (i) five percent (5%), or (ii) the actual vacancy rate at the Property; and (y) the Operating Expenses (defined below) for the period being measured; and (z) an amount for management expenses not less than the greater of (aa) three percent (3%) of the amount of Gross Rents and expense reimbursements reduced by any adjustment for vacancy/collection losses, or (bb) the actual management expenses of the Property as of the date of determination.

"Note" shall have the meaning ascribed to such term in Recital B hereof.

"OFAC" shall have the meaning ascribed to such term in <u>Section 6.18</u> hereof.

"OFAC Laws and Regulations" shall have the meaning ascribed to such term in <u>Section 6.18</u> hereof.

"Operating Agreements" shall mean, collectively, any covenants, restrictions or agreements of record relating to the construction, operation or use of the Property.

"Operating Budget" shall have the meaning ascribed to such term in <u>Section 10.6</u> hereof.

"Operating Expenses" means for purposes of calculating Net Operating Income all actual operating expenses and disbursements of every kind, nature or description actually paid or due and payable (and accrued even if not payable in the case of real property taxes and insurance premiums) during or projected by Lender to be incurred for the period being measured, including, without limitation, those for leasing, management, operation, maintenance, repairs, annual taxes, bond assessments, ground lease payments, insurance, utilities and other annual expenses (but not tenant retrofit and lease commission costs) actually expended, on a cash basis. Operating Expenses shall not include any interest or principal payments on the Loan or any allowance for depreciation nor shall it include asset management fees or other fees payable under the operating agreement of Borrower. Operating Expenses shall not include any management expenses to the extent that such management expenses have already been deducted from Net Operating Income pursuant to the definition of Net Operating Income contained herein.

"Outstanding Principal Balance" means the then outstanding principal balance of the Loan.

"Participant" shall have the meaning ascribed to such term in <u>Section 12.13</u> hereof.

"Patriot Act" shall have the meaning ascribed to such term in <u>Section 6.17</u> hereof.

"Payment Date" shall have the meaning ascribed to such term in the Note.

"Permitted Operating Expenses" shall have the meaning ascribed to such term in <u>Section 10.5(b)</u> hereof.

"Person" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization or other entity.

"Prescribed Laws" shall have the meaning ascribed to such term in <u>Section 6.18</u> hereof.

"Property" shall have the meaning ascribed to such term in <u>Recital A</u> hereof.

"Property Management Agreement" means, individually and collectively as the context may require, (i) any agreement for the management or leasing of the property, as the same may be modified, amended and/or supplemented from time to time as permitted pursuant to the terms hereof and the other Loan Documents or (ii) a Qualified Replacement Property Management Agreement if the agreement referenced in clause (i) is no longer in effect.

"Property Manager" means a property manager acceptable to Lender, the Replacement Property Manager (as defined in Section 9.15), or any other successor property manager for the Property as expressly permitted pursuant to this Agreement.

"Qualified Replacement Property Management Agreement" shall mean a leasing and management agreement with a Qualified Replacement Property Manager, which leasing and management agreement shall be acceptable to Lender in form and substance (such approval to be granted or withheld in Lender's sole and absolute discretion).

"Qualified Replacement Property Manager" means a reputable and experienced property management organization/leasing agency possessing experience in managing and leasing office properties similar in size, scope, use and value as the Property, as approved by Lender in its sole discretion.

"Rating Agency" means a nationally recognized organization that assesses and issues opinions regarding the relative credit quality of bond issues.

"Real Property" shall have the meaning ascribed to such term in <u>Recital A</u> hereof.

"Required Work" shall have the meaning ascribed to such term in <u>Section 2.3(e)</u>.

"Reserves" means, collectively, any reserves established under the Loan Documents.

"Secondary Market Transaction" means (1) any sale of the Security Instrument, this Agreement, the Note and other Loan Documents to one or more investors as a whole loan, (2) a participation of the Loan or Borrower's obligations under the Loan to one or more investors, (3) a securitization of the Loan, (4) a pledge of the Loan, the Security Instrument, this Agreement, the Note and/or the other Loan Documents, and/or (5) any other sale, pledge, hypothecation, participation, encumbrance or transfer of the Loan or Borrower's obligations under the Loan or any interest therein to one or more investors "Security Instrument" shall have the meaning ascribed to such term in Recital C hereof.

"Structural Engineering Report" shall have the meaning given to such term in <u>Section 3.1.1(h)</u> hereof.

"Subdivision Map" shall have the meaning ascribed to such term in <u>Section 9.5</u> hereof.

"Survey" shall have the meaning ascribed to such term in <u>Section 3.1.1(k)</u> hereof.

"Tax and Insurance Reserve" shall have the meaning ascribed to such term in <u>Section 2.4(a)</u> hereof.

"Title Company" means Stewart Title Guaranty Company.

"Title Policy" means an TLTA extended coverage lender's title policy issued by Title Company insuring the lien of the Security Instrument in the full maximum principal amount of the Loan subject only to such exceptions approved by Lender and including such endorsements as are required by Lender.

"Transfer" means the sale, transfer, hypothecation, encumbrance, mortgage, conveyance, lease (excluding lease agreements of portions of the Improvements done in the ordinary course of business and in strict accordance with this Agreement), alienation, assignment, pledge, disposition, divestment, or leasing with option to purchase, or assignment of the Property, or any portion thereof or interest therein (whether direct or indirect, legal or equitable, including the issuance, sale, assignment, pledge, alienation, conveyance, divestment, transfer, disposition, hypothecation, mortgage or encumbrance of any direct or indirect ownership interest in Borrower or in any entity having an ownership interest in Borrower, whether direct or indirect) (or entering into any agreement or contract to do any of the foregoing that is not conditioned on compliance with the terms of the Loan Documents), or undertaking, suffering or causing any of the foregoing to occur voluntarily, involuntarily or by operation of law.

"UCC Searches" shall have the meaning ascribed to such term in <u>Section 3.1.1(t)</u>.

## ARTICLE 2.LOAN

**2.1**     <u>LOAN</u>.  By and subject to the terms of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender the principal sum of FIFTEEN MILLION AND NO/100 DOLLARS ($15,000,000.00), said sum to be evidenced by the Note.  The Note shall be secured, in part by, among other things, the Security Instrument encumbering the Property.  Amounts disbursed to or on behalf

of Borrower pursuant to the Note shall be used to refinance the Property and Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents.

**2.2** **MATURITY DATE**. On the Maturity Date, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full. All payments due to Lender under this Agreement, whether at the Maturity Date or otherwise, shall be paid in immediately available funds.

**2.3** **FUNDING OF LOAN**.

(a) Initial Funding Aggregate Amount. Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, including, without limitation, satisfaction of the conditions precedent set forth in Section 3.1.1 hereof, on the Effective Date, Borrower agrees to borrow from Lender, and Lender shall disburse to Borrower from the proceeds of the Loan the sum of Fifteen Million and No/100 Dollars ($15,000,000.00) (the "Initial Funding Amount"). The Initial Funding Amount shall be used for paying (A) in full any existing financing or other liens on the Property, (B) reasonable out-of-pocket fees, costs and expenses incurred by Lender in connection with the Loan transaction, including, without limitation, all appraisal, title, escrow, engineering, environmental and reasonable attorneys' fees and expenses (collectively, the "Lender Expenses"), (C) the Loan Commitment Fee and (D) establishment of the Tax and Insurance Reserve. Borrower hereby authorizes Lender to disburse on the Effective Date such Loan proceeds directly to Lender as are necessary to pay the Lender Expenses and the Loan Commitment Fee so long as such expenses are memorialized on a closing statement acknowledged by both Borrower and Lender.

(b) [Omitted].

(c) Disbursement Requests Subsequent to Effective Date from Reserve Accounts. Without limitations on other restrictions on funding contained in this Section 2.3 or Section 3.1.2, there shall not be more than one (1) disbursement in any calendar month from the Reserves under this Section 2.3. In addition, in connection with any such disbursement, Borrower shall give to Lender, at 11755 Wilshire Boulevard, Suite 1425, Los Angeles, California 90025, Attention: Simond Lavian or at such other address as Lender shall designate, an original or facsimile written request for disbursement in the form as is required by Lender in its sole discretion (together with all supporting documents and information required by Lender for draws), no later than 2:00 p.m. Eastern Standard Time or Eastern Daylight Time, as applicable, and not less than ten (10) Business Days prior to the proposed funding date of such disbursement. Subject to Lender's approval of the request for disbursement, which shall be in Lender's good-faith discretion, and in accordance with the terms and conditions contained in this Agreement, Lender shall use good faith efforts to make available to Borrower the proceeds of each disbursement requested by Borrower on the funding date specified in the Borrower's request for disbursement (or such other date as Lender shall deem appropriate) and shall disburse such funds into such account of Borrower as Borrower shall specify and Lender shall approve.

(d) General Provisions Relating to the Reserves. Funds in the Holdbacks and Reserves shall be used only for the purposes and pursuant to line item limitations set forth in the Approved Budget (subject to adjustment as provided in Section 10.6 hereof), or as otherwise set forth in this Agreement. Funds in each of the Reserves may be commingled with other funds of Lender (or its servicer, if applicable). Borrower grants to Lender a first priority security interest in all funds on deposit in the Reserves to secure Borrower's obligations under the Loan Documents. If an Event of Default shall occur hereunder or under any of the other Loan Documents, Lender may, without notice or demand on Borrower or any Affiliates of Borrower, at its option: (i) withdraw any or all of the funds (including, without limitation, interest) then remaining in the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, reasonable attorneys' fees, costs and expenses) to the

Loan or any other obligations of Borrower under the other Loan Documents in such manner as Lender shall deem appropriate in its sole discretion, (ii) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code, including, without limitation, those with respect to the Reserves and/or (iii) exercise any other remedies available at law or in equity. Borrower shall execute any and all documents or agreements, and take such actions, as Lender in its good faith deems necessary or advisable to ensure that Lender shall at all times retain a first-priority perfected security interest in each of the Reserves. Lender shall have no obligation to advance funds from any of the Reserves if a Default or an Event of Default exists. Lender may (but shall not be obligated to) cause funds in the Reserves (other than the Tax and Insurance Reserve) to be deposited into interest bearing accounts of the type customarily maintained by Lender or its servicing agent for the investment of similar reserves, which accounts may not yield the highest interest rate then available. Interest payable on such amounts shall be computed based on the daily outstanding balance of the applicable Reserve (other than the Tax and Insurance Reserve), such interest shall be retained by Lender and accumulated for the benefit of Borrower and added to the balance in the applicable Reserve (other than the Tax and Insurance Reserve) and shall be disbursed for payment of the items for which other funds in the applicable Reserve are to be disbursed.

(e)    Required Work.    Any improvements required to be performed under this Agreement or paid for under this Agreement ("Required Work") (including, without limitation, all work required under Section 9.12 hereof and all work paid for or required to be performed under or funded from a Reserve) shall be completed in a lien-free and good and workmanlike manner as soon as practicable in substantial accordance with the Approved Plans and Specifications and in strict compliance with the term of any applicable Lease. Without limitation, all work to be all Required Work shall comply with all applicable laws, ordinances, rules and regulations of all Governmental Authorities having jurisdiction over the Property and applicable insurance requirements, including applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters. Borrower agrees that all materials contracted or purchased for construction of the Property and all labor hired or contracted for with respect to any construction and paid for with proceeds of the Loan will be used and employed solely on the Property and for no other purpose. Without limitation of the foregoing, Borrower shall cause all of the capital improvement work (as shown on the Approved Budget (if any)) to be completed pursuant to the terms herein within the time frames set forth in Exhibit C attached hereto (if any). Failure to timely complete each such work (if any) shall constitute an Event of Default.

(f)    Termination Payments.    Any of the following items received by Borrower shall be delivered to Lender or deposited into a Reserve established and/or designated by Lender: (i) lease rejection, termination, surrender or cancellation payments (including in any bankruptcy case) or lease buy-out or surrender payments from any tenant (including any payment relating to unamortized tenant improvements and/or leasing commissions), forfeited security deposits, proceeds from letters of credits or similar payoffs received by Borrower, (ii) any settlements of claims of Borrower against third parties in connection with any Lease, (iii) any holdover rents or use and occupancy fees from any tenant or former tenant (to the extent not being paid for use and occupancy or holdover rent) and (iv) any other extraordinary event pursuant to which Borrower receives payments or income derived from or generated by the use, ownership or operation of the Property not otherwise covered by this Agreement or the other Loan Documents shall be deposited into the Reserve designated by Lender.

## 2.4    ADDITIONAL RESERVES.

(a)    Tax and Insurance Impounds.    Tax and insurance reserves shall be maintained by a monthly deposit (on each Payment Date (as defined in the Note)) by Borrower of one-twelfth ($1/12^{th}$) of the annual real property taxes and assessments for the Property and one-twelfth ($1/12^{th}$) of the annual insurance premiums payable for the Property, each as reasonably estimated by Lender (the "Tax and Insurance Reserve"). Notwithstanding the foregoing, on the Effective Date, the Tax and Insurance Reserve

shall be funded in an amount which, when the required monthly payments are added thereto, will be sufficient to pay such charges when due. Borrower shall provide to Lender a copy of the applicable invoices at least ten (10) Business Days prior to when due. If Lender at any time determines that any amounts paid into the Tax and Insurance Reserve are insufficient for the payment in full of such taxes, assessments, levies and/or insurance premiums, Lender shall notify Borrower of the increased amounts required to pay all amounts due, whereupon Borrower shall pay (or cause to be paid) to Lender within ten (10) Business Days thereafter the additional amount as stated in Lender's notice.

So long as no Default or Event of Default has occurred and is continuing, all sums in the Tax and Insurance Reserve shall be held by Lender in the Tax and Insurance Reserve to pay annual real property taxes and assessments for the Property when necessary so that the maximum tax discount available may be obtained with regard to the Property and to pay insurance premiums for the Property in one installment before the same become delinquent. Borrower shall be responsible for ensuring the receipt by Lender, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and statements for all real property taxes and assessments and insurance premiums to be paid from the Tax and Insurance Reserve, and, so long as no Event of Default hereunder or under any other Loan Document has occurred and is continuing, Lender shall pay the governmental authority or other party entitled thereto directly, to the extent funds are available for such purpose in the Tax and Insurance Reserve. In making any payment from the Tax and Insurance Reserve, Lender shall be entitled to rely on any bill, statement or estimate procured from any public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof. The Tax and Insurance Reserve shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Lender's option and in Lender's discretion, may either be held in a separate account or be commingled by Lender with the general funds of Lender or Lender's loan servicer. Interest (if any) on the funds contained in the Tax and Insurance Reserve shall accrue for the benefit of and belong to Lender and shall be paid immediately to Lender. No interest on funds contained in the Tax and Insurance Reserve shall be paid by Lender to Borrower. The Tax and Insurance Reserve is solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment of taxes, assessments and insurance premiums following receipt of bills, invoices or statements therefor in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. Upon assignment of the Loan by Lender, any funds in the Tax and Insurance Reserve shall be turned over to the assignee and any responsibility of Lender, as assignor, with respect thereto shall terminate. If the total funds in the Tax and Insurance Reserve shall exceed the amount of payments actually applied by Lender for the purposes of the Tax and Insurance Reserve, such excess shall, at the option of Lender, either be credited by Lender on subsequent payments to be made hereunder or refunded to Borrower. If, however, the Tax and Insurance Reserve shall not contain sufficient funds to pay the sums required when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Lender the full amount of any such deficiency. If Borrower shall fail to deposit with Lender the full amount of such deficiency as provided above, such failure shall constitute an Event of Default and, without limiting Lender's other rights and remedies by reason thereof, Lender shall have the option, but not the obligation, to make such deposit and all amounts so deposited by Lender, together with interest thereon at the Default Interest Rate from the date deposited by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. If there is an Event of Default, Lender may, but shall not be obligated to, to the extent permitted by law, apply at any time the balance then remaining in the Tax and Insurance Reserve against the indebtedness secured by the Security Instrument in whatever order Lender shall subjectively determine. No such application of the Tax and Insurance Reserve shall be deemed to cure any Default or Event of Default hereunder. Upon full payment of the indebtedness secured hereby in accordance with its terms or at such earlier time as Lender may elect,

the balance of the Tax and Insurance Reserve then in Lender's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

**2.5**    **DISTRIBUTION OF CASH FLOW.**

(a)    Provided that no Event of Default has occurred and is continuing, Borrower shall cause all Gross Operating Income to be applied on a monthly basis for the following purposes and in the following order of priority:

(i)    First, to establish and fund the Tax and Insurance Reserve;

(ii)    Next, the balance, if any, to Lender to make the monthly interest payments due and payable on the Loan;

(iii)    Next, the balance, if any, to establish and fund any other Reserves to be funded by Borrower hereunder;

(iv)    Next, the balance, if any, to Lender for the payment of any other amounts then due and payable under the Loan Documents;

(v)    Next, the balance, if any, to the payment of the Permitted Operating Expenses;

(vi)    Finally, the balance, if any, to Borrower in accordance with the Loan Documents.

SUBJECT TO THE PROVISIONS OF SECTION 3 OF THE NOTE, IN THE EVENT THAT GROSS OPERATING INCOME SHALL NOT BE SUFFICIENT TO ENABLE BORROWER TO MAKE ANY OF THE PAYMENTS DESCRIBED IN SUBPARAGRAPHS (i) THROUGH (iv) ABOVE, BORROWER SHALL NOT BE RELIEVED OF ITS OBLIGATIONS TO MAKE SUCH PAYMENTS.

(b)    Notwithstanding the foregoing, upon the occurrence of an Event of Default, Borrower shall have no right to apply Gross Operating Income for any purpose without Lender's prior written approval, and Lender shall have all of the remedies available to it pursuant to this Agreement, the other Loan Documents and Applicable Laws.

**ARTICLE 3.**
**DISBURSEMENT**

**3.1**    **CONDITIONS PRECEDENT TO DISBURSEMENTS**.

3.1.1    Lender's obligation to make the initial disbursement under the Loan Documents shall be subject to satisfaction of following conditions precedent by not later than the date hereof:

(a)    <u>No Default or Event of Default</u>.  There exists no Default or Event of Default.

(b)    <u>Loan Documents</u>. Lender shall have received all Loan Documents, other documents, instruments, policies, and forms of evidence or other materials requested by Lender under the terms of this Agreement or any of the other Loan Documents.

(c)    Security Instrument. The Security Instrument is a valid lien upon the Property and is prior and superior to all other liens and encumbrances thereon except those approved by Lender in writing.

(d)    Representations and Warranties True at Closing.  The representations and warranties contained in Article 6 of this Agreement or otherwise made by or on behalf of Borrower in any of the Loan Documents or in any certificate, written statement or other writing given in connection with the Loan (including, but not limited to, all financial and operating statements) shall be true and correct in all material respects on and as of the Effective Date with the same effect as if made at such time.

(e)    Performance.  Borrower shall have performed and complied with all agreements and conditions contained herein required to be performed and complied with by Borrower prior to or on the Effective Date.

(f)    Reports, Studies and Permits. Lender shall have received and approved in form and substance reasonably satisfactory to Lender: (i) a report of the physical condition of the Property; (ii) copies of all agreements which were material to completion of the Improvements; (iii) copies of all building permits and similar permits, licenses, approvals, zoning and land use approval, development agreements and other authorizations of governmental agencies, if any, required in connection with the development of the Property; and (iv) copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by or with any governmental agency in connection with the Property.

(g)    Environmental Matters.  Lender shall have received the Environmental Report in form and substance reasonably satisfactory to Lender from an independent, licensed environmental engineer approved by Lender, certifying to Lender that the Property is free from any Hazardous Substances, except for such uses which are in compliance with Environmental Laws.  Such report shall be addressed directly to Lender or, if such report is not addressed to Lender, Borrower shall obtain reliance letters satisfactory to Lender.

(h)    Structural Engineering Report.  Lender shall have received and approved from an independent, licensed engineer reasonably acceptable to Lender, a report (the "Structural Engineering Report") certifying to Lender that the Property is structurally sound and is in good order and repair, identifying, among other things, any deferred maintenance for the Property and the cost thereof, providing a 10-year schedule of anticipated capital expenditures and the per annum costs thereof, and setting forth recommendations of remedial repairs, capital improvements and replacements which should be undertaken.

(i)    Earthquake Report.  To the extent required by Lender, Lender shall have received and approved from an independent, licensed engineer reasonably acceptable to Lender, a report stating the probable maximum loss to the Property resulting from seismic events.  The report shall include, but shall not be limited to, a soil analysis, structural analysis, and soil-structure interaction analysis, proximity to known faults and seismic history.

(j)    Title Insurance.  The Title Company shall be irrevocably committed to issue to Lender the Title Policy which shall include extended coverage policies of title insurance, together with such endorsements as required by Lender, in the amount of the Loan (or other amount approved by Lender) and issued by Title Company, with such reinsurance or co-insurance as may be required by Lender, in form and substance satisfactory to Lender insuring that Borrower is the owner of the Property, and that the Security Instrument creating the insurable interest of Lender under the Title Policy is a valid first lien on the Property encumbered thereby, in favor of Lender, its successors and assigns, as the insured, free and clear of all liens,

encumbrances and exceptions to title whatsoever, other than encumbrances approved in writing by Lender prior to the Effective Date.

(k)     Survey.  Borrower shall have furnished to Lender two (2) copies of an acceptable survey by an independent, registered surveyor reasonably satisfactory to Lender, certified to Lender, its successors and assigns, and the Title Company as correct and as having been made in accordance with the most recent standards for "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM (the "Survey").

(l)     Insurance.  Borrower shall have delivered to Lender the policies of insurance (or certificates) as required by Article 5 of this Agreement, and shall have delivered evidence reasonably satisfactory to Lender of the payment of all premiums payable for the existing period of such policies.

(m)     Consents, Licenses, Permits and Approvals.  Borrower shall have furnished to Lender copies of, or other evidence satisfactory to Lender establishing that Borrower has obtained, all consents, licenses, permits and approvals from any and all governmental authorities having jurisdiction over Borrower and/or the Property, which are required in connection with the Property and the Improvements and/or the execution, delivery and performance by Borrower under, and the validity and enforceability of, the Loan Documents, and all such consents, licenses, permits and approvals shall be in full force and effect, and written proof that any and all corporate, partnership and limited liability company action necessary to enable Borrower to enter into the financing transactions contemplated by this Agreement shall have been obtained and/or taken by Borrower (including, without limitation, any required consents of any partners, members and/or shareholders).

(n)     REAs, CCRs.  Lender shall have received copies of any reciprocal easement agreements, development agreements, covenants, conditions and restrictions or similar agreements affecting the Property and each and all of the same shall be reasonably satisfactory in form and substance to Lender.

(o)     Financial Statements.  Lender shall have received originally signed and dated financial statements, balance sheets, and tax returns from Borrower, and each Guarantor, and any other financial information relating to the Property requested by Lender, including, without limitation, income and expense statements.

(p)     Payment of Fees and Expenses.  Borrower shall have paid to Lender, on or before the Effective Date, the Loan Commitment Fee and the Lender Expenses.

(q)     Leases and Tenant Estoppels.  Borrower shall have provided Lender with (i) copies of all signed Leases and any amendments and lease guarantees for the Property; (ii) [intentionally omitted]; (iii) a current itemized and certified rent roll for the Property; and (iv) a tenant estoppel certificate, which at Borrower's election, may be delivered within thirty (30) days of the Effective Date) and subordination and non-disturbance agreement executed by all tenants of Major Leases of the Property, in each case respecting the underlying lease related thereto, in form, substance and scope satisfactory to Lender in its sole discretion (in which, without limiting the generality of the foregoing, the applicable tenant shall certify, represent and warrant to Lender that, among other things, each such Lease is in effect in accordance with its terms, and that there are no existing defaults under any of the Leases).

(r)     Lien Search Reports.  Lender shall have received satisfactory reports of UCC, federal tax lien, state tax lien, bankruptcy, judgment and pending litigation searches conducted by a search firm reasonably acceptable to Lender (collectively, the "UCC Searches").  Such UCC Searches shall have been received in relation to Borrower and Guarantor.

(s)     No Injunction.  No law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the good faith judgment of Lender would enjoin, prohibit or restrain, or impose or result in an adverse effect upon the making or repayment of the Loan or the consummation of the transactions contemplated by the Loan Documents.

(t)     Material Contracts.  Borrower shall have delivered to Lender a copy of all Material Agreements and Operating Agreements relating to the Property, including without limitation, the Property Management Agreement.  In addition, if required by Lender, Borrower shall obtain estoppels and other customary agreements with any third parties under such Material Agreements and Operating Agreements.

(u)     Site Inspection.  Lender shall have performed, or caused to be performed on its behalf, an on-site due diligence review of the Property satisfactory to Lender in Lender's sole discretion.

(v)     Subdivision.   Lender shall have received evidence satisfactory to Lender (including title endorsements) that the Real Property comprising the Property constitutes a separate lot for real estate tax and assessment purposes.

(w)     No Material Adverse Change.  Since the date financial reports were delivered to Lender, there shall have been no material adverse change in the financial condition or business of Borrower or Guarantor nor any material decline in the condition or market value of the Property, each as determined by Lender in its sole discretion.

(x)     Underwriting and Due Diligence.  Lender shall have satisfactorily completed its underwriting and due diligence with respect to the Loan, Borrower, the partners, joint venturers or members of Borrower, each Guarantor, and the Property, including, without limitation, any title, survey, insurance, tenant estoppel letters, lease abstracts, environmental reports, structural reports, and financial statements relating to the Property, and Lender shall have completed such other real estate and legal due diligence investigations as Lender deems necessary, and such review and investigations shall provide Lender with resulting information which, in Lender's sole discretion, is satisfactory to permit Lender to enter into this Agreement and to make the Loan.

(y)     Budgets.  Lender shall have reviewed and approved capital improvement and operating budgets for the Property, and Borrower's proposed sources and uses of funds for the Loan proceeds, together with a detailed timeline for completion of the capital improvements or renovations (if any) contemplated for the Property.

(z)     Affiliate Fees.  Borrower shall have disclosed to Lender, and Lender shall have approved, all fees, commissions and other amounts (collectively, "Affiliate Fees") which have been or will be reimbursed or paid to or paid on behalf of Borrower, any Guarantor or any Affiliate thereof in connection with the acquisition or financing of the Property, including, without limitation, amounts paid by the Seller or any affiliate of the Seller.  All Affiliate Fees shall be deducted from the calculation of the capitalization costs of the financing transaction contemplated by this Agreement for determining the maximum principal amount of the Loan and Borrower's required equity contribution.  Without limitation on the foregoing, all Affiliate Fees shall be subordinate to the Loan and shall be terminable by Lender in the event of the occurrence of an Event of Default.

(aa)    [Omitted].

(bb)    Charter Documents.  Lender shall have received from Borrower and Guarantor, certified copies of all organizational documents relating to such Person (other than a natural Person) as

Lender may request, including, but not limited to, all partnership or operating agreements evidencing the organization, existence and authority of Borrower and such other corporate, partnership and limited liability company documents with respect to Borrower and its constituent entities as Lender shall require, including evidence of authorization and incumbency of all Persons executing the Loan Documents on behalf of Borrower, good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the execution, delivery and performance of the Loan Documents, and incumbency certificates.

           (cc)    <u>Additional Matters</u>. Lender shall have received such other permits, certificates (including certificates of occupancy reflecting the use of the Property as of the Effective Date), opinions, documents and instruments (including without limitation, written proof from the appropriate Governmental Authority regarding the zoning of the Property) in form and substance reasonably acceptable to Lender relating to the Loan as may have been requested by Lender and all other documents and all legal matters in connection with the Loan shall be reasonably satisfactory in form and substance to Lender.

    3.1.2    The obligation of Lender to make any disbursement under the Loan of all or a portion of the Reserves under <u>Section 2.4</u> is subject to the satisfaction of the following additional conditions precedent as of the date of any such disbursement:

           (a)    <u>Disbursement Request</u>. Lender shall have received a written request for disbursement submitted in accordance with <u>Section 2.3</u> of this Agreement, which shall provide a detailed description of the uses of the proceeds of such disbursement;

           (b)    <u>Use of Proceeds; Disbursement Schedule</u>. The proceeds of the disbursement are solely for uses permitted under this Agreement including the disbursement schedule contained in the approved any Capital Improvement Budget and/or the Approved Budget; and Borrower shall have satisfied any other specific conditions herein for use of the Loan proceeds to be disbursed to Borrower;

           (c)    <u>Representations and Warranties</u>. All of the representations and warranties of Borrower contained in this Agreement or in any other Loan Document shall be true and correct in all material respects as though made on and as of such date;

           (d)    <u>No Event of Default</u>. No Default or Event of Default shall have occurred and be continuing or would result from the making of such disbursement;

           (e)    <u>Application of Gross Operating Income</u>. Borrower shall have applied all Gross Operating Income in accordance with the <u>Section 2.5</u> hereof and shall provide evidence reasonably satisfactory to Lender evidencing such application;

           (f)    <u>No Material Adverse Change</u>. No change shall have occurred in Borrower, the Property or any other Collateral which has a material adverse effect upon the value of the Collateral or the right or ability of Lender to receive payment in full of all amounts payable by Borrower to Lender under this Agreement or the other Loan Documents;

           (g)    <u>Title Policy</u>. The lien of the Security Instrument shall continue to be insured by the Title Policy as a senior priority lien against the Property and Lender shall receive any endorsements to the Title Policy required by Lender in connection therewith (including any endorsement required to increase the amount of coverage to reflect such disbursement);

           (h)    <u>Affirmation</u>. If required by Lender, each Guarantor shall have reaffirmed in writing to Lender all of its obligations under the Guaranty;

(i)       Fees and Costs. All out-of-pocket fees and expenses payable to Lender (or other fees and expenses due and payable hereunder), to the extent then due and payable, shall have been (or contemporaneously are being) paid in full and all title premiums and other title and survey charges shall have been (or contemporaneously are being) paid in full;

(j)       Lender shall have received such other documents or items as Lender or its counsel may require in their good-faith discretion.

(k)       Lender, at its option and without further direction from Borrower, may disburse any improvements payment to the Person to whom payment is due or through an escrow satisfactory to Lender or directly to Borrower for payment to such Persons. Borrower hereby irrevocably directs and authorizes Lender to so advance the proceeds of the Loan. All sums so advanced shall constitute advances of the Loan and shall be secured by the Loan Documents.

## ARTICLE 4.
### [OMITTED]

## ARTICLE 5.
### INSURANCE

Borrower shall at all times keep the improvements now existing or hereafter erected on the Property insured against all losses, hazards, casualties, liabilities and contingencies as Lender shall require and in such amounts and for such periods as Lender shall require. Borrower shall purchase and maintain the following policies of insurance with respect to the Property in form and substance satisfactory to Lender as follows:

**5.1       PROPERTY INSURANCE**. Property insurance covering loss or damage by fire, lightning, water, wind and such other perils as are included in a standard "special causes of loss form" property insurance policy in an amount no less than one hundred percent (100%) of the replacement cost (including cost of demolition, increased costs to repair or rebuild the Property to comply with current building, zoning or land use ordinance or law, and debris removal) of all real and personal property, including tenant improvements, twelve (12) months of gross rental income or business income with not less than an additional ninety (90) day period of extended indemnity coverage, and including such other endorsements as Lender may reasonably require, insuring against damage to the Property in an amount acceptable to Lender. The loss valuation clause of the policy shall be replacement cost value. The deductible under such policy shall not exceed $25,000. This policy shall contain ordinance or law coverage, including loss to undamaged parts of the building to the full building damage limit of the policy and with demolition and increased cost of construction insured to limits in an amount acceptable to Lender. The policy shall contain a standard mortgagee insurance clause and a Lender's Loss Payable Endorsement or clause (ISO form CP 12 18 or equivalent) with Lender named on the policy as both mortgagee and loss payee.

**5.2       BOILER AND MACHINERY INSURANCE.** Boiler and machinery (or equipment breakdown) insurance, in an amount which is no less than twenty percent (20%) of the sum of the one hundred percent (100%) replacement cost value of the Property, or such other amount agreed by Lender, plus an amount equivalent to the annual Gross Operating Income for the Property, covering the mechanical breakdown of boilers, air conditioning equipment and other machinery and equipment in an amount deemed necessary by Lender. The loss valuation clause of the policy shall be replacement value.

**5.3** **FLOOD INSURANCE.** Flood insurance if the Property lies within Flood Zones A or V, or if otherwise deemed necessary by Lender, in a form and with insured limits and deductibles acceptable to Lender.

**5.4** **EARTHQUAKE INSURANCE.** If the Property is in an area prone to geological phenomena, including, but not limited to, sinkholes, or mine subsidence, earth movement or earthquake, insurance covering such perils with insured limits and deductibles acceptable to Lender. This policy shall include ordinance or law coverage as shown above in Section 5.1. The loss valuation clause of the policy shall be replacement cost.

**5.5** **TERRORISM INSURANCE.** As required by Lender, Borrower shall provide evidence of insurance covering loss from acts of terrorism.

**5.6** **LIABILITY INSURANCE.** Commercial General Liability insurance with limits no less than $5,000,000 each occurrence and $5,000,000 in the aggregate for any policy year with Lender included as an additional insured with the coverage primary and non-contributory to any other valid and collectible insurance. The use of a combination of primary and excess liability insurance policies shall be permitted in order to maintain the required limits of liability insurance. All liability insurance policies must provide for claims to be insured on an occurrence basis. All liability policies shall include coverage of a broad form standard, including, but not limited to, explosion, collapse and underground property damage (x,c,u), completed operations, broad form contractual liability, broad form property damage and personal injury coverage.

**5.7** **CONSTRUCTION.** During any period of construction, reconstruction, renovation or alteration of the Property at a cost in excess of 10% of the stated amount of the Note, Borrower shall maintain at Borrower's sole expense, with licensed insurers approved by Lender, the following policies of insurance in form and substance satisfactory to Lender:

(a)     Builder's Risk Insurance coverage in any amount equal to 100% of the completed value replacement cost of all improvements to be constructed, written on a Causes of Loss – Special Form or its equivalent, in a non-reporting completed value form. The loss valuation clause of the policy shall be replacement cost value. Coverage shall be extended to insure project soft costs to include 100% of the cost during the construction term of construction loan interest, taxes and insurance and shall insure loss of income or rents in an amount equivalent to the gross income or loss of rents for an indemnity period of no less than twelve months. Any exclusion for loss or damage to existing structures shall be removed from the policy. The policy shall contain a basic perils deductible no greater than $25,000. Coverage shall permit for partial occupancy by Borrower and shall insure all construction materials and supplies on the construction site, stored off-site and while in transit. The policy shall include coverage of ordinance or law perils as shown above in Section 5.1 and of equipment breakdown perils as shown above in Section 5.2;

(b)     Borrower shall require of its contractor, and contractor shall purchase and maintain, (1) general liability insurance with limits of $3,000,000 each occurrence / $3,000,000 annual aggregate with Lender and Borrower included as additional insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $1,000,000 per occurrence. Borrower shall require of the sub-contractors, and sub-contractors shall purchase and maintain, (1) general liability insurance with limits of $1,000,000 each occurrence / $1,000,000 annual aggregate with Lender and Borrower included as additional insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $1,000,000 per occurrence.

**5.8** **GENERAL**. All insurance policies contemplated by Section 5.1 hereof shall name Borrower as the insured. All premiums on insurance policies shall be paid in full. Borrower shall provide the Lender certified copies of all required insurance policies, or other evidence which is reasonably acceptable to Lender. Property insurance certificates shall be issued using the ACORD 28 form. All insurance policies shall provide that the insurance shall not be cancelable or materially changed without thirty (30) days prior written notice to Lender. All policies, other than liability insurance policies, shall not contain any co-insurance clause or such clause shall be removed by an "agreed amount" endorsement. Lender shall be named under a Lender's Loss Payable Endorsement (ISO form CP 12 18 or equivalent) and as mortgagee with a standard form mortgagee clause applying on all non-liability insurance policies which Borrower maintains with respect to the Property and Improvements. Borrower shall provide to Lender evidence, in a form as is reasonably required by Lender, of any other hazard insurance Lender may reasonably deem necessary at any time during the Loan. Without limitation on the foregoing, all policies shall be insured by a licensed insurance company or companies with a rating of A- VIII or better by A.M. Best Co. and shall contain deductibles not in excess of five percent (5%) of the policy limits.

## ARTICLE 6.
### REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender's entry into this Agreement, Borrower represents and warrants to Lender as of the Effective Date (and as of the date of any additional advances hereunder) and continuing thereafter that:

**6.1** **AUTHORITY/ENFORCEABILITY**. Borrower is in compliance with all laws and regulations applicable to its organization, existence and transaction of business and has all necessary rights and powers to own, develop and operate the Property and Improvements as contemplated by the Loan Documents.

**6.2** **BINDING OBLIGATIONS**. Borrower is authorized to execute, deliver and perform its obligations under the Loan Documents, and such obligations shall be valid and binding obligations of Borrower.

**6.3** **FORMATION AND ORGANIZATIONAL DOCUMENTS**. Borrower has delivered to Lender all formation and organizational documents of Borrower and of the managing member, partners, joint venturers or members of Borrower, if any, and of all Guarantors other than Guarantors which are natural persons, if any, and all such formation and organizational documents remain in full force and effect and have not been amended or modified since they were delivered to Lender. As of the date hereof, the organizational chart set forth as Schedule I hereto accurately sets forth the ownership structure of Borrower and its Affiliates. A true, correct and complete copy of the Certificate of Formation, or equivalent thereof, of Borrower filed with the Delaware Secretary of State on December 23, 2014, pursuant to which Borrower was formed, along with the Operating Agreement for Borrower dated as of December 12, 2017, have been delivered to Lender, have not been amended, are in full force and effect, and all required filings with applicable authorities have been made with respect to Borrower. Borrower shall promptly provide Lender with copies of any amendments or modifications of the formation or organizational documents of Borrower and any Guarantor.

**6.5** **NO VIOLATION**. Borrower's execution, delivery, and performance under the Loan Documents do not: (a) require any consent or approval not heretofore obtained under any partnership agreement, operating agreement, articles of incorporation, bylaws or other document; (b) violate any Applicable Laws; or (c) conflict with, or constitute a breach or default or permit the acceleration of obligations under any agreement, contract, lease, or other document by which the Borrower is or the Property and Improvements are bound or regulated.

**6.6** **COMPLIANCE WITH LAWS**. Borrower has obtained, and at all times shall have obtained all permits, licenses, exemptions, and approvals necessary to construct, occupy, operate and market the Property and Improvements in accordance with the Approved Budget, and shall maintain compliance with all Applicable Laws. The Property is a legal parcel lawfully created in full compliance with all subdivision laws and ordinances.

**6.7** **LITIGATION**. Except as disclosed to Lender in writing, there are no claims, actions, suits, or proceedings pending, or to Borrower's knowledge threatened, against Borrower or any Guarantor affecting the Property or Improvements.

**6.8** **FINANCIAL CONDITION**. All financial statements and information heretofore and hereafter delivered to Lender by Borrower, including, without limitation, information relating to the financial condition of Borrower, the Property, the Improvements, the partners, joint venturers or members of Borrower, each Guarantor, fairly and accurately represent the financial condition of the subject thereof in all material respects and have been prepared (except as noted therein) in accordance with GAAP (or such other prudent accounting principles reasonably acceptable to Lender) consistently applied. Borrower acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

**6.9** **NO MATERIAL ADVERSE CHANGE**. There has been no material adverse change in the financial condition of Borrower and/or Guarantor since the dates of the latest financial statements furnished to Lender and, except as otherwise disclosed to Lender in writing, Borrower has not entered into any material transaction which is not disclosed in such financial statements.

**6.10** **ACCURACY**. All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or security for the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any misrepresentation or omission.

**6.11** **TAX LIABILITY**. Borrower has filed all required federal, state, county and municipal tax returns and has paid all taxes and assessments owed and payable, and Borrower has no knowledge of any basis for any additional payment with respect to any such taxes and assessments.

**6.12** **COMPLIANCE**. Borrower is familiar with and in compliance with all governmental requirements for the development, ownership and operation of the Property and construction of the Improvements and will conform to and comply with all governmental requirements and any Approved Plans and Specifications relating to any construction.

**6.13** **ERISA**.

(a) Borrower is not an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code), and neither the execution of this Agreement nor the making of the Loan gives rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.

(b) Borrower is not (i) an employee benefit plan (as defined in Section 3(3) of ERISA), (ii) a plan as defined in Section 4975(e)(1) of the Code, which is subject to Section 4975 of the Code, or (iii) an entity whose underlying assets constitute "plan assets" of any such employee benefit plan or plan for purposes of Title I of ERISA or Section 4975 of the Code.

**6.14**   **BUSINESS LOAN.** The Loan is a business loan transaction in the stated amount solely for the purpose of carrying on the business of Borrower and none of the proceeds of the Loan will be used for the personal, family or agricultural purposes of the Borrower.

**6.15**   **PROPERTY MANAGEMENT AGREEMENT.** The Property is not subject to any agreement which provides for the management, leasing and/or operation of the Property or Improvements and Borrower shall not enter into any such agreement without Lenders prior written consent.

**6.16**   **MATERIAL AGREEMENTS.**

(a)   Borrower has not entered into, and is not bound by, any Material Agreement which continues in existence, except those previously disclosed in writing to Lender.

(b)   Each of the Material Agreements is in full force and effect, there are no monetary or other defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no monetary or other defaults thereunder by any other party thereto. None of Borrower or any other Person acting on Borrower's behalf has given or received any notice of default under any Material Agreement that remains outstanding or in dispute.

(c)   Borrower has delivered true, correct and complete copies of the Material Agreements (including all amendments and supplements thereto) to Lender.

(d)   No Material Agreement or Operating Agreement has as a party which is an Affiliate of Borrower.

**6.17**   **LEASES.** The rent roll attached hereto as Exhibit F hereto is true, complete and correct and the Property is not subject to any Leases or occupancy agreements other than as described in such Exhibit F (and without limitation, there are no agreements or documents affecting any of the Leases except as expressly listed on such Exhibit F). To Borrower's knowledge, the Leases identified on Exhibit F are in full force and effect and there are no defaults thereunder by either party (except as disclosed in the rent roll). The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto. Except as disclosed by the rent roll, no rent (including security deposits) has been paid more than one (1) month in advance of its due date. All work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable tenant. Any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any tenant has already been received by such tenant (except as disclosed in the rent roll). The tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises and have commenced the payment of rent under the Leases.

**6.18**   **PATRIOT ACT AND RELATED MATTERS.** Borrower and Guarantor shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting Borrower, the Property, or the use thereof, including, without limitation, Prescribed Laws (collectively, "Applicable Laws"). The term "Prescribed Laws" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "Patriot Act"), (b) OFAC Laws and Regulations (as defined below), (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. and (d) all other legal requirements relating to money laundering or terrorism. Lender shall have the right to audit Borrower's compliance with the Prescribed Laws. Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that each of Borrower and the Property complies with all Prescribed Laws or is exempt from compliance with Prescribed Laws. "OFAC Laws and Regulations" means any lists, laws, rules, sanctions and regulations maintained by the

United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") pursuant to any authorizing statute, Executive Order No. 13224 (September 23, 2001) and any related enabling or implementing executive orders or regulation, including the Trading with the Enemy Act, 50 U.S.C. App. 1-44, as amended from time to time, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, as amended from time to time, the unrepealed provisions of the Iraqi Sanctions Act, Pub. L. No. 101-513; United Nations Participation Act, 22 U.S.C. § 287c, as amended from time to time, the International Security and Development Cooperation Act, 22 U.S.C. § 2349 aa 9, as amended from time to time, The Cuban Democracy Act, 22 U.S.C. §§ 6001-10, as amended from time to time, The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 2339b, as amended from time to time, and The Foreign Narcotics Kingpin Designation Act, Pub. L. No. 106-120, as amended from time to time.

**6.19** **NO BANKRUPTCY**. No bankruptcy or insolvency proceedings are pending or contemplated by Borrower or, to the best knowledge of Borrower, against Borrower or by or against any endorser or cosigner of the Note, or any guarantor or indemnitor under any guaranty or indemnity agreement executed in connection with the Note or the loan evidenced thereby and secured hereby.

**6.20** **NOT FOREIGN PERSON**. Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations, including temporary regulations.

### ARTICLE 7.
### HAZARDOUS MATERIALS

**7.1** **SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS**.

(a) Borrower hereby represents and warrants to Lender that, as of the date hereof, to the best of Borrower's knowledge and except as disclosed to Lender in writing prior to the Effective Date: (i) the Property is not in material violation of any local, state or federal law, rule or regulation pertaining to environmental regulation, contamination or clean-up (collectively, "Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq. and 40 CFR §302.1 et seq.), as amended by the Superfund Amendments and Reauthorization Act of 1986; the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq. and 40 CFR § 116.1 et seq.); those relating to Lead Based Paint (as defined below); the Hazardous Materials Transportation Act (49 U.S.C. §1801 et seq.); the Clean Air Act, 42 U.S.C. §7401 et seq; the Toxic Substances Control Act; 15 U.S.C. §2601 et seq; the Safe Drinking Water Act) (42 U.S.C. §300f et seq); the Texas Water Code §§26.001 et. seq. (including but not limited to §26.346); and the Texas Health & Safety Code §§361.001 et. seq.; and the regulations promulgated pursuant to said laws, all as same may have been or may be amended relating to or affecting the Property, any portion thereof, whether or not caused by or within the control of Borrower; (ii) to the best of Borrower's knowledge, no hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls, petroleum products, flammable explosives, radioactive materials, infectious substances or raw materials which include hazardous constituents), paint containing more than 0.5% lead by dry weight ("Lead Based Paint") or any other substances or materials which are included under or regulated by Environmental Laws, or any mold (collectively, "Hazardous Substances"), are located on or have been handled, generated, stored, processed or disposed of on or released or discharged from the Property (including underground contamination) except for those substances used by Borrower in the ordinary course of Borrower's business and in compliance with all Environmental Laws; (iii) the Property is not subject to any private or governmental lien or judicial or administrative notice or action relating to Hazardous Substances; (iv) to the best of Borrower's knowledge, there are no existing or closed underground storage tanks or other underground storage receptacles for Hazardous Substances on the Property; (v) Borrower has received no written notice

of and, to the best of Borrower's knowledge, there exists no investigation, action, proceeding or claim by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of the Property nor does Borrower know of any basis for such a claim; and (vi) Borrower has received no notice of and, to the best of Borrower's knowledge, there has been no claim by any party that any use, operation or condition of the Property has caused any nuisance or any other liability or adverse condition on any other property nor does Borrower know of any basis for such a claim.

(b)  Borrower shall keep or cause the Property to be kept free from Hazardous Substances (except those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws), shall not install or use any underground storage tanks, shall expressly prohibit the use, generation, handling, storage, production, processing and disposal of Hazardous Substances (except those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws), and, without limiting the generality of the foregoing, so long as this Agreement continues in effect, shall not install in the Improvements or permit to be installed in the Improvements asbestos or any substance containing asbestos.

(c)  Borrower shall immediately notify Lender if Borrower shall become aware of the possible existence of (i) any Hazardous Substances on the Property (except those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws), or other potential environmental problem or liability, with respect to the Property, (ii) any lien, action or notice affecting the Property or Borrower resulting from any violation or alleged violation of the Environmental Laws, (iii) the institution of any investigation, inquiry or proceeding concerning Borrower or the Property pursuant to any Environmental Law or otherwise relating to Hazardous Substances, or (iv) the discovery of any occurrence, condition or state of facts which would render any representation or warranty contained in this Agreement incorrect in any respect if made at the time of such discovery or (v) that the Property is in violation of any Environmental Laws. Further, immediately upon receipt of the same, Borrower shall deliver to Lender copies of any and all orders, notices, permits, applications, reports, and other communications, documents and instruments pertaining to the actual, alleged or potential presence or existence of any Hazardous Substances at, on, about, under, within in connection with the Property. Borrower shall, promptly following written request thereof by Lender, at Borrower's sole cost and expense, and regardless of the source of contamination, take all actions as shall be reasonably necessary or advisable for the clean-up of any and all portions of the Property or other affected property, including, without limitation, all investigative, monitoring, removal, containment and remedial actions in accordance with all applicable Environmental Laws (and in all events in a manner reasonably satisfactory to Lender), and shall further pay or cause to be paid, at no expense to Lender, all clean-up, administrative and enforcement costs of applicable governmental agencies which may be asserted against the Property. In the event Borrower fails to do so, Lender may, but shall not be obligated to, cause the Property or other affected property to be freed from any Hazardous Substances or otherwise brought into conformance with Environmental Laws and any and all costs and expenses incurred by Lender in connection therewith shall be paid by Borrower within five (5) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice. In the event Borrower fails to pay such costs and expenses within five (5) days after such written notice from Lender, such costs and expenses, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable by Borrower on demand and shall be secured by this Agreement and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. In furtherance of the foregoing, Borrower hereby grants to Lender and Lender's agents and employees access to the Property during normal business hours and an irrevocable license to remove any items reasonably deemed by Lender to be Hazardous Substances and to do all things Lender shall deem necessary to bring the Property in conformance with Environmental Laws. Borrower covenants and agrees, at Borrower's sole cost and expense, to indemnify, defend, protect (at trial and appellate levels, and with attorneys, consultants and

experts reasonably acceptable to Lender), and hold Lender harmless from and against any and all present and future liens, damages, losses, liabilities, obligations, settlement payments, penalties, assessments, citations, directives, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, reasonable attorneys', reasonable consultants' and reasonable experts' fees and disbursements actually incurred in investigating, defending, settling or prosecuting any claim, litigation or proceeding) (collectively, "Costs") which may at any time be imposed upon, incurred by or asserted or awarded against Lender or the Property, and arising directly or indirectly from or out of: (i) the violation of any Environmental Laws relating to or affecting the Property, whether or not caused by or within the control of Borrower; (ii) the actual or alleged presence, release or threat of release of any Hazardous Substances now or hereafter, on, in, under or affecting all or any portion of the Property, regardless of whether or not caused by or within the control of Borrower; (iii) the failure by Borrower to comply fully with the terms and conditions of this Section 7.1; (iv) the breach of any representation or warranty contained in this Section 7.1; or (v) the enforcement of this Section 7.1(c), including, without limitation, the cost of assessment, containment and/or removal of any and all Hazardous Substances from all or any portion of the Property, the cost of any actions required to be taken under this Section 7.1 in response to the presence, release or threat of release of any Hazardous Substances on, in, under, within or otherwise affecting any portion of the Property to prevent or minimize such release or threat of release so that it does not migrate or otherwise cause or threaten danger to present or future public health, safety, welfare or the environment, and costs incurred to comply with the Environmental Laws in connection with all or any portion of the Property. The indemnity set forth in this Section 7.1(c) shall also include, without limitation, any diminution in the value of the security afforded by the Property or any future reduction in the sales price of the Property by reason of any matter set forth in this Section 7.1(c). Notwithstanding anything contained herein to the contrary, in no event shall Borrower be liable for or be obligated to indemnify Lender for Costs resulting solely from Lender's gross negligence or willful misconduct. Lender's rights under this Section 7.1(c) shall survive payment in full of the indebtedness secured hereby and shall be in addition to all other rights of Lender under this Agreement, the Note and the other Loan Documents.

(d)     Upon Lender's request, at any time and from time to time after the occurrence of an Event of Default hereunder or at such other time as Lender has reasonable grounds to believe that Hazardous Substances are or have been released, stored or disposed of on or around the Property or that the Property may be in violation of the Environmental Laws, Borrower shall provide, at Borrower's sole cost and expense, an inspection or audit of the Property prepared by a hydrogeologist or environmental engineer or other appropriate consultant reasonably approved by Lender indicating the presence or absence of Hazardous Substances on the Property or an inspection or audit of the Improvements prepared by an engineering or consulting firm approved by Lender indicating the presence or absence of friable asbestos or substances containing asbestos on the Property, as applicable. If Borrower fails to provide such inspection or audit within thirty (30) days after such request, without waiving any other rights or remedies of Lender by reason of Borrower's failure to do so, Lender may order the same, and Borrower hereby grants to Lender and Lender's employees and agents access to the Property during normal business hours and an irrevocable license to undertake such inspection or audit. The cost of such inspection or audit shall be paid by Borrower within five (5) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice. In the event Borrower fails to pay such cost within five (5) days after such written notice from Lender, such cost, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(e)     Reference is made to the Environmental Indemnity Agreement. The provisions of this Agreement and the Environmental Indemnity Agreement shall be read together to maximize the coverage with respect to the subject matter thereof, as determined by Lender; provided, however, the

obligations of the Indemnitors (as defined in the Environmental Indemnity Agreement) are not secured by the liens and security interests under this Agreement, as more fully set forth in the Environmental Indemnity Agreement.

(f)     Borrower agrees that if it has been, or if at any time hereafter it is, determined that the Property contains Lead Based Paint, on or before thirty (30) days following (i) the date hereof, if such determination was made prior to the date hereof or (ii) receipt of a an assessment report describing the location and condition of the Lead-Based Paint (a "Lead Based Paint Report") making such determination, if such determination is hereafter made, as applicable, Borrower shall, at Borrower's sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations, abatement and maintenance plan for the Lead Based Paint on the Property, which plan shall be prepared by an expert reasonably approved by Lender, and be in form, scope and substance reasonably acceptable to Lender (together with any Lead-Based Paint Report, the "O&M Plan") (If an O&M Plan has been prepared prior to the date hereof, Borrower agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof.)  Compliance with the O&M Plan shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.

(g)     Borrower agrees that if it has been, or if at any time hereafter it is, determined that the Property contains asbestos-containing materials ("ACM's"), on or before thirty (30) days following (i) the date hereof, if such determination was made prior to the date hereof or (ii) receipt of a report prepared by an environmental consultant making such determination, if such determination is hereafter made, as applicable, Indemnitors shall, at their sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations and maintenance program (the "Maintenance Program") designed by an environmental consultant, reasonably approved by Lender, with respect to the ACM's, consistent with "Guidelines for Controlling Asbestos-Containing Materials in Buildings" (ISOPIA, 1985) and other relevant guidelines, and such Maintenance Program will hereafter continuously remain in effect until the Loan is repaid in full.  In furtherance of the foregoing, Borrower shall inspect and maintain all ACM's on a regular basis and ensure that all ACM's shall be maintained in a condition that prevents exposure of occupants to ACM's at all times.  Without limiting the generality of the preceding sentence, provided a Maintenance Program is in place, Lender may reasonably require (i) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (ii) an amendment to such Maintenance Program to address changing circumstances, laws or other matters, (iii) at Borrower's sole cost and expense, supplemental examination of the Property by consultants specified by Lender (but not more frequently than once in any calendar year unless an Event of Default has occurred and is continuing), and (iv) variation of the Maintenance Program in response to the reports provided by any such consultants.

**7.2     LEGAL EFFECT OF SECTION**.  Borrower and Lender agree that Borrower's duty to indemnify Lender hereunder shall survive: (i) any judicial or non-judicial foreclosure under the Security Instrument, or transfer of the Property in lieu thereof; (ii) the release and reconveyance or cancellation of the Security Instrument; and (iii) the satisfaction of all of Borrower's obligations under the Loan Documents.

**ARTICLE 8.**
**RECONVEYANCE**

**8.1     FULL REPAYMENT AND RECONVEYANCE**.  Upon indefeasible payment in full of all sums owing and outstanding under the Loan Documents other than contingent liabilities for which no claim has then been made, Lender shall issue a full release and reconveyance of the Property and

Improvements from the lien of the Security Instrument; provided, however, that all of the following conditions shall be satisfied at the time of, and with respect to, such reconveyance and remittance: (a) Lender shall have received all escrow, closing and recording costs, the costs of preparing and delivering such reconveyance and any sums then due and payable under the Loan Documents; (b) Lender shall have received the Exit Fee (as defined in the Note) and any prepayment premiums as provided for in the Note; and (c) Lender shall have received a written release satisfactory to Lender of any set aside letter, letter of credit or other form of undertaking which Lender has issued to any surety, governmental agency or any other party in connection with the Loan and/or the Property and Improvements. Lender's obligation to make further disbursements under the Loan shall terminate as to any portion of the Loan undisbursed as of the date of issuance of such full release or reconveyance, and any commitment of Lender to lend any undisbursed portion of the Loan shall be canceled.

## ARTICLE 9.
## COVENANTS OF BORROWER

**9.1** **EXPENSES**. Borrower shall pay all of the reasonable Lender expenses and all other third-party costs and expenses incurred by Lender or any of its Affiliates, from time to time, including documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including UCC and judgment and tax lien searches and UCC filings and fees for post-closing UCC and judgment and tax lien searches, if required by Lender), all servicing fees and expenses and attorneys' fees incurred (a) in any effort to enforce, protect or collect payment of any obligations hereunder or otherwise secured by the Security Instrument or to enforce any Loan Document or any related agreement, document or instrument, or effect collection hereunder or thereunder, (b) in connection with entering into, negotiating, preparing, reviewing and executing this Agreement and the other Loan Documents and all related agreements, documents and instruments, (c) arising in any way out of administration of the Loan including any wire transfer fees or audit expenses and a servicing fee equal to 0.1% per annum of the original, maximum principal balance of the Loan payable in arrears on each Payment Date, (d) in connection with instituting, maintaining, preserving, enforcing and foreclosing on Lender's security interests, whether through judicial proceedings or otherwise, (e) in connection with reviewing Borrower's compliance with insurance requirements (both prior to the Effective Date and thereafter during the term of the Loan), (f) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower or any Guarantor, (g) in seeking, obtaining or receiving any advice with respect to its rights and obligations under this Agreement, any of the other Loan Documents and all related agreements, documents and instruments, or (h) in connection with any modification, restatement, supplement, amendment, waiver or extension of this Agreement or any other Loan Document or any related agreement, document or instrument, and all of the same may be charged to Borrower's account and shall be part of the obligations secured by the Security Instrument. Borrower recognizes and agrees that formal written appraisals of the Property and Improvements by a licensed independent appraiser may be required by Lender's internal procedures and/or federal regulatory reporting requirements on an annual and/or specialized basis and that Lender may, at its option, require inspection of the Property and Improvements by an independent supervising architect and/or cost engineering specialist: (i) at least once each month during the course of any capital improvement project/construction at the Property; (ii) upon completion of any new or remodeled Improvements; and (iii) at least semi-annually thereafter. If any of the services described above are provided by an employee of Lender, Lender's costs and expenses for such services shall be calculated in accordance with Lender's standard charge for such services.

**9.2** **ERISA COMPLIANCE**. Borrower shall at all times comply with the provisions of ERISA with respect to any retirement or other employee benefit plan to which it is a party as employer, and as soon as possible after Borrower knows, or has reason to know, that any Reportable Event (as defined in ERISA) with respect to any such plan of Borrower has occurred, it shall furnish to Lender a written

statement setting forth details as to such Reportable Event and the action, if any, which Borrower proposes to take with respect thereto, together with a copy of the notice of such Reportable Event furnished to the Pension Benefit Guaranty Corporation.

### 9.3    LEASING.

All Leases (and expansions, renewals or modifications of Leases, and any cancellation or termination of any such Leases) of all or any part of the Property and Improvements shall be with Tenants approved by Lender in writing and upon terms approved in writing by Lender in its sole but good faith discretion prior to Borrower's execution of any such Major Lease (or expansion, renewal or modification of a Lease). Borrower shall deliver to Lender true, complete and correct copies of any proposed Lease (or proposed expansion, renewal or modification of a Lease) requiring Lender's approval in accordance with Section 12.4 below and Lender shall approve or disapprove such proposed Lease (or proposed expansion, renewal or modification of a Lease) within ten (10) Business Days after its receipt of the same. In the event Lender does not approve or disapprove the proposed Lease (or proposed expansion, renewal or modification of a Lease) within such ten (10) Business Day period, then the proposed lease shall be deemed approved, provided that such deemed approval shall only be effective if (a) the envelope in which the proposed lease is delivered to Lender and the transmittal memo accompanying both have written the following notice in bold-face capital letters in 14-point font or larger:   "RESPONSE REQUIRED WITHIN TEN (10) BUSINESS DAYS OF RECEIPT.  FAILURE TO DISAPPROVE THE SAME SHALL BE DEEMED APPROVAL IF NOT DISAPPROVED IN WRITING PRIOR TO THE EXPIRATION OF TEN (10) BUSINESS DAYS AFTER RECEIPT", and (b) Borrower delivers to Lender a second (2nd) notice containing the same language not earlier than three (3) Business Days prior to the expiration of the aforementioned 10-Business Day notice period..

### 9.4    APPLICATION OF GROSS OPERATING INCOME. Borrower shall apply all Gross Operating Income from the Property and Improvements pursuant to the Approved Budget and otherwise in accordance with the terms of the Loan Documents

### 9.5    SUBDIVISION MAPS. Borrower shall have no right to record any final map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Property (collectively, "Subdivision Map"), without Lender's prior written consent, which approval may be granted or withheld in Lender's sole and absolute discretion. Without limitation on the foregoing, Lender shall also have the right to approve, in its sole and absolute discretion, any changes to or amendments of the current zoning for the Property.

### 9.6    FURTHER ASSURANCES. Upon Lender's request and at Borrower's sole cost and expense, Borrower shall execute, acknowledge and deliver any other instruments and perform any other reasonable acts necessary, desirable or proper, as determined by Lender, to carry out the purposes of this Agreement and the other Loan Documents or to perfect and preserve any liens created by the Loan Documents.

### 9.7    ASSIGNMENT. Without the prior written consent of Lender in its sole discretion, Borrower shall not assign Borrower's interest under any of the Loan Documents, or in any monies due or to become due thereunder, and any assignment without such consent shall be void. In this regard, Borrower acknowledges that Lender would not make this Loan except in reliance on Borrower's expertise, reputation, prior experience in owning and operating commercial real property, Lender's knowledge of Borrower, and Lender's understanding that this Agreement is more in the nature of an agreement involving personal services than a standard loan where Lender would rely on security which already exists.

**9.8** **[RESERVED.]**

**9.9** **TRANSFERS**. By delivery of this Agreement, Borrower acknowledges that the financial standing and managerial and operational ability of Borrower are substantial and material considerations to Lender in its agreement to make the Loan and that any encumbrance or transfer of an interest in the Property or in Borrower whether direct or indirect, will materially impair Lender's security under the Security Instrument. To induce Lender to make the Loan, Borrower agrees Borrower shall not effect a Transfer, either directly or indirectly, or by operation of law, without in each instance first obtaining Lender's prior written consent, which consent may be withheld for any reason, or given upon such terms and conditions as Lender deems necessary or appropriate, all within Lender's sole and absolute discretion, to the extent permitted by Applicable Law. Upon any Transfer made in violation of this Section 9.9, without limitation on Lender's other rights, Lender shall have the absolute right in its sole discretion, without demand or notice, to declare all sums, indebtedness and obligations secured by this Agreement and the other Loan Documents to be immediately due and payable (including the Yield Maintenance and the Exit Fee (as each such term is defined in the Note)), except to the extent that and in such particular circumstances where exercise of such right by Lender is prohibited by law. Any Transfer effected pursuant to a consent by Lender shall be subject to this Agreement and the other Loan Documents, and any direct transferee shall, as a condition of the effectiveness of any such consent and as a covenant of Borrower and such transferee, and in form and substance prescribed by Lender, assume all obligations hereunder and agree to be bound by all provisions contained herein. Such assumption shall not, however, release Borrower or any maker or guarantor (including any Guarantor) from any liability thereunder.

Notwithstanding the preceding provisions of Section 9.9, provided no Default or Event of Default exists hereunder and provided a transfer would not cause a Default or Event of Default (including a default under Section 9.10 hereof) or result in a change in the day to day Control of Borrower, transfers (but not encumbrances) of ownership interests, whether direct or indirect in Borrower, shall be permitted hereunder, provided at all times the management of Borrower is Controlled by Guarantor and Guarantor at all times owns, directly or indirectly, at least fifty percent (50%) of the ownership interests in Borrower; provided, the following conditions are satisfied: (i) Borrower shall give Lender written notice of such transfer, with copies of all instruments effecting such transfer (at least ten (10) Business Days prior to the proposed transfer) and (b) Borrower shall promptly cause to be delivered to Lender any amendment to the Loan Documents as may be required by Lender, including execution and delivery of any new pledge agreements and UCC financing statements (it being understood that no transfers permitted herein shall negate, circumvent or otherwise adversely impact any pledges of ownership interests held by Guarantor or an Affiliate of Guarantor and delivered to Lender or an Affiliate of Lender). Borrower shall pay any and all reasonable costs and expenses of Lender incurred in connection with such transfer (including, without limitation, reasonable attorneys' fees and expenses). In addition, the transfer or pledge of ownership interests in Borrower delivered to Lender or an Affiliate of Lender shall be permitted.

**9.10** **SINGLE PURPOSE ENTITY**. Borrower hereby represents and warrants to, and covenants with, Lender that Borrower has been, is and shall remain a single purpose bankruptcy remote entity and shall at all times comply with the following covenants:

(a) The purpose for which Borrower is organized shall be limited to (i) acquiring, owning, developing, holding, selling, leasing, transferring, exchanging, operating and managing Borrower's interest in the Property, (ii) entering into the Loan, (iii) refinancing the Loan in connection with a permitted repayment of the Loan, and (iv) transacting any and all lawful business that is incident, necessary and appropriate to accomplish the foregoing.

(b)     Borrower has not owned, does not own and will not own any asset or property other than (i) its interest in the Property and (ii) incidental personal property necessary for and used in connection with the ownership or operation of the same.

(c)     Borrower shall not engage in a business other than the ownership, operation and management of the Property and acquire any other property without Lender's prior written consent.

(d)     Borrower shall not enter into any contract or agreement with any Affiliate, any Guarantor, without Lender's prior written consent.

(e)     Borrower shall not incur, create, assume or guarantee any indebtedness or liabilities, secured or unsecured, direct or contingent, other than (i) the Loan and incidental costs and expenses associated therewith, (ii) unsecured indebtedness incurred in the ordinary course of business of owning, operating, and maintaining the Property, that (A) are in such amounts that are normal and reasonable under the circumstances (but in no event more than one percent (1.00%) of the Outstanding Principal Balance (in the aggregate together with all trade payables or accrued expenses incurred by Borrower)), (B) are not evidenced by a note, and (C) are required to be paid within sixty (60) days from the date they are first incurred by Borrower, and (iii) non-delinquent property taxes and assessments. No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Property, and no indebtedness may be secured, directly or indirectly, by any partnership, membership or other equity interest in Borrower (comprising the same) without Lender's consent in Lender's sole and absolute discretion.

(f)     Borrower has not made and will not make any loans or advances to any Person or entity and shall not acquire obligations or securities of an Affiliate.

(g)     Provided there is sufficient cash flow from the Property, Borrower is and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(h)     Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not amend, modify or otherwise change, in violation of the covenants of this Section 9.10 or organizational documents of Borrower, as the case may be without the written consent of Lender.

(i)     Borrower shall maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates. Borrower's assets will not be listed as assets on the financial statement of any other Person. Borrower shall have its own separate financial statement, provided, however, that Borrower's assets may be included in a consolidated financial statement of its parent companies if inclusion on such a consolidated statement is required to comply with the requirements of GAAP, and provided, further, that such consolidated financial statement shall contain a footnote to the effect that Borrower's assets are owned by Borrower, as the case may be and that they are being included on the financial statement of its parent solely to comply with the requirements of GAAP, and provided, further, that such assets shall be listed on Borrower's own separate balance sheet. Borrower will file its own tax returns (unless a disregarded entity for tax purposes) and will not file a consolidated federal income tax return with any other corporation. Borrower shall maintain its books, records, resolutions and agreements as official records.

(j)     Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person, shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name and shall not identify itself or any of its Affiliates as a division or part of the other.

(k)     Provided there is sufficient cash flow from the Property, Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(l)     Borrower has not nor at any time sought nor will seek the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, or the sale of material assets of Borrower except in connection with a payoff of the Loan.

(m)     Borrower will not commingle the funds and other assets of Borrower with those of any other Person, and will not participate in a cash management system with any such Person.

(n)     Borrower will not commingle its assets with those of any other Person and will hold all of its assets in its own name.

(o)     Borrower will not guarantee or become obligated for the debts of any other Person and has not, does not and will not in the future hold itself out as being responsible for the debts or obligations of any other Person.

(p)     Borrower shall not pledge its assets for the benefit of any other Person, other than with respect to the Loan.

(q)     Borrower shall not file a petition for relief under the Bankruptcy Code, or under any other present or future state of federal law regarding bankruptcy, reorganization or other debtor relief law.

(r)     Borrower shall not partition and shall not permit any partition of the Property.

**9.11     MATERIAL AGREEMENTS.**

(a)     Borrower shall (i) promptly perform and/or observe the covenants, agreements and conditions required to be performed and observed by it under each Material Agreement and Operating Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any default by any party under any Material Agreement and Operating Agreement of which it is aware and (c) promptly enforce the performance and observance of all of the covenants, agreements and conditions required to be performed and/or observed by any other party under each Material Agreement and Operating Agreement to which Borrower is a party in a commercially reasonable manner

(b)     Borrower shall not, without Lender's prior consent: (a) enter into, surrender or terminate any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject (unless, with respect to Material Agreements (other than Leases), the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject, except as provided therein or, with respect to Material Agreements (other than Leases), on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject in any material respect, except, with respect to Material Agreements (other than Leases), on an arm's-length basis and commercially reasonable terms.

**9.12    COMPLETION OF REQUIRED CAPITAL IMPROVEMENTS AND TENANT IMPROVEMENTS COMMENCED BY BORROWER**.    Borrower shall complete all capital improvements required under any Capital Improvement Budget and the Approved Budget and this Agreement, and any tenant improvements commenced by Borrower, each on-time and free and clear of any liens. Without limitation on the foregoing, Borrower shall complete all capital improvements it commences which are not required by the Approved Budget and this Agreement, which Lender subsequently approves in writing as required hereunder.

**9.13    [OMITTED]**.

**9.14    LOAN TO VALUE RATIO**.    At all times, Borrower shall cause the Property to maintain a Loan-to-Value Ratio of no more than sixty percent (60%).

**9.15    PROPERTY MANAGEMENT AGREEMENT**.    Without the prior written consent of Lender, Borrower shall not enter into any agreement which provides for the management, leasing and/or operation of the Property or Improvements.    Any such agreements approved by Lender shall expressly provide that they are subordinate to Lender's rights and interests under the Loan and the Loan Documents in all respects.    Any property managers and leasing agents for the Property shall be subject to Lender's prior approval and, at Lender's request, Borrower shall cause each such property manager or leasing agent to execute and deliver to Lender a consent and agreement to the foregoing provisions in form and substance acceptable to Lender.

Notwithstanding the preceding provisions of Section 9.15, provided no Default or Event of Default exists hereunder, Borrower shall be permitted to replace a Property Manager with a replacement property manager ("Replacement Property Manager") without Lender's prior written consent, provided that Replacement Property Manager is under the control of the Guarantor and provided, the following conditions are satisfied: (i) Borrower shall give Lender written notice of such replacement, with copies of all instruments effecting such replacement (at least ten (10) Business Days prior to the proposed replacement), (ii) the terms of the new property management agreement are not materially less favorable to Borrower and Lender than those in the existing Property Management Agreement and (iii) Borrower shall promptly cause to be delivered to Lender any amendment to the Loan Documents as may be required by Lender, including execution and delivery of a Subordination of Management Agreement.

Any Property Management Agreement shall at all times be terminable without payment of a premium or fee immediately upon an Event of Default and otherwise upon not less than thirty (30) days' prior written notice; provided, however, that without the prior written consent of Lender, Borrower shall not enter into any new agreement, or modify, amend, supplement, assign, replace or terminate any existing agreement, in each case, which provides for the management, leasing and/or operation of the Property or Improvements.    All such agreements must expressly provide that they are subordinate to Lender's rights and interests under the Loan and the Loan Documents in all respects.    All property managers and leasing agents for the Property shall be subject to Lender's prior approval and, at Lender's request, Borrower shall cause each such property manager or leasing agent to execute and deliver to Lender a consent and agreement to the foregoing provisions in form and substance acceptable to Lender.

**9.16    MAINTENANCE**.    Borrower shall keep the Property in good condition and repair and shall provide security for the Property in at least the same manner as maintained on the date hereof.

**9.17    UTILITIES**.    Borrower shall pay when due all charges that are incurred by Borrower for the benefit of the Property for gas, telephone, electricity, water, sewer, or other services furnished to the Property.

**9.18    NO CHANGE IN USE**.  The Property shall be used solely for office purposes and Borrower shall not permit any change in use or additional uses on the Property without the prior written consent of Lender.

**9.19    PATRIOT ACT AND RELATED MATTERS**.  Borrower and Guarantor shall comply with any and all existing and future Applicable Laws, including, without limitation, all Prescribed Laws.

## ARTICLE 10.
## REPORTING COVENANTS

**10.1    FINANCIAL INFORMATION**.  Borrower shall deliver to Lender, as soon as available, but in no event later than thirty (30) days after each calendar year end, a current financial statement for Borrower (including, without limitation, an income and expense statement, rent roll and balance sheet) certified by an authorized representative of Borrower together with any other financial information reasonably required by Lender. In addition, Borrower shall deliver to Lender, as soon as available, but in no event later than twenty (20) days after the end of each calendar month, a current income and expenses statement and rent roll certified by Borrower (which shall also include aged payables and receivables). Borrower shall cause each Guarantor to deliver to Lender annual financial statements (including contingent liabilities) of Guarantor as applicable, within sixty (60) days after each calendar year end, and such other financial statements of each Guarantor for such other periods and to be delivered within such time periods as Lender may request, provided that Lender shall not request such reports for any periods more frequently than quarterly and within delivery time periods less than thirty (30) days of the end of the applicable quarter. Each Guarantor's financial statements shall be certified by an authorized representative of each Guarantor, as applicable, to be true and correct in all material aspects and not contain any material omissions. Notwithstanding anything to the contrary contained herein, if an Event of Default occurs, all financial statements required hereunder shall be audited by an accounting firm approved by Lender in writing in its sole discretion.

(a)    Borrower shall also deliver to Lender such quarterly and other financial information regarding any persons or entities in any way obligated on the Loan as Lender may specify and within such reasonable times as Lender may request.  If in addition to the annual financial statements audited financial information is prepared, Borrower shall deliver to Lender copies of that information within twenty (20) days of its final preparation.  All such financial information shall include a statement which specifies the accounting methodology used to prepare the information.  Without limitation, all financial statements will include a calculation of Net Operating Income, delinquency reports, tenant and expenses payable and receivable reports, rent rolls and occupancy statistics and shall be certified by Borrower.

(b)    If any statements, information or reports required hereunder (including under this Section 10.1, Sections 10.3, 10.4 and 10.5) are not timely delivered, there shall be an initial fee of $500.00 for the first day late and a subsequent fee of $250.00 per each day thereafter that such statements, information or reports are not delivered.

**10.2    BOOKS AND RECORDS**.  Borrower shall maintain complete books of account and other records for the Property and Improvements and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by Lender upon reasonable prior notice.

**10.3    MONTHLY PROGRESS REPORTS ON RENOVATION TIMELINE**.  In addition to any other reporting requirements contained herein, until such time as the Note is paid in full, within twenty (20) days after the end of each month, Borrower shall provide Lender with (i) a written statement that no

renovations have taken place at the Property or (b) if renovations have taken place at the Property, a progress reports on the status of the renovation timeline (including Borrower's adherence to such timeline and any modifications to such timeline).

**10.4    LEASING REPORTS**. Borrower shall deliver to Lender monthly rent rolls, leasing schedules and reports, delinquency reports, occupancy statistics, lists of prospective tenants and property tours (which shall include a list of leasing prospects, proposals and the then-current negotiation status of the same, in such detail as Lender may require), operating statements, and/or such other leasing information as Lender shall request with respect to the Property and Improvements, each in form and substance reasonably satisfactory to Lender, within twenty (20) days of the end of the applicable month.

**10.5    OPERATING STATEMENTS FOR PROPERTY AND IMPROVEMENTS**. Until such time as the Note is paid in full, Borrower shall deliver to Lender monthly operating reports within twenty (20) days after the end of each month, and within twenty (20) days after the end of each quarter, which show in detail the amounts and sources of Gross Operating Income received by or on behalf of Borrower and the amounts and purposes of Permitted Operating Expenses paid by or on behalf of Borrower with respect to the Property and Improvements for the previous month.

(a)    "Gross Operating Income" for this purpose shall mean the sum of any and all amounts, payments, fees, rentals, additional rentals, expense reimbursements (including, without limitation, all reimbursements by tenants, lessees, licensees and other users of the Property and Improvements), discounts or credits to Borrower, income, interest and other monies directly or indirectly received by or on behalf of or credited to Borrower from any person with respect to Borrower's ownership, use, development, operation, leasing, franchising, marketing or licensing of the Property and Improvements. Gross Operating Income shall be computed on a cash basis and shall include for each quarterly statement all amounts actually received in such quarter whether or not such amounts are attributable to a charge arising in such quarter.

(b)    "Permitted Operating Expenses" shall mean the following expenses, but only to the extent provided in the Operating Budget: (i) taxes and assessments imposed upon the Property and Improvements to the extent that such taxes and assessments are required to be paid by Borrower and are actually paid or reserved for by Borrower; (ii) bond assessments; (iii) insurance premiums for casualty insurance (including, without limitation, earthquake) and liability insurance carried in connection with the Property and Improvements; (iv) operating expenses incurred by Borrower for the management, operation, cleaning, leasing, maintenance and repair of the Property and Improvements (provided, however, that any property management fees may not exceed the lesser of three percent (3%) of the amount of Gross Rents), but in all events only to the extent provided in the Approved Budget. Permitted Operating Expenses shall not include any interest or principal payments on the Loan or any allowance for depreciation.

**10.6    BUDGET**. On or before December 1 of each year throughout the term of the Loan, as the same may be extended, Borrower shall submit to Lender for Lender's review and approval (a) a capital improvement budget for the Property which shall not include any payment to Borrower or any Affiliate unless expressly approved by Lender, in writing, in its sole discretion and (b) an operating budget (the "Operating Budget") for the Property (collectively with the Capital Improvement Budget, the "Approved Budget"). Borrower shall cause the Property to be owned and operated in accordance with the capital improvement budget and Operating Budget as approved by Lender, and shall make no changes to any such approved budgets without the prior written consent of Lender (provided, however, that overall deviations of ten percent shall not be deemed to be a violation of the provisions of this Section 10.6).

## ARTICLE 11.
## EVENTS OF DEFAULT AND REMEDIES

**11.1** **EVENT OF DEFAULT**. The occurrence of any one or more of the following shall constitute an event of default (an "Event of Default") under this Agreement and the other Loan Documents:

(a) <u>Monetary</u>. Borrower's failure to pay when due any sums payable under the Note or any of the other Loan Documents within five (5) days when due (provided, however, that there shall be no grace period for amounts due at the Maturity Date or upon earlier acceleration and there shall be no grace period if a grace period is already provided under the applicable Loan Documents for such payments); or

(b) <u>Liens, Attachment; Condemnation</u>. (i) The recording of any claim of lien against the Property or Improvements or the service on Lender of any bonded stop notice relating to the Loan and the continuance of such claim of lien or bonded stop notice for thirty (30) days following notice without discharge, satisfaction or provision for payment being made by Borrower in a manner satisfactory to Lender; or (ii) [omitted]; or (iii) the sequestration or attachment of, or any levy or execution upon any of the Property or Improvements, any other collateral provided by Borrower under any of the Loan Documents, any monies in the Reserves, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of forty-five (45) days or the sale of the assets affected thereby; or

(c) <u>Representations and Warranties</u>. Any of Borrower's representations or warranties contained in the this Agreement or any other Loan Document was untrue in any material respect when made; or

(d) <u>Voluntary Bankruptcy; Insolvency; Dissolution</u>. (i) The filing of a petition by Borrower for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law; (ii) the filing of any pleading or an answer by Borrower in any involuntary proceeding under the Bankruptcy Code or other debtor relief law which admits the jurisdiction of the court or the petition's material allegations regarding Borrower's insolvency; (iii) a general assignment by Borrower for the benefit of creditors; or (iv) Borrower applying for, or the appointment of, a receiver, trustee, custodian or liquidator of Borrower or any of its property; or

(e) <u>Involuntary Bankruptcy</u>. The failure of Borrower to effect a full dismissal of any involuntary petition under the Bankruptcy Code or under any other debtor relief law that is filed against Borrower or in any way restrains or limits Borrower or Lender regarding the Loan, the Property or the Improvements, prior to the earlier of the entry of any court order granting relief sought in such involuntary petition, or ninety (90) days after the date of filing of such involuntary petition; or

(f) <u>Partners; Corporate Guarantor; Limited Guarantor</u>. The occurrence of any of the events specified in Section <u>11.1 (d)</u> or <u>11.1 (e)</u> as to any Guarantor; or

(g) <u>Transfer</u>. Any Transfer occurs without the prior written consent of Lender in its sole and absolute discretion (except as may be expressly permitted by <u>Section 9.9</u> hereof); or

(h) <u>Loss of Priority</u>. The failure at any time of the Security Instrument to be a valid first lien upon the Property and Improvements or any portion thereof, other than as a result of any release or reconveyance of the Security Instrument with respect to all or any portion of the Property and Improvements pursuant to the terms and conditions of this Agreement; or

(i)    <u>Single Purpose Entity</u>. Borrower shall fail to strictly comply with the provisions of <u>Section 9.10</u> (Single Purpose Entity); or

(j)    <u>Key Person or Entity</u>. The retirement, death, or incapacity of Guarantor or withdrawal of Guarantor from the operation of Borrower, and Borrower's failure to provide a substitute or replacement of such Person approved in writing by Lender in its sole discretion within sixty (60) days after the occurrence of any such retirement, death, incapacity or withdrawal; or

(k)    <u>Environmental Indemnity Agreement</u>. The occurrence of a default (after all notice and grace periods provided therein, if any, shall have expired) under the Environmental Indemnity Agreement; or

(l)    <u>Guaranties</u>. The occurrence of a default (after all notice and grace periods provided therein, if any, shall have expired) under the Carveout Guaranty; or

(m)    <u>Other Payments</u>. Borrower's failure to timely fund any Reserves as required hereunder if such failure continues for ten (10) Business Days following Borrower's receipt of written notice thereof from Lender; or

(n)    <u>Permits; Utilities; Insurance</u>. (i) The neglect, failure or refusal of Borrower to keep in full force and effect any material permit, license, consent or approval required for the operation of the Property that is not fully reinstated within thirty (30) days after Lender gives Borrower notice of the lapse of effectiveness of such material permit, license, consent or approval; (ii) the curtailment in availability to the Property of utilities or other public services necessary for the full occupancy and utilization of the Improvements that is not restored to full availability within thirty (30) days after Lender gives Borrower notice of such curtailment of availability; or (iii) the failure by Borrower to maintain any insurance required under this Agreement or any Loan Document; or

(o)    <u>Material Obligation</u>. Failure of Borrower to pay when due any indebtedness or other liability of Borrower or the Property aggregating in excess of $100,000.00 ("Material Indebtedness"); the default by Borrower in the performance (beyond the applicable grace period with respect thereto, if any) of any term, provision or condition contained in any agreement under which any Material Indebtedness was created or is governed; the occurrence of any other event or condition, the effect of which event or condition is to cause, or to permit the holder or holders of any Material Indebtedness to cause, such Material Indebtedness to become due prior to its stated maturity; or any Material Indebtedness of Borrower shall be declared to be due and payable or required to be prepaid or repurchased (other than by a regularly scheduled payment) prior to the stated maturity thereof; or

(p)    <u>Other Default</u>. The occurrence of an event of default under any other Loan Document or Borrower's default in the performance of any other term, covenant or condition contained in this Agreement or any other Loan Document which is not cured within thirty (30) days after written notice of such default given by Lender to Borrower.

**11.2**    **ACCELERATION UPON EVENT OF DEFAULT; REMEDIES**. Upon the occurrence of any Event of Default specified in this Article 11, Lender may, at its sole option, declare all sums owing to Lender under the Note, this Agreement and the other Loan Documents immediately due and payable. Upon such acceleration, Lender may, in addition to all other remedies permitted under this Agreement and the other Loan Documents and at law or in equity, apply any sums in the Reserves to the sums owing under the Loan Documents and any and all obligations of Lender to fund further disbursements under the Loan shall terminate.

**11.3    DISBURSEMENTS TO THIRD PARTIES**. Upon the occurrence of an Event of Default occasioned by Borrower's failure to pay money to a third party as required by this Agreement, Lender may but shall not be obligated to make such payment from the Loan proceeds or other funds of Lender. If such payment is made from proceeds of the Loan, Borrower shall immediately deposit with Lender, upon written demand, an amount equal to such payment. If such payment is made from funds of Lender, Borrower shall immediately repay such funds upon written demand of Lender. In either case, the Event of Default with respect to which any such payment has been made by Lender shall not be deemed cured until such deposit or repayment (as the case may be) has been made by Borrower to Lender.

**11.4    LENDER'S COMPLETION OF CONSTRUCTION**. Upon the occurrence and continuance of an Event of Default, Lender may, upon five (5) days prior written notice to Borrower, and with or without legal process, take possession of the Property and Improvements, remove Borrower and all agents, employees and contractors of Borrower from the Property and Improvements, complete the work of any construction and market and lease the Property and/or Improvements. For this limited purpose, Borrower irrevocably appoints Lender as its attorney-in-fact, which agency is coupled with an interest. As attorney-in-fact, Lender may, in Borrower's name, take or omit to take any action Lender may deem appropriate, including, without limitation, exercising Borrower's rights under the Loan Documents and all contracts concerning the Property and/or Improvements.

**11.5    REPAYMENT OF FUNDS ADVANCED**. Any funds expended by Lender in the exercise of its rights or remedies under this Agreement and the other Loan Documents shall be payable to Lender upon written demand, together with interest at the rate applicable to the principal balance of the Note from the date the funds were expended.

**11.6    RIGHTS CUMULATIVE, NO WAIVER**. All Lender's rights and remedies provided in this Agreement and the other Loan Documents, together with those granted by law or at equity, are cumulative and may be exercised by Lender at any time. Lender's exercise of any right or remedy shall not constitute a cure of any Event of Default unless all sums then due and payable to Lender under the Loan Documents are repaid and Borrower has cured all other Events of Default. No waiver shall be implied from any failure of Lender to take, or any delay by Lender in taking, action concerning any Event of Default or failure of condition under the Loan Documents, or from any previous waiver of any similar or unrelated Event of Default or failure of condition. Any waiver or approval under any of the Loan Documents must be in writing and shall be limited to its specific terms.

**ARTICLE 12.**
**MISCELLANEOUS PROVISIONS**

**12.1    INDEMNITY**. BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FOR, FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR STRICT LIABILITY OF LENDER OR ITS DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS, SUCCESSORS OR ASSIGNS, WHICH ANY SUCH PARTY MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, CONSTITUENT PARTNER OR

MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY OF THE PROPERTY OR IMPROVEMENTS. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS SUCH PARTIES SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE SECURITY INSTRUMENT.

    **12.2    FORM OF DOCUMENTS**. The form and substance of all documents, instruments, and forms of evidence to be delivered to Lender under the terms of this Agreement and any of the other Loan Documents shall be subject to Lender's approval and shall not be modified, superseded or terminated in any respect without Lender's prior written approval.

    **12.3    NO THIRD PARTIES BENEFITED**. No person other than Lender and Borrower and their permitted successors and assigns shall have any right of action under any of the Loan Documents.

    **12.4    NOTICES**. All notices or other communications required or permitted to be given pursuant to the provisions of this Agreement shall be in writing and shall be considered as properly given if delivered to the appropriate party at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement). Except when otherwise required by law, any notice which a party is required or may desire to give the other shall be in writing and may be sent by e-mail (provided that a copy is simultaneously sent by one of the other permitted means of giving notice hereinafter set forth), by personal delivery or by mail (either (i) by United States registered or certified mail, return receipt requested, postage prepaid, or (ii) by Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery). Any notice so given by e-mail shall be deemed to have been given as of the date on which the sender of such communication shall confirm receipt thereof by the appropriate parties. Any notice so given by mail shall be deemed to have been given as of the date of delivery established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be. Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the notice is to be given; provided, however, that non-receipt of any communication as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication. For purposes of notice, the addresses of the parties shall be:

| | |
|---|---|
| Borrower: | c/o World Class Capital Group, LLC<br>401 Congress, 33rd Floor<br>Austin, Texas<br>Attention: Nate Paul |
| With a copy to: | c/o World Class Capital Group, LLC<br>767 Fifth Avenue, 16th Floor<br>New York, NY 10153<br>Attention: Legal Department |
| Lender: | U.S. Real Estate Credit Holdings III-A, LP<br>c/o Calmwater Capital<br>11755 Wilshire Blvd., Suite 1425<br>Los Angeles, California 90025<br>Attention: Larry Grantham, Managing Director<br>Email: larry@calmwatercapital.com |

With a copy to:     Safarian, Choi & Bolstad LLP
555 South Flower St., Suite 650
Los Angeles, California 90071
Attention: Alex Y. Choi, Esq.
Email:  achoi@safarianchoi.com

Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of fifteen (15) days' notice to the other party in the manner set forth hereinabove. Borrower shall forward to Lender, without delay, any notices, letters or other communications delivered to the Property or to Borrower naming Lender, "Lender" or any similar designation as addressee, or which is reasonably likely to affect the ability of Borrower to perform its obligations to Lender under the Loan Documents.

     **12.5**   **ATTORNEY-IN-FACT**. Upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably appoints and authorizes Lender, as Borrower's attorney-in-fact, which agency is coupled with an interest, to execute and/or record in Lender's or Borrower's name any notices, instruments or documents that Lender deems appropriate to protect Lender's interest under any of the Loan Documents.

     **12.6**   **ACTIONS**. Borrower agrees that Lender, in exercising the rights, duties or liabilities of Lender or Borrower under the Loan Documents, may commence, appear in or defend any action or proceeding purporting to affect the Property, the Improvements, or the Loan Documents and Borrower shall immediately reimburse Lender upon written demand for all such expenses so incurred or paid by Lender, including, without limitation, attorneys' fees and expenses and court costs.

     **12.7**   **RIGHT OF CONTEST**. Borrower may contest in good faith any claim, demand, lien, levy or assessment by any person other than Lender which would constitute an Event of Default if: (a) Borrower pursues the contest diligently, in a manner which Lender determines is not prejudicial to Lender, and does not impair the rights of Lender under any of the Loan Documents; and (b) Borrower deposits with Lender any funds or other forms of assurance which Lender in good faith determines from time to time appropriate to protect Lender from the consequences of the contest being unsuccessful. Borrower's compliance with this Section 12.7 shall operate to prevent such claim, demand, levy or assessment from becoming an Event of Default.

     **12.8**   **RELATIONSHIP OF PARTIES**. The relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any third party with respect to the Property or Improvements, except as expressly provided in this Agreement and the other Loan Documents.

     **12.9**   **DELAY OUTSIDE LENDER'S CONTROL**. Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents (and Lender may suspend or terminate all or any portion of Lender's obligations under the Loan Documents) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any governmental or local authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockade (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's control.

     **12.10**  **ATTORNEYS' FEES AND EXPENSES; ENFORCEMENT**. If any attorney is engaged by Lender to enforce or defend any provision of this Agreement, any of the other Loan Documents,

or as a consequence of any Event of Default under the Loan Documents, with or without the filing of any legal action or proceeding, and including, without limitation, any fees and expenses incurred in any bankruptcy proceeding of the Borrower, then Borrower shall immediately pay to Lender, upon demand, the amount of all attorneys' fees and expenses and all costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.

**12.11  IMMEDIATELY AVAILABLE FUNDS**.  Unless otherwise expressly provided for in this Agreement, all amounts payable by Borrower to Lender shall be payable only in United States currency, immediately available funds.

**12.12  LENDER'S CONSENT**.  Wherever in this Agreement there is a requirement for Lender's consent, determination and/or a document to be provided or an action taken "to the satisfaction of Lender", except as otherwise expressly set forth herein, it is understood by such phrase that Lender shall exercise its consent, right or judgment in its sole and absolute discretion.

**12.13  LOAN SALES AND PARTICIPATIONS; DISCLOSURE OF INFORMATION**.  Borrower agrees that Lender may elect, at any time, to sell, assign or grant participations in all or any portion of its rights and obligations under the Loan Documents, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at Lender's sole discretion ("Participant").  Borrower further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to:  (a) the Property and Improvements and its operation; (b) any party connected with the Loan (including, without limitation, Borrower, any Person having any interest, whether direct or indirect, in Borrower, any constituent partner or member of Borrower, and any Guarantor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves.  In connection with any such sale, assignment or participation, Borrower further agrees that the Loan may be split into two or more loans with the economic terms materially the same as provided herein and in the other Loan Documents, the Loan Documents shall be sufficient evidence of the obligations of Borrower to each purchaser, assignee, or participant, and upon written request by Lender, Borrower shall enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such sale, assignment or participation.  The indemnity obligations of Borrower under the Loan Documents shall also apply with respect to any Participant.

**12.14  SECONDARY MARKET TRANSACTION; DISCLOSURE OF INFORMATION**.  Borrower acknowledges that Lender may effectuate one or more Secondary Market Transactions.  At no out-of-pocket expense to Borrower, Borrower shall cooperate in all respects with Lender (and agrees to cause its Affiliates and their respective officers and representatives to cooperate) in effecting any such Secondary Market Transaction and shall cooperate in all respects (and agrees to cause its Affiliates and their respective officers and representatives to cooperate) to implement all requirements imposed by any Investment Party or Rating Agency involved therein, including, without limitation, by executing amendments to Borrower's organizational documents (including, without limitation, Borrower's organizational chart) and/or the obligations evidenced by the Note and this Agreement and secured by the Security Instrument, and modifications to any Loan Documents, and by delivering an estoppel certificate acceptable to Lender within ten (10) days of Lender's request and such other documents as may be reasonably requested by Lender, which may include, among other things, opinions of counsel (including, if requested by Lender, a so-called "substantive non-consolidation" opinion with respect to Borrower and its Affiliates acceptable to Lender in its sole discretion at Borrower's sole cost and expense).  Borrower

shall provide such information and documents relating to Borrower, any Guarantor, the Property and any tenants as Lender may reasonably request in connection with such Secondary Market Transaction. Borrower shall make available to Lender all information concerning its business and operations that Lender may reasonably request. Lender shall be permitted to share all information provided in connection with the Loan with the Investment Parties, Rating Agencies, investment banking firms, accounting firms, law firms and other third-party advisory firms involved with the Loan Documents or the applicable Secondary Market Transaction, including, without limitation, all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (a) the Property and Improvements and its operation; (b) any party connected with the Loan (including, without limitation, Borrower, any Person having any interest, whether direct or indirect, in Borrower, any constituent partner or member of Borrower and any Guarantor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan. It is understood that the information provided to Lender in connection with the Loan may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus potential Investment Parties may also see some or all of the information with respect to the Loan, any Guarantor, the Property, Borrower and the holders of direct or indirect interests in Borrower. Borrower irrevocably waives any and all rights it may have under any Applicable Laws (including, without limitation, any right of privacy) to prohibit such disclosure. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower. Borrower hereby agrees to indemnify, defend and hold the Lender Indemnified Parties harmless as to any losses, damages, costs, expenses, liabilities (including, without limitation, strict liability), claims, obligations, settlement payments, penalties, fines, assessments, citations, litigation, demands, defenses, judgments, suits, proceedings or other expenses of any kind whatsoever (including attorneys' fees and expenses and court costs), that arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the information provided by or on behalf of Borrower, or arise out of or are based upon the omission or alleged omission by Borrower to state therein a material fact required to be stated in such information, or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading. Lender may publicize the existence of the Loan or Borrower's obligations under the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

**12.15 RESERVED.**

**12.16 LENDER'S AGENTS.** Lender may designate an agent or independent contractor to exercise any of Lender's rights under this Agreement and any of the other Loan Documents. Any reference to Lender in any of the Loan Documents shall include Lender's agents, employees or independent contractors.

**12.17 TAX SERVICE.** Lender is authorized to secure, at Borrower's expense, a tax service contract with a third party vendor which shall provide tax information on the Property and Improvements satisfactory to Lender.

**12.18 WAIVER OF RIGHT TO TRIAL BY JURY.** EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR

CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

**12.19** **SEVERABILITY**. If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents; provided, however, that if the rate of interest or any other amount payable under the Note or this Agreement or any other Loan Document, or the right of collectability therefor, are declared to be or become invalid, illegal or unenforceable, Lender's obligations to make advances under the Loan Documents shall not be enforceable by Borrower.

**12.20** **HEIRS, SUCCESSORS AND ASSIGNS**. Except as otherwise expressly provided under the terms and conditions of this Agreement, the terms of the Loan Documents shall bind and inure to the benefit of the heirs, successors and assigns of the parties.

**12.21** **TIME**. Time is of the essence of each and every term of this Agreement.

**12.22** **HEADINGS**. All article, section or other headings appearing in this Agreement and any of the other Loan Documents are for convenience of reference only and shall be disregarded in construing this Agreement and any of the other Loan Documents.

**12.23** **GOVERNING LAW**. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

**12.24** **INTEGRATION; INTERPRETATION**. The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. The Loan Documents shall not be modified except by written instrument executed by all parties. Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing.

**12.25** **JOINT AND SEVERAL LIABILITY**. The liability of all persons and entities obligated in any manner under this Agreement and any of the Loan Documents shall be joint and several.

**12.26** **COUNTERPARTS**. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single document. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages. Facsimile and other electronically transmitted signatures shall serve as the functional equivalent of manually executed signatures for all purposes.

**12.27** **CONFIDENTIALITY AND PUBLICITY**.

(a)     Borrower hereby agrees that Lender or any Affiliate of Lender may (i) disclose a general description of transactions arising under the Loan Documents for advertising, marketing or other similar purposes, (ii) use Borrower's or any Guarantor's names, logos or other indicia germane to such parties in connection with such advertising, marketing or other similar purposes and (iii) disclose any and all information concerning the Loan Documents, as well as any information regarding the Borrower or any Guarantor and their operations, received by Lender in connection with the Loan Documents required by its lenders or funding or financing sources

(b)     Borrower agrees, and agrees to cause each of its Affiliates, (i) not to transmit or disclose provision of any Loan Document to any Person (other than to Borrower's advisors and officers on a need-to-know basis) without Lender's prior written consent, (ii) to inform all Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions. Borrower agrees to submit to Lender and Lender reserves the right to review and approve all materials that Borrower or any of its Affiliates prepares that contain Lender's name or describe or refer to any Loan Document, any of the terms thereof or any of the transactions contemplated thereby. Borrower shall not, and shall not permit any of its Affiliates to, use Lender's name (or the name of any of Lender's Affiliates) in connection with any of its business operations, including without limitation, advertising, marketing or press releases or such other similar purposes, without Lender's prior written consent. Nothing contained in any Loan Document is intended to permit or authorize Borrower or any of its Affiliates to contract on behalf of Lender.

**12.28**     **BROKERS**. Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower shall indemnify, defend and hold Lender harmless for, from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein, regardless of whether caused in whole or in part by the negligence or strict liability of Lender. The provisions of this Section 12.28 shall survive the expiration and termination of this Agreement and the payment of the Loan.

**12.29**     **OFFSETS AND COUNTERCLAIMS**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including any servicer of Borrower, or otherwise offset any obligations to make payments required under the Loan Documents.

**12.30**     **REMEDIES OF BORROWER**. If a claim or adjudication is made that Lender or any of its agents, including any servicer of Borrower, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including any servicer of Borrower, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Borrower specifically waives any claim against Lender and its agents, including any servicer of Borrower, with respect to actions taken by Lender or its agents on Borrower's behalf, other than any such claim arising from the gross negligence or willful misconduct of Lender or such agent.

**12.32**     **PRINCIPLES OF CONSTRUCTION**. Unless otherwise specifically provided, (a) all references to sections and schedules are to those in this Agreement or the other applicable Loan Document, as the context requires, (b) the words "hereof," "herein" and "hereunder" and words of similar import refer

to this Agreement or the other applicable Loan Document, as the context requires, as a whole and not to any particular provision, (c) all definitions are equally applicable to the singular and plural forms of the terms defined, (d) the word "including" means "including but not limited to," (e) accounting terms not specifically defined herein shall be construed in accordance with GAAP, (f) the word "Property" shall be deemed followed by the words "or any part thereof," (g) the term "knowledge" of a Person means the actual knowledge of such Person, after having made due inquiry and investigation and (h) whenever pursuant to this Agreement or any agreement, instrument or document contemplated herein, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory or acceptable to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (unless otherwise expressly provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.

**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGE(S)]**

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date appearing on the first page of this Agreement.

**LENDER:**

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP,**
an Irish limited partnership, acting by its
General Partner, U.S. Real Estate Credit
Holdings III-A GP Limited

By:    Calmwater Asset Management, LLC,
a Delaware limited liability company,
its Investment Manager

By:    _____
Name:  DAVID HEAVERSI
Title:   President

**BORROWER**:

**WC 56 EAST AVENUE, LLC,**
a Delaware limited liability company

By:    WC 56 East Avenue MM, LLC,
       a Delaware limited liability company,
       its Managing Member

       By:  _____
       Name:  Natin Paul
       Title:   President

**[SIGNATURE PAGE TO LOAN AGREEMENT]**

## SCHEDULE I

## ORGANIZATIONAL CHART

**[ATTACHED]**



# EXHIBIT A

## LEGAL DESCRIPTION OF LAND

A 1.118 ACRE, 48,700 SQUARE FEET, TRACT OF LAND OUT OF BLOCK 2, OUTLOT 73, DIVISION "E" OF THE GOVERNMENT OUTLOTS ADJOINING THE ORGINAL CITY OF AUSTIN, TRAVIS COUNTY, TEXAS. HAVING BEEN CONVEYED TO WC 56 EAST A VENUE, LLC BY INSTUMENT OF RECORD IN DOCUMENT NUMBER 2015026718 IN THE OFFICIAL PUBLIC RECORDS OF TRAVIS COUNTY, TEXAS; SAID 1.118 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

POINT OF BEGINNING at a 1/2" iron rod with plastic cap found at the intersection of the south right of way line of River Street with the west right of way line of East A venue, also being the northeast corner of the 1.118 acre tract of land herein described;

THENCE, S 16° 33' 20" W, a distance of 380.28 feet with the west right of way line of East A venue and the east line of said 1.1178 acre tract to a 1/2" iron rod found on the west right-of-way line of East Avenue, the southeast corner of the herein described tract of land and the northeast corner of Lot A, Zoppp Addition, a subdivision recorded in Book 65, Page 56 of the Plat Records of Travis County, Texas having been conveyed to 48 East Ave. LLC by instrument of record in Document Number 2014101790 of the official public records of Travis County Texas;

THENCE, N 73° 43' 47" W, leaving the west right of way line of East Avenue with the south line of said 1.118 acre tract and the north line of said Lot A, a distance of 127.75 feet to a 1/2" iron rod found at the to a 1/2" iron rod found at the southwest corner of the herein described tract of land and the northwest corner of said Lot A also on the east line of a 20' alley;

THENCE, N 16° 28' 21" W, with the west line of the herein described tract of land and the east line of said 20' alley a distance of 380.55 feet to a nail with a washer found at the northwest corner of the herein described tract of land and the intersection of the east right of way line of said 20' alley with the south right of way line of River Street for the northwest corner of the herein described tract of land;

THENCE, S 73° 36' 22" E, with the south right-of-way line of River Street and the north line of the herein described tract of land, a distance of 128.30 feet to the POINT OF BEGINNING and containing 1.118 acres of land.

## EXHIBIT B

## DOCUMENTS

I. <u>Loan Documents</u>. The documents listed in this <u>Section I</u>, and amendments, modifications and supplements thereto which have received the prior written consent of Lender, together with any documents executed in the future that are approved by Lender and that recite that they are "Loan Documents" for purposes of this Agreement are collectively referred to herein as the Loan Documents.

1. This Agreement.

2. The Promissory Note dated as of the date hereof, in the maximum principal amount of $15,000,000, made by Borrower payable to the order of Lender.

3. The Deed of Trust, Security Agreement and Financing Statement dated as of the date hereof, executed by Borrower, as Trustor, to the trustee named therein, for the benefit of Lender.

4. Uniform Commercial Code – National Financing Statement – Form UCC-1, showing Borrower, as debtor, and Lender, as secured party, to be filed with the Secretary of State of the State of Texas.

5. Uniform Commercial Code – National Financing Statement – Form UCC-1, showing Borrower, as debtor, and Lender, as secured party, to be recorded in the Official Records.

6. Assignment of Leases and Rents dated as of the date hereof, executed by Borrower and Lender.

7. Notice of Final Agreement dated as of the date hereof, executed by Borrower.

8. Indemnity and Guaranty Agreement dated as of the date hereof, executed by Guarantor in favor of Lender.

9. Hazardous Substances Indemnity Agreement dated as of the date hereof, executed by the Borrower and Guarantor in favor.

10. Payment Guaranty Agreement dated as of the date hereof, executed by Guarantor in favor of Lender. of Lender.

11. Collateral Assignment of Interest Rate Cap Agreement dated as of the date hereof.

## EXHIBIT C

### Approved Budget

**[NONE]**

**EXHIBIT D**

**[OMITTED]**

**EXHIBIT E**

**[OMITTED]**

## EXHIBIT F

## RENT ROLL AND LIST OF LEASES

**[ATTACHED]**

56 East Avenue Rent Roll

## 56 East Avenue

| Units | Lease | Area | Lease From | Lease To | Term | Annual Rent | Annual Rent Per Area |
|---|---|---|---|---|---|---|---|
| A | Austin Travis County Integral Care | 16,832 | Feb-15 | Dec-17 | 35 | $472,136 | $28.05 |
| Average/Weighted Average | | 16,832 | | | | $472,136 | $28.05 |

# **EXHIBIT B**

## PROMISSORY NOTE
### (World Class – 56 East Avenue)

$15,000,000                                                              December 12, 2017

**FOR VALUE RECEIVED**, the undersigned, WC 56 EAST AVENUE LLC, a Delaware limited liability company ("Borrower"), the principal place of business of which is 401 Congress Avenue, 33rd Floor, Austin, Texas 78701, promises to pay to the order of **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership ("Lender"), having its principal office at 11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025, or at such other place as Lender may designate to Borrower in writing from time to time, the principal amount of FIFTEEN MILLION AND NO/100 DOLLARS ($15,000,000.00) in lawful money of the United States of America (the "Loan"), with interest thereon to be computed on the unpaid principal balance at the "Note Rate" (as defined herein), adjusted with respect to each Interest Period (as defined herein), together with all other amounts due hereunder and under the other Loan Documents (as defined in the Loan Agreement (as defined herein)), and to be paid in installments as set forth in this Note. Capitalized terms used herein but not defined herein shall have the meaning set forth in that certain Loan Agreement (the "Loan Agreement") between Borrower and Lender, dated as the date hereof.

## 1.        TERMS OF PAYMENT

(a)        (i)        Borrower shall deliver to Lender (A) on the date the proceeds of the Loan are advanced to or for the benefit of Borrower (the "Initial Funding Date"), a payment of interest only for the period from and including the Initial Funding Date through and including December 31, 2017 and (B) thereafter, commencing on February 1, 2018 (the "First Payment Date") and on each Payment Date (as hereinafter defined) thereafter throughout the term of the Loan, monthly payments of interest in arrears. As used herein, "Payment Date" means the First Payment Date and the first day of each calendar month thereafter throughout the term of the Loan and "Monthly Payment" shall mean each payment of interest and principal (if any) due on each Payment Date throughout the term of the Loan.

(ii)        On the Initial Funding Date, Borrower shall pay to Lender a loan commitment fee (the "Loan Commitment Fee") in the amount equal to one percent (1%) of the maximum amount of the Loan. Borrower hereby authorizes Lender to disburse on the Initial Funding Date a portion of the Loan in such amount directly to Lender in payment of the Loan Commitment Fee. The Loan Commitment Fee shall be deemed earned upon payment and shall not be subject to reduction or be refundable under any circumstances.

(b)        Unless extended pursuant to Section 1(f) hereof or accelerated following an Event of Default pursuant to the terms of the Loan Documents, the unpaid principal amount, together with all accrued and unpaid interest thereon, the Exit Fee (as defined herein) and any and all accrued and unpaid sums under the Loan Documents shall be due and payable on January 1, 2019 (the "Maturity Date"). Interest on the principal amount of this Note shall be calculated on the basis of a 360-day year and based on the actual number of days elapsed for any period in which interest is being calculated. Solely for the purpose of making any payment hereunder, but not for the purpose of calculating the amount thereof or the application/allocation thereof to principal and interest, if the first (1st) day of a given month is not a Business Day (as defined herein), then the Payment Date for such month shall be the next succeeding Business Day. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever. "Business Day", as used herein, shall mean a day other than (i) a Saturday or Sunday, or (ii) any other day on which commercial banks in the State of California or the State of Texas are not permitted or required to be open for general banking business.

(c)     Payments in federal funds immediately available at the place designated for payment received by Lender prior to 2:00 p.m. local time of such place on a day on which Lender is open for business at said place of payment shall be credited prior to close of business while other payments may, at the option of Lender, not be credited until immediately available to Lender in federal funds at the place designated for payment prior to 2:00 p.m. local time at said place of payment on a day on which Lender is open for business. Each such monthly installment shall be applied first, to the payment of accrued interest, second, to any amounts hereafter advanced by Lender hereunder or under any other Loan Document, third, to any late fees, fourth, to other amounts payable to Lender, and, last, to reduction of principal.

(d)     The term "Note Rate" as used in the Loan Documents and this Note shall mean an interest rate equal to the sum of the following, rounded up to the nearest one-sixteenth percent (1/16%): (i) the greater of (A) one and one-quarter percent (1.25%) per annum, or (B) LIBOR (as defined herein), plus (ii) seven and one quarter percent (7.25%) per annum. The term "LIBOR" means the rate per annum which is equal to the London Interbank Offered Rate reported from time to time by Reuters Screen LIBOR01 Page, at which foreign branches of major United States banks offer United States dollar deposits to other banks for a one-month period in the London interbank market at approximately 11:00 a.m., London time, on the first calendar day of the applicable month, or if such day is not a Eurodollar Business Day (as defined herein), the first succeeding Eurodollar Business Day. If such interest rate shall cease to be available from Reuters Screen LIBOR01 Page, LIBOR shall be determined from such financial reporting service as Lender shall reasonably determine and use with respect to Lender's other loan facilities on which interest is determined on LIBOR (or such other commercially reasonable and comparable index should LIBOR no long be available). If two or more such rates appear on Reuters Screen LIBOR01 Page or other applicable pages, the rate in respect of such Interest Period will be the arithmetic mean of such offered rates, absent manifest error. The term "Eurodollar Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York, New York are authorized or required to close but excluding therefrom any day on which commercial banks are not open for dealings in U.S. dollar deposits in the London interbank market. The term "Interest Period" means the period from and including the first day of each calendar month during the term of the Loan through and including the last day of the same calendar month.

(e)     For each Interest Period, Lender shall calculate the interest payable for such Interest Period at the Note Rate on the unpaid principal balance as of the first Eurodollar Business Day of the Interest Period, and no adjustments to such payment amount shall be made on account of principal payments made during the Interest Period after the first Eurodollar Business Day thereof; provided, however, that in all events, adjustments to such payment amount shall be made on account of disbursements from the Reserves made during the Interest Period after the first Eurodollar Business Day therefor. Lender's determination of LIBOR as in effect from time to time, and Lender's calculations of interest payable for an Interest Period, shall be conclusive and binding absent manifest error. Borrower shall purchase, at Borrower's sole cost and expense, a twelve (12) month interest rate cap, to the benefit of Lender at the one (1) month LIBOR estimated benchmark of up to three percent (3%) for the initial term of the Loan, with a notional amount equal to the principal amount of the Loan, and otherwise with terms acceptable to Lender in Lender's sole but reasonable discretion (the "Initial Cap"). Borrower shall indemnify Lender from and against any loss, cost, expense, charge or penalty which Lender may sustain or incur as a consequence of a breach, default or termination of any interest rate swap, rate cap transaction, rate floor transaction, rate collar transaction or similar transaction governing any amounts disbursed hereunder resulting from Borrower's prepayment of any amount hereunder. A certificate from Lender as to the amount of any such loss or expense to Lender, furnished to Borrower by Lender shall be conclusive and binding upon Borrower in the absence of demonstrable error in the information on which such certificate is based.

(f)     Borrower shall have two (2) consecutive options to extend the Maturity Date until six (6) months after the then scheduled Maturity Date (the "Extension Term"), provided that Borrower's

right to exercise such option shall be subject to and conditioned on Borrower's satisfaction of all of the following terms and conditions:

(i)     Borrower shall deliver to Lender a notice (the "Extension Notice"), not earlier than ninety (90) days prior to the then scheduled Maturity Date, nor later than thirty (30) days prior to the scheduled Maturity Date, of Borrower's election to extend the then-scheduled Maturity Date as permitted in this Section 1(f), which election shall be irrevocable.

(ii)     No Default or Event of Default shall have occurred and shall remain uncured (as of the date of the Extension Notice or as of the date on which the Extension Term would commence).

(iii)     All of the representations and warranties of Borrower or any indemnitor or guarantor contained in the Loan Documents shall be true, accurate and complete in all material respects as of the date the Extension Notice is given and as of the date on which the Extension Term would commence (as if all such representations and warranties were remade as of the date the Extension Notice is given and as of the date on which the Extension Term would commence and Borrower's delivery of the Extension Notice shall be deemed to be a remaking and reaffirmation of all of such representations and warranties as of such dates).

(iv)     Borrower shall deliver to Lender an endorsement or written continuation of the title insurance policy issued to Lender as of the date hereof insuring the priority of the lien of the Security Instrument, showing that on the commencement date of the Extension Term, title to the Property covered by such title insurance policy is vested in Borrower and that no exceptions to title to the Property exist, other than those exceptions set forth in the original title insurance policy issued to Lender by the title company as of the date hereof.

(v)     Borrower shall deliver to Lender (and, at Lender's request, cause to be recorded or filed, as applicable) any and all such other items as Lender may reasonably require to confirm or assure the liens and security interests of Lender in the Property (as defined in the Security Instrument) continue to be valid and enforceable first priority liens and security interests securing the indebtedness evidenced hereby, including without limitation, UCC searches, supplemental environmental or engineering reports, consultant's reports, modifications or extension agreements and other documentation, all at no cost to Lender.

(vi)     As of the effective date of the Extension Term, there shall be no existing law, rule, regulation or guideline applicable to Lender, this Loan transaction or the Property prohibiting or precluding Lender's modification or extension of the Loan or otherwise adversely affecting the validity and enforceability of the Loan Documents and the Loan shall be in good standing as determined by Lender, in its sole and absolute discretion.

(vii)     Borrower shall pay any and all fees and charges incurred in connection with the extension of the scheduled Maturity Date, including without limitation, attorneys' fees and disbursements incurred by Lender and fees and expenses relating to the examination of title, title insurance premiums, surveys, and recording costs, documentary, transfer or other similar taxes and revenue stamps.

(viii)     Borrower shall pay to Lender concurrently with the delivery of the Extension Notice an extension fee in an amount equal to Seventy-Five Thousand and No/100 Dollars ($75,000.00).

(ix)     Borrower shall pay all costs and deliver to Lender an interest rate cap (fully covering the applicable Extension Term), to the benefit of Lender, with terms (including without limitation, a LIBOR "benchmark") acceptable to Lender in Lender's sole but reasonable discretion (together with a collateral assignment of such interest rate cap in form and substance satisfactory to Lender).

(x)      Property shall have maintained a Loan-to-Value Ratio of not more than 60% .

(xi)     With respect to the exercise of the second option to extend the Maturity Date, Borrower shall have duly and validly exercised the first option to extend the Maturity Date.

## 2.     PREPAYMENTS

During the first partial calendar month of the term of this Loan (if any), and through and including July 1, 2018 (collectively, the "Early Prepayment Period"), Borrower may prepay the Loan in full or in part so long as (i) Borrower gives to Lender not less than ten (10) days and not more than forty-five (45) days prior irrevocable written notice to Lender specifying the date on which prepayment is to be made (the "Early Prepayment Date"), (ii) Borrower pays on the Early Prepayment Date:  (a) all accrued interest to and including the Early Prepayment Date; (b) the Yield Maintenance; (c) the Exit Fee (or a prorated portion of the Exit Fee based on the partial amount of the Loan being prepaid) and (d) all other sums due under this Note and the other Loan Documents, and (iii) if Borrower prepays only a portion of the Loan, the principal prepaid shall not be less than Five Hundred Thousand Dollars ($500,000).  Thereafter, Borrower may prepay the Loan in full or in part upon not less than ten (10) days and not more than forty-five (45) days prior irrevocable written notice to Lender specifying the date on which prepayment is to be made (the "Prepayment Date") and upon prepayment of:  (a) all accrued interest to and including the Prepayment Date; (b) the Exit Fee (or a prorated portion of the Exit Fee based on the partial amount of the Loan being prepaid) and (c) all other sums due under this Note and the other Loan Documents and (iii) if Borrower prepays only a portion of the Loan, the principal prepaid shall not be less than Five Hundred Thousand Dollars ($500,000).  No amount repaid in respect of the Loan may be reborrowed.

For purposes of this Section 2, "Yield Maintenance" means the aggregate amount of interest that would have been due to Lender with respect to the amount of principal being prepaid or repaid, for the period from and after the Early Prepayment Date through and including July 1, 2018.  Such interest shall be calculated by Lender using a Note Rate equal to the interest which is anticipated to accrue on the amount being prepaid for the period commencing on the date of prepayment through the end of the Early Prepayment Period at the greater of (i) the then Note Rate and (ii) the Note Rate which would be in effect under the Note under the so-called "Forward LIBOR Curve" during the period being measured.

## 3.     EXCULPATION

(a)      Notwithstanding anything in the Loan Documents to the contrary, but subject to the qualifications hereinbelow set forth, Lender agrees that:

(i)      Borrower shall be liable upon the indebtedness evidenced hereby and for the other obligations arising under the Loan Documents to the full extent (but only to the extent) of the security therefor, the same being the Property.

4

(ii)     Judicial or other proceedings brought by Lender against Borrower upon an Event of Default shall be limited to the preservation, enforcement and foreclosure, or any thereof, of the liens, security titles, estates, assignments, rights and security interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, and, except with respect to the liability described below in this Section 3, no attachment, execution or other writ of process shall be sought, issued or levied upon any assets, properties or funds of Borrower other than the Property.

In the event of a foreclosure of such liens, security titles, estates, assignments, rights or security interests securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, no judgment for any deficiency upon the indebtedness evidenced hereby shall be sought or obtained by Lender against Borrower, except with respect to the liability described below in this Section 3; PROVIDED, HOWEVER, THAT, NOTWITHSTANDING THE FOREGOING PROVISIONS OF THIS SECTION 3, BORROWER SHALL BE FULLY AND PERSONALLY LIABLE (AND SUBJECT TO LEGAL ACTION) FOR PAYMENT AND PERFORMANCE OF EACH OF THE FOLLOWING:

(A)     for any and all Losses (as defined herein) incurred or suffered by Lender and arising out of or in connection with any fraud or material misrepresentation or failure to disclose a material fact by Borrower or any of Borrower's principals, officers, general partners, managing members or managers, any guarantor, any indemnitor or any agent, employee or other person authorized or apparently authorized to make statements, representations or disclosures on behalf of Borrower, any principal, officer, general partner or member of Borrower, any guarantor or any indemnitor;

(B)     for any and all Losses (as defined herein) incurred or suffered by Lender arising out of in connection with any misapplication or misappropriation of any proceeds paid under any insurance policies (or paid as a result of any other claim or cause of action against any person or entity) by reason of damage, loss or destruction to all or any portion of the Property which, under the terms of the Loan Documents, should have been delivered to Lender;

(C)     for any and all Losses (as defined herein) incurred or suffered by Lender and arising out of or in connection with any misapplication or misappropriation of any proceeds or awards resulting from the condemnation or other taking in lieu of condemnation of all or any portion of the Property, or any of them which, under the terms of the Loan Documents, should have been delivered to Lender;

(D)     for any and all Losses (as defined herein) incurred or suffered by Lender and arising out of or in connection with any misapplication or misappropriation of any tenant security deposits or other refundable deposits paid to or held by Borrower or any other person or entity in connection with Leases of all or any portion of the Property which are not applied in accordance with the terms of the applicable Lease or other agreement;

(E)     for any and all Losses (as defined herein) incurred or suffered by Lender and arising out of or in connection with any misapplication or misappropriation (including failure to turn over to Lender on demand following an Event of Default) of: (i) any tenant security deposits and Rents and Profits collected in advance, (ii) any funds disbursed to Borrower from any reserve, (iii) any funds held by Borrower for the benefit of another party, or (iv) any other funds due Lender under the Loan Documents.

(F)     for all obligations and indemnities of Borrower under the Loan Documents (including, without limitation, the Hazardous Substances Indemnity Agreement

5

dated of even date herewith) relating to hazardous or toxic substances or compliance with environmental laws and regulations to the full extent of any losses or damages (including, but not limited to, those resulting from diminution in value of the Property) incurred by Lender as a result of the existence of such hazardous or toxic substances or failure to comply with environmental laws or regulations;

(G)       all Rents and Profits, issues, products and income of the Property received or collected by or on behalf of Borrower after an Event of Default (excluding payments collected by Lender) and not applied to payment of principal, interest and other amounts due under this Note and the other Loan Documents, and to the payment of actual and reasonable operating expenses of the Property, as they become due or payable (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally prevented from directing the disbursement of such sums);

(H)       for any and all Losses (as defined herein) incurred or suffered by Lender and arising out of or in connection with waste committed with respect to the Property by, or damage to the Property as a result of the intentional misconduct or gross negligence of Borrower or any of Borrower's principals, officers, partners, managing members, or managers, any guarantor, any indemnitor, or any agent or employee of any such persons, or any removal of the Property in violation of the terms of the Loan Documents;

(I)       for failure to pay any valid taxes, assessments, mechanic's liens, materialmen's liens or other liens which could create liens on any portion of the Property which would be superior to the lien or security title of the Security Instrument or the other Loan Documents, to the full extent of the amount claimed by any such lien claimant except, with respect to any such taxes or assessments, to the extent that (i) the Rents and Profits, issues, products and income of the Property are insufficient to pay such amounts, and (ii) funds have been deposited with Lender pursuant to the terms of any Loan Documents specifically for the applicable taxes or assessments and not applied by Lender to pay such taxes and assessments, and as to any other lienable event, to the extent adequate security therefor has been posted by Borrower;

(J)       for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts under the Note, in the event of any violation of Section 9.10 of the Loan Agreement [Single Purpose Entity];

(K)       for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts under the Note, in the event of any transfer of or further encumbrance placed on the Property in violation of Section 9.9 of the Loan Agreement [Transfer];

(L)       for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts under this Note, if Borrower shall voluntarily file a petition under Title 11 of the U.S. Code (the "Act"), as such Act may from time to time be amended, or under any similar or successor Federal statute relating to bankruptcy, insolvency, arrangements or reorganizations, or under any state bankruptcy or insolvency act, or file an answer in any involuntary proceeding admitting insolvency or inability to pay debts, or if Borrower shall fail to seek dismissal within ninety (90) days of the filing of any such involuntary proceeding, or fail to obtain a vacation of any such involuntary proceeding within one hundred twenty (120) days of the filing of such involuntary proceeding, or if any affiliate of Borrower initiates or joins in any such involuntary proceeding against Borrower, or if Borrower shall be adjudged a bankrupt, or if a trustee or receiver shall be appointed for Borrower or

6

Borrower's property, or if the Property shall become subject to the jurisdiction of a Federal bankruptcy court or similar state court, or if Borrower shall make an assignment for the benefit of Borrower's creditors, or if there is an attachment, execution or other judicial seizure of any portion of Borrower's assets and such seizure is not discharged within ten (10) days;

    (M) for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts under this Note, upon any action by Borrower or any guarantor or indemnitor under any indemnity or guaranty executed in connection with the Loan which prevents Lender from lawfully taking possession of the Property after an Event of Default;

    (N) for any and all Losses (as defined herein) incurred or suffered by Lender in the event Borrower fails to complete, or fails to cause to be completed, the Required Work in accordance with the terms of the Loan Agreement.

As used in this Section 3, "Losses" shall mean and include any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgment, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damage, of whatever kind or nature (including but not limited to reasonable attorneys' fees (which attorneys' fees shall include but not be limited to appellate fees and reasonable fees for all paralegals, legal assistants and other paraprofessionals)) and other costs of defense). Notwithstanding the foregoing, Borrower shall not be liable for any Losses that are attributable to the gross negligence or willful misconduct of Lender.

   References herein to particular sections of the Loan Documents shall be deemed references to such sections as affected by other provisions of the Loan Documents relating thereto. Nothing contained in this Section 3 shall (x) be deemed to be a release or impairment of the indebtedness evidenced by this Note or the other obligations of Borrower under the Loan Documents or the lien of the Loan Documents upon the Property, or (y) preclude Lender from foreclosing the Loan Documents in case of any default or from enforcing any of the other rights of Lender except as stated in this Section 3, or (z) release, relieve, reduce, waive, limit or impair in any way whatsoever any obligation of any party to the Indemnity and Guaranty Agreement and Hazardous Substances Indemnity Agreement each of even date herewith executed and delivered in connection with the indebtedness evidenced by this Note.

   (b) Notwithstanding anything to the contrary in this Note, the Security Instrument or any of the other Loan Documents, Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness evidenced hereby or secured by the Security Instrument or any of the other Loan Documents or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Note, the Security Instrument and the other Loan Documents.

## 4. DEFAULT

   (a) It is hereby expressly agreed that should any default occur in the payment of principal or interest as stipulated above and such payment is not made within five (5) days after the date such payment is due (except that no grace or notice period is provided for the payment of principal and interest due on the Maturity Date), or should any other "Event of Default" or any default not cured within any applicable grace or notice period occur under any other Loan Document, then an event of default (an "Event of Default") shall exist hereunder, and in such event the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued

thereon and the Exit Fee, shall, at the option of Lender and with notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity.

(b)    In the event that any payment is not received by Lender on the date when due (subject to the applicable grace period), then in addition to any default interest payments due hereunder and any other amounts due under the Loan Documents, Borrower shall also pay to Lender a late charge in an amount equal to five percent (5.0%) of the amount of such overdue payment. So long as any Event of Default exists, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby, and at all times after maturity of the indebtedness evidenced hereby (whether by acceleration or otherwise), interest shall accrue on the outstanding principal balance of this Note from (i) the date of the occurrence of any such Event of Default or, in the case of any monetary Event of Default, the due date of the payment giving rise to such Event of Default, through and including (ii) the date such Event of Default is cured or, in the case of any monetary Event of Default, the full amount of the payment due is credited or the outstanding principal amount evidenced hereby, together with all interest accrued and unpaid thereon and all other amounts payable under and with respect to the Loan Documents is paid and credited at the Default Interest Rate. "Default Interest Rate" shall mean a rate per annum equal to the lesser of (a) five percent (5.0%) in excess of the Note Rate, or (b) the maximum rate of interest, if any, which may be charged or collected from Borrower under applicable law and such default interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or default, and such late charges and default interest are reasonable estimates of those damages and do not constitute a penalty.

(c)    The remedies of Lender in this Note or in the Loan Documents, or at law or in equity, shall be cumulative and concurrent, and may be pursued singly, successively or together in Lender's discretion. In the event this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs of collection including, without limitation reasonable attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and disbursements. In addition, in connection with any other action arising from or in connection with this Note, Lender shall be entitled to an award of its costs and expenses, including without limitation reasonable attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and disbursements, incurred or paid before and at trial or any other proceeding which may be instituted, at any tribunal level, and whether or not suit or any other proceeding is instituted.

(d)    The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, the Security Instrument. All of the terms and provisions of the Loan Documents are incorporated herein by reference. Some of the Loan Documents are to be filed for record on or about the date hereof in the appropriate public records.

(e)    Time is of the essence with respect to this Note and the provisions herein contained.

## 5.    LIMIT OF VALIDITY

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by Lender in accordance with applicable law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Loan but were not payable as a result of the operation of this

Section shall be cumulated and the interest and Charges payable to Lender in respect of other indebtedness or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Note Rate shall have been received by Lender. If, for any reason whatever, the Charges paid or received on the Loan produces a rate which exceeds the Maximum Rate, Lender shall credit against the principal of the Loan (or, if such indebtedness shall have been paid in full, shall refund to the payor of such Charges) such portion of said Charges as shall be necessary to cause the interest paid on the Loan to produce a rate equal to the Maximum Rate. All sums paid or agreed to be paid to the holders of the Loan for the use, forbearance or detention of the Loan shall, to the extent required to avoid or minimize usury and to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note, so that the interest rate does not exceed the Maximum Rate. The provisions of this Section shall control all agreements, whether now or hereafter existing and whether written or oral, between the parties hereto. On each day, if any, that Texas law establishes the Maximum Rate, the Maximum Rate shall be the "weekly ceiling" (as defined in Chapter 303 of the Texas Finance Code (the "Texas Finance Code")) for that day. Lender may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code by notice to Borrower, if and to the extent permitted by the Texas Finance Code. Without notice to Borrower or any other person or entity, the Maximum Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates.

## 6. NO WAIVER: AMENDMENT

No failure to accelerate the indebtedness evidenced hereby by reason of default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (a) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (b) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any applicable laws; and Borrower hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for the payment of this Note or any installment due hereunder made by agreement with any person or any guarantor now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender agrees otherwise in writing. This Note may not be waived, changed, modified or discharged orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

## 7. WAIVERS

Presentment for payment, demand, protest and notice of demand, intent to accelerate, acceleration, protest and nonpayment and all other notices are hereby waived by Borrower. Borrower hereby, for itself and any other person or entity claiming by, through, under or on behalf of Borrower, further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.

## 8. USE OF FUNDS

Borrower hereby warrants, represents and covenants that no funds disbursed hereunder shall be used for personal, family or household purposes, but only for commercial and business uses and purposes as represented, disclosed and certified to Lender by Borrower prior to the date hereof.

9

## 9.     ENFORCEABILITY

This Note shall be interpreted, construed and enforced according to the laws of the State of Texas (without reference to the conflicts of law rules of the State of Texas). The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, which shall include, without limitation, a transferee pursuant to Section 12.13 of the Loan Agreement, whether by voluntary action of the parties or by operation of law (without implying Lender's consent to any transfer or further encumbering of the Property in violation of Section 9.9 of the Loan Agreement).  As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.  If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.  Titles of articles, sections, clauses and paragraphs are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof.  This Note shall not be construed more strictly against one party than against the other merely by virtue of the fact that this Note may have been physically prepared by one of the parties, or such party's counsel, it being agreed that all parties and their respective counsel have mutually participated in the negotiation and preparation of this Note.  This Note and the other Loan Documents contain the entire agreements between the parties hereto relating to the subject matter hereof and thereof, and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.  Lender may sell, transfer and deliver the Loan Documents to one or more investors in the secondary mortgage market.  In connection with such sale, Lender may retain or assign responsibility for servicing the Loan or may delegate some or all of such responsibility and/or obligations to a servicer, including, but not limited to, any subservicer or master servicer, on behalf of the investors.  All references to Lender herein shall refer to and include, without limitation, any such servicer, to the extent applicable.

## 10.     UNCONDITIONAL PAYMENT

Borrower is and shall be obligated to pay principal, interest and any and all other amounts which become payable hereunder or under the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff.  In the event that at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

## 11.     TAXES

Borrower shall pay the cost of all revenue, tax or other stamps now or hereafter required by law at any time to be affixed to this Note, to the Security Instrument and/or to any other Loan Document; and if any tax is now or hereafter imposed with respect to notes of the nature of this Note or debts of the nature of the debt evidenced by this Note, Borrower agrees to pay to Lender upon demand the amount of such tax, and hereby waives any contrary provision of any law or rule of court now or hereafter in effect.

### 12.    SEVERABILITY

In the event any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  Furthermore, in the event that the application of any provision of this Note to any person or circumstance shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part, or in any respect, then, and in any event, such invalidity, illegality or unenforceability shall not be deemed to affect the application of such provision to any person or entity or circumstance against whom or which such application is legal, valid and enforceable.

**[REMAINDER OF THE PAGE LEFT INTENTIONALLY BLANK]**

### 13. WAIVER; EXIT FEE

Upon the Maturity Date (including any acceleration thereof), or upon Borrower's prepayment of this Note pursuant to Section 2 hereof, a fee (the "Exit Fee") in the amount of $75,000.00 shall be due and payable by Borrower to Lender in cash or immediately available funds.

TO THE EXTENT THE YIELD MAINTENANCE OR THE EXIT FEE IS DEEMED IN WHOLE OR IN PART TO CONSTITUTE A CHARGE, FEE OR PENALTY FOR PREPAYMENT OF THE LOAN (ALTHOUGH NOT INTENDED AS SUCH), BORROWER HEREBY EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER APPLICABLE LAW TO PREPAY THIS NOTE, IN WHOLE OR IN PART, WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY DATE OF THIS NOTE, AND (B) AGREES THAT, IF, FOR ANY REASON, A PREPAYMENT OF ANY OR ALL OF THIS NOTE IS MADE, UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE OF THIS NOTE BY LENDER ON ACCOUNT OF ANY DEFAULT BY BORROWER UNDER THIS NOTE, THE SECURITY INSTRUMENT, OR ANY OTHER DOCUMENT SECURING THIS NOTE, INCLUDING, BUT NOT LIMITED TO, ANY TRANSFER, DISPOSITION OR FURTHER ENCUMBRANCE AS PROHIBITED OR RESTRICTED HEREIN AND BY THE SECURITY INSTRUMENT, THEN BORROWER SHALL BE OBLIGATED TO PAY, CONCURRENTLY THEREWITH, THE YIELD MAINTENANCE AND THE EXIT FEE THAT WOULD THEN BE DUE. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN EVIDENCED BY THIS NOTE AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER AND AGREEMENT.

_____
Initials

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

### 14. SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL

(a)     BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE LAND (AS DEFINED IN THE SECURITY INSTRUMENT) IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS NOTE OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE IN WHICH THE LAND (AS DEFINED IN THE SECURITY INSTRUMENT) IS LOCATED, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT BORROWER WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM WITH RESPECT TO THIS NOTE (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 12.4 OF THE LOAN AGREEMENT, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(b)     EACH OF BORROWER AND LENDER HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS NOTE MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

### 15. INCREASED COSTS

(a)     All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any governmental authority, which are imposed, enacted or become effective after the date hereof (such non-excluded taxes being referred to collectively as "Foreign Taxes"), excluding income and franchise taxes of the United States of America imposed by the jurisdiction under the laws of which Lender is organized or any political subdivision or taxing authority thereof or therein or imposed by the jurisdiction of Lender's applicable

13

lending office where Lender is resident or engaged in business or any political subdivision or taking authority thereof or therein. If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(b)    In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other governmental authority:

(A)    shall hereafter impose, modify or hold applicable any reserve, capital adequacy, tax, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of LIBOR hereunder;

(B)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(C)    shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender within ten (10) days of written demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender in its reasonable discretion. If Lender becomes entitled to claim any additional amounts pursuant to this subsection, Lender shall provide Borrower with not less than thirty (30) days' notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This provision shall survive payment of this Note and the satisfaction of all other obligations of Borrower under the Loan Agreement and the Loan Documents.

Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender sustains or incurs as a consequence of (A) any default by Borrower in payment of the principal of or interest on a LIBOR loan, including, without limitation, any such actual out-of-pocket loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR loan hereunder), and (B) any prepayment (whether voluntary or mandatory) of the LIBOR loan on a day that is not the last day of an Interest Period, including, without limitation, such actual out-of-pocket loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the LIBOR loan hereunder; provided, however, Borrower shall not indemnify Lender from any

14

loss or expense arising from Lender's willful misconduct or gross negligence. This provision shall survive payment of this Note in full and the satisfaction of all other obligations of Borrower under the Loan Agreement and the other Loan Documents.

**[END OF TEXT; SIGNATURE FOLLOWS ON NEXT PAGE]**

**IN WITNESS WHEREOF,** Borrower has executed this Note under seal as of the date first above written.

> BORROWER:
>
> **WC 56 EAST AVENUE, LLC,**
> a Delaware limited liability company
>
> By:    WC 56 East Avenue MM, LLC,
>        a Delaware limited liability company,
>        its Managing Member
>
>        By:
>        Name:  Natin Paul
>        Title:   President

**[SIGNATURE PAGE TO PROMISSORY NOTE]**

# EXHIBIT C

**ELECTRONICALLY RECORDED**                    **2017196451**

TRV      **51**      PGS

*#50CTOT*
*17-334937-Am/MM*

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

Safarian Choi & Bolstad LLP
555 South Flower St., Suite 650
Los Angeles, California 90071
Attention:  Alex Choi, Esq.

(Space Above For Recorder's Use)

### DEED OF TRUST,
### SECURITY AGREEMENT AND FINANCING STATEMENT

by

**WC 56 EAST AVENUE LLC, a Delaware limited liability company**

having an office at

401 Congress Avenue, 33rd Floor, Austin, Texas 78701

(**"Borrower"**)

to

**CYRUS N. ANSARI, ESQ.**
having an office at

c/o Stutzman, Bromberg, Esserman & Plifka,
2323 Bryan Street, Suite 2200, Dallas, Texas  75201

(**"Trustee"**)

for the benefit of

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP, an Irish limited partnership**

having an office at
c/o Calmwater Capital, 11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025

(**"Lender"**)

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## DEED OF TRUST, SECURITY AGREEMENT AND FINANCING STATEMENT
(World Class – 56 East Avenue)

**THIS DEED OF TRUST, SECURITY AGREEMENT AND FINANCING STATEMENT** (this "Security Instrument") is made as of December 12, 2017 ("Effective Date"), by WC 56 EAST AVENUE LLC, a Delaware limited liability company ("Borrower"), the address of which is 401 Congress Avenue, 33rd Floor, Austin, Texas 78701, to CYRUS N. ANSARI, ESQ. (together with any successor or substitute Trustee from time to time designated or acting in accordance herewith, the "Trustee"), the address of which is c/o Stutzman, Bromberg, Esserman & Plifka, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201, for the benefit of U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP, an Irish limited partnership("Lender"), the address of which is c/o Calmwater Capital, 11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025.

W I T N E S S E T H  T H A T:

BORROWER HEREBY IRREVOCABLY GRANTS, BARGAINS, TRANSFERS, MORTGAGES, CONVEYS AND ASSIGNS TO TRUSTEE, IN TRUST FOR THE BENEFIT OF LENDER, WITH POWER OF SALE AND RIGHT OF ENTRY, all of Borrower's right, title and interest now owned or hereafter acquired in and to the following property, all of which is hereinafter collectively defined as the "Property":

A.     All that certain land situated at 50-56 East Avenue, in the City of Austin, County of Travis, State of Texas, more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "Land"), together with all of the easements, rights, privileges, franchises, tenements, hereditaments and appurtenances now or hereafter thereunto belonging or in any way appertaining and all of the estate, right, title, interest, claim and demand whatsoever of Borrower therein or thereto, either at law or in equity, in possession or in expectancy, now or hereafter acquired;

B.     All structures, buildings and improvements of every kind and description now or at any time hereafter located or placed on the Land (the "Improvements");

C.     All furniture, furnishings, fixtures, goods, equipment, inventory or personal property owned by Borrower and now or hereafter located on, attached to or used in and about the Improvements, including, but not limited to, all machines, engines, boilers, dynamos, elevators, stokers, tanks, cabinets, awnings, screens, shades, blinds, carpets, draperies, lawn mowers, and all appliances, plumbing, heating, air conditioning, lighting, ventilating, refrigerating, disposal and incinerating equipment, and all fixtures and appurtenances thereto, and such other goods and chattels and personal property owned by Borrower as are now or hereafter used or furnished in operating the Improvements, or the activities conducted therein,

and all building materials and equipment hereafter situated on or about the Land or the Improvements, and all warranties and guaranties relating thereto, and all additions thereto and substitutions and replacements therefor (exclusive of any of the foregoing owned or leased by tenants of space in the Improvements);

D.     All easements, rights of way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, air rights and other development rights now or hereafter located on or appurtenant to the Land and/or the Improvements or under or above the same or any part or parcel thereof, and all estates, rights, titles, interests, tenements, hereditaments and appurtenances, reversions and remainders whatsoever, in any way belonging, relating or appertaining to the Land and/or the Improvements or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Borrower;

E.     All water, ditches, wells, reservoirs and drains and all water, ditch, well, reservoir and drainage rights which are appurtenant to, located on, under or above or used in connection with the Land and/or the Improvements, or any part thereof, whether now existing or hereafter created or acquired;

F.     All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above the Land;

G.     All cash funds, deposit accounts and other rights and evidence of rights to investments or cash, now or hereafter created or held by Lender pursuant to this Security Instrument or any other of the Loan Documents (as hereinafter defined), including, without limitation, all funds now or hereafter on deposit in any reserves or accounts held by or on behalf of Lender pursuant to this Security Instrument or any other of the Loan Documents (including, without limitation, the reserves established pursuant to Article I of this Security Instrument) (collectively, the "Reserves");

H.     All leases (including, without limitation, oil, gas and mineral leases), licenses, rental agreements, concessions and occupancy agreements of all or any part the Land and/or the Improvements now or hereafter entered into (each, a "Lease" and collectively, "Leases"), and all rents, royalties, issues, profits, revenue, income and other benefits (collectively, the "Rents and Profits") of the Land and/or the Improvements, now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future Lease or other agreement pertaining thereto or arising from any of the Contracts (as hereinafter defined) or any of the General Intangibles (as hereinafter defined) and all cash or securities deposited to secure performance by the tenants, lessees, licensees or occupants (each, a "Tenant" and collectively, "Tenants"), as applicable, of their obligations under any such Leases, whether said cash or securities are to be held until the expiration of the terms of said Leases or applied to one or more of the installments of rent coming due prior to the expiration of said terms, subject to, however, the provisions contained in Section 1.8 hereinbelow;

I.     All contracts and agreements now or hereafter entered into covering any part of the Land and/or the Improvements (except Leases), together with any management agents, leasing agents, sales agents, service and maintenance agents, contractors and other third parties

(collectively, the "Contracting Parties", or, singularly, a "Contracting Party"), whether now existing or hereafter arising, relating to the management, operation, leasing, sale, maintenance and repair of the Land and Improvements, including, without limitation, management agreements, franchise agreements, equipment leases and personal property leases (collectively, the "Contracts" or, singularly, a "Contract") and all revenue, income and other benefits thereof, including, without limitation, management agreements, service contracts, maintenance contracts, equipment leases, personal property leases and any contracts or documents relating to construction on any part of the Land and/or the Improvements (including plans, drawings, surveys, tests, reports, bonds and governmental approvals) or to the management or operation of any part of the Land and/or the Improvements;

J.      Any and all warranties and guaranties relating to the Property or any fixtures, equipment or personal property owned by Borrower and located on and/or used in connection with the Property, whether now existing or hereafter arising; and any and all permits, licenses, certificates of use and occupancy (or their equivalent) and applications and approvals issued by any governmental authority or agency relating to the construction, ownership, operation and/or use of the Property, to the extent assignable, whether now existing or hereafter arising (collectively, the "Warranties")

K.      All present and future deposits given to any public or private utility with respect to utility services furnished to any part of the Land and/or the Improvements;

L.      All present and future funds, accounts, instruments, accounts receivable, documents, causes of action, claims, general intangibles (including without limitation, patents, copyrights, trademarks, trade names, service marks and symbols now or hereafter used in connection with any part of the Land and/or the Improvements, all names by which the Land or the Improvements may be operated or known, all rights to carry on business under such names, and all rights, interest and privileges which Borrower has or may have as developer or declarant under any covenants, restrictions or declarations now or hereafter relating to the Land and/or the Improvements) and all notes or chattel paper now or hereafter arising from or by virtue of any transactions related to the Land and/or the Improvements (together with the Contracts, and the Warranties, collectively, the "General Intangibles");

M.      All water taps, sewer taps, certificates of occupancy, permits, licenses, franchises, certificates, consents, approvals and other rights and privileges now or hereafter obtained in connection with the Land and/or the Improvements and all present and future warranties and guaranties relating to the Improvements or to any equipment, fixtures, furniture, furnishings, personal property or components of any of the foregoing now or hereafter located or installed on the Land and/or the Improvements;

N.      All building materials, supplies and equipment now or hereafter placed on the Land and/or in the Improvements and all architectural renderings, models, drawings, plans, specifications, studies and data now or hereafter relating to the Land and/or the Improvements;

O.      All right, title and interest of Borrower in any insurance policies or binders now or hereafter referred to in clauses (A)-(N) and (P)-(R) including any unearned premiums thereon;

P.      All proceeds, products, substitutions and accessions (including without limitation, claims and demands therefor) of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards;

Q.      All present and future tax refunds relating to the Property.  The term "Tax" includes, without limitation, all real estate and personal property taxes, assessments and impositions, whether special or general, and any similar governmental charges or assessments that are levied upon the Property; and

R.      All other or greater rights and interests of every nature in the Land and/or the Improvements and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Borrower.

FOR THE PURPOSES OF SECURING:

(1)      The debt evidenced by that certain Promissory Note (such Promissory Note, together with any and all renewals, modifications, consolidations and extensions thereof, substitutions therefor, replacements thereof and any other evidence of indebtedness given in exchange therefor, is hereinafter referred to as the "Note") signed as of the Effective Date, made by Borrower to the order of Lender in the original principal amount of $15,000,000.00, with a maturity date of January 1, 2019, as may be extended in accordance with the Note, together with interest as therein provided;

(2)      The full and prompt payment and performance of all of the provisions, agreements, covenants and obligations contained herein and contained in any other agreements, documents or instruments now or hereafter evidencing, securing, guaranteeing or otherwise relating to the indebtedness evidenced by the Note (the Note, this Security Instrument, the Loan Agreement between the parties of even date herewith (the "Loan Agreement"), and such other agreements, documents and instruments executed and/or delivered in connection with the Loan, together with any and all renewals, amendments, extensions and modifications thereof, supplements thereof and other changes of any kind thereto are hereinafter collectively referred to as the "Loan Documents"; capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement) and the payment of all other amounts therein covenanted to be paid and performance of all other obligations therein covenanted to be performed;

(3)      Any and all additional advances made by Lender to protect or preserve the Property or the lien or security interest created hereby on or in the Property, or for Taxes, assessments or insurance premiums as hereinafter provided or for performance of any of Borrower's obligations hereunder or under the other Loan Documents or for any other purpose provided herein or in the other Loan Documents (whether or not the original Borrower remains the owner of the Property at the time of such advances); and

(4)      Any and all other indebtedness now owing or which may hereafter be owing by Borrower to Lender, including, without limitation, Yield Maintenance and the Exit Fee (as each such term is defined in the Note) and any other prepayment fees, however and whenever incurred

or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, consolidations, replacements and extensions thereof.

(All of the sums referred to in Paragraphs (1) through (4) above are herein sometimes referred to as the "secured indebtedness" or the "indebtedness secured hereby"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement.

TO HAVE AND TO HOLD the above granted and described Property, together with all and singular the rights, hereditaments and appurtenances in any way appertaining or belonging thereto, unto Trustee and Trustee's successors or substitutes in this trust, and for their successors and assigns, in trust and for the uses and purposes hereafter set forth, forever, subject, however, to all Permitted Exceptions (defined in Section 1.1 below).

Borrower, for Borrower and Borrower's successors and assigns, hereby agrees to warrant and forever defend, all and singular, title to the Property unto Trustee, and Trustee's successors or substitutes in the trust, forever, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof;

PROVIDED, HOWEVER, that if Borrower shall pay in full or cause to be paid in full to Lender the secured indebtedness and all other covenants contained in the Loan Documents shall have been performed on or before the Maturity Date, then this Security Instrument shall be satisfied and the estate, right, title and interest of Lender in the Property shall cease, and, upon payment to Lender of all costs and expenses incurred for the preparation of the release hereinafter referenced and all recording costs, if allowed by law, Lender shall release this Security Instrument and the lien hereof by proper instrument.

Anything to the contrary herein or elsewhere notwithstanding, the obligations of the guarantor under (i) the Hazardous Substances Indemnity Agreement, dated as of the date here, from Borrower and Natin Paul, an individual, to Lender (the "Hazardous Substances Indemnity"), and (ii) the Indemnity and Guaranty Agreement, dated as of the date hereof, from Natin Paul, an individual, to Lender (the "Indemnity and Guaranty Agreement"), or any other guarantor under any other separate guaranty accepted by Lender, shall not be secured by this Security Instrument, any separate assignment of leases or assignment of rents, or any other lien encumbering the Property.

## ARTICLE I
### REPRESENTATIONS, WARRANTIES AND COVENANTS OF BORROWER

For the purpose of further securing the indebtedness secured hereby and for the protection of the security of this Security Instrument, for so long as the indebtedness secured hereby or any part thereof remains unpaid, Borrower covenants and agrees as follows:

1.1    Certain Representations, Warranties and Covenants of Borrower. Borrower, for itself and its successors and assigns, does hereby represent, warrant and covenant to and with Lender, its successors and assigns, that, except as disclosed to Lender in writing prior to the Effective Date:

(a)     Borrower has good and marketable title to the Land and to the Improvements located thereon, subject only to those matters set forth as exceptions to or subordinate matters that Lender has agreed to accept in the title insurance policy issued to Lender insuring the lien of this Security Instrument, excepting therefrom all preprinted and/or standard exceptions (the "Permitted Exceptions"), and has full power and lawful authority to grant, bargain, sell, convey, assign, transfer and mortgage the Land and the Improvements located thereon in the manner and form hereby done or intended.  Borrower will preserve Borrower's interest in and title to the Land and to the Improvements located thereon and will forever warrant and defend the same to Lender against any and all claims whatsoever and will forever warrant and defend the validity and priority of the lien and security interest created herein against the claims of all persons and parties whomsoever, subject to the Permitted Exceptions.  The foregoing warranty of title shall survive the foreclosure of this Security Instrument and shall inure to the benefit of and be enforceable by Lender in the event Lender acquires title to the Land and to the Improvements located thereon pursuant to any foreclosure.

(b)     The Land and the Improvements, and the intended use thereof by Borrower comply in all material respects with all applicable restrictive covenants, zoning ordinances, subdivision and building codes, flood disaster laws, applicable health and environmental laws and regulations and all other ordinances, orders or requirements issued by any state, federal or municipal authorities having or claiming jurisdiction over the Property.  The Land and the Improvements constitute one or more separate tax parcels for purposes of ad valorem taxation.  The Land and the Improvements do not require any rights over, or restrictions against, other property in order to comply with any of the aforesaid governmental ordinances, orders or requirements or such rights over or restrictions against have been obtained.  Without limitation of the foregoing, the Improvements have been designed and shall be constructed and completed, and thereafter maintained, in strict accordance and full compliance with all of the requirements of the Americans with Disabilities Act, of July 26, 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101, et. seq., as amended from time to time.  Borrower shall be responsible for all ADA compliance costs.  All certifications, permits, licenses and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property as an office project, whether temporary or permanent, have been obtained and are in full force and effect.  Borrower shall keep and maintain, or cause Property Manager to keep and maintain, all certifications, permits, licenses and approvals necessary for the operation of the Property as an office project.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property, or any portion thereof.

(c)     All utility services necessary and sufficient for the full use, occupancy, operation and disposition of the Land and the Improvements for their intended purposes are available to the Property, including water, storm sewer, sanitary sewer, gas, electric, cable and telephone facilities, through public rights of way or perpetual private easements approved by Lender.

(d)     All streets, roads, highways, bridges and waterways necessary for access to and full use, occupancy, operation and disposition of the Land and the Improvements have been completed, have been dedicated to and accepted by the appropriate municipal authority and

are open and available to the Land and the Improvements without further condition or cost to Borrower.

      (e)    All curb cuts, driveways and traffic signals shown on the survey delivered to Lender prior to the execution and delivery of this Security Instrument are existing and have been fully approved by the appropriate governmental authority.

      (f)    The Property is free from delinquent water charges, sewer rents, taxes and assessments.

      (g)    As of the date of this Security Instrument, the Property is free from unrepaired material damage caused by fire, flood, accident or other casualty.

      (h)    As of the date of this Security Instrument, no part of the Land or the Improvements has been taken in condemnation, eminent domain or like proceeding nor is any such proceeding pending or, to Borrower's knowledge and belief, threatened or contemplated.

      (i)    The Improvements are structurally sound, in good repair and free of material defects in materials and workmanship and have been constructed and installed in substantial compliance with the plans and specifications relating thereto. All major building systems located within the Improvements, including, without limitation, the heating, ventilating and air conditioning systems and the electrical and plumbing systems, are in working order and condition. There are no defects, facts or conditions affecting the Property or any portion thereof which would make the Property unsuitable for the occupancy, use or sale thereof. There are no surface or subsurface soil conditions adversely affecting the Property, including, without limitation, unstable soil or landfills.

      (j)    Borrower has delivered to Lender, and will deliver to Lender upon written request, true, correct and complete copies of any Contracts and all amendments thereto or modifications thereof.

      (k)    Each Contract constitutes the legal, valid and binding obligation of Borrower and, to the best of Borrower's knowledge and belief, is enforceable against any other party thereto. No default exists, or with the passing of time or the giving of notice or both would exist, under any Contract which would, in the aggregate, have a material adverse effect on Borrower or the Property.

      (l)    No Contract provides any party with the right to obtain a lien or encumbrance upon the Property superior to the lien of this Security Instrument.

      (m)    Borrower and the Property are free from any past due obligations for sales and payroll taxes, including, but not limited to, transient accommodation taxes.

    1.2    <u>Defense of Title</u>. If, while this Security Instrument is in force, the title to the Property or the interest of Lender therein shall be the subject, directly or indirectly, of any action at law or in equity, or be attached, directly or indirectly, or endangered, clouded or adversely affected, directly or indirectly, in any manner, Borrower, at Borrower's expense, shall take all necessary and proper steps for the defense of said title or interest, including without limitation

the employment of counsel approved by Lender, the prosecution or defense of litigation, and the compromise or discharge of claims made against said title or interest. Notwithstanding the foregoing, in the event that Lender determines that Borrower is not adequately performing Borrower's obligations under this Section 1.2, or in good faith determines that a conflict of interest or potential conflict of interest exists therein, Lender may, without limiting or waiving any other rights or remedies of Lender hereunder, take such steps, with respect thereto as Lender shall deem necessary or proper and any and all costs and expenses paid by Lender in connection therewith, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

    1.3    <u>Performance of Obligations</u>. Borrower shall pay when due the principal of and the interest on the indebtedness evidenced by the Note. Borrower shall also pay all charges, fees and other sums required to be paid by Borrower as provided in the Loan Documents, and shall observe, perform and discharge all obligations, covenants and agreements to be observed, performed or discharged by Borrower set forth in the Loan Documents in accordance with their terms. Further, Borrower shall promptly and strictly perform and comply with all covenants, conditions, obligations and prohibitions required of Borrower in connection with any other document or instrument affecting title to the Property, or any part thereof, regardless of whether such document or instrument is superior or subordinate to this Security Instrument.

    1.4    <u>Insurance</u>. Borrower shall, at Borrower's expense, maintain in force and effect on the Property at all times while this Security Instrument continues in effect all required insurance pursuant to the Loan Agreement.

    1.5    <u>Payment of Taxes</u>. Borrower shall pay or cause to be paid all Taxes which are or may become a lien on the Property or which are assessed against or imposed upon the Property. Borrower shall furnish Lender with receipts (or if receipts are not immediately available, with copies of canceled checks evidencing payment with receipts to follow promptly after they become available) showing payment of such Taxes at least fifteen (15) days prior to the applicable delinquency date therefor. Notwithstanding the foregoing, Borrower may in good faith, by appropriate proceedings and upon notice to Lender, contest the validity, applicability or amount of any asserted Tax so long as (a) such contest is diligently pursued, (b) Lender determines, in Lender's subjective opinion, that, if such Tax is not paid, such contest suspends the obligation to pay the Tax and that nonpayment of such Tax will not result in the sale, loss, forfeiture or diminution of the Property or any part thereof or any interest of Lender therein, and, (c) prior to the earlier of the commencement of such contest or the delinquency date of the asserted Tax, Borrower deposits in the Tax and Insurance Reserve an amount determined by Lender to be adequate to cover the payment of such Tax (if unpaid) and a reasonable additional sum to cover possible interest, costs and penalties; <u>provided</u>, <u>however</u>, <u>that</u> Borrower shall promptly cause to be paid any amount adjudged by a court of competent jurisdiction to be due, with all interest, costs and penalties thereon, promptly after such judgment becomes final; and <u>provided</u>, <u>further</u>, <u>that</u> as and when each such contest shall be concluded, the Taxes, interest, costs and penalties shall be paid prior to the date any writ or order is issued under which the Property may be sold, lost or forfeited.

1.6    Casualty and Condemnation.  Borrower shall give Lender prompt written notice of the occurrence of any casualty affecting, or the institution of any proceedings for eminent domain or for the condemnation of, the Property or any portion thereof.  All insurance proceeds on the Property, and all causes of action, claims, compensation, awards and recoveries for any damage, condemnation or taking of all or any part of the Property or for any damage or injury to the Property for any loss or diminution in value of the Property, are hereby assigned to and shall be paid to Lender.  Lender may participate in any suits or proceedings relating to any such proceeds, causes of action, claims, compensation, awards or recoveries and Lender is hereby authorized, in Lender's own name or in Borrower's name, to adjust any loss covered by insurance or any condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and Borrower shall from time to time deliver to Lender any instruments required to permit such participation, provided, however, that, so long as no Default or Event of Default shall have occurred and be continuing, Lender shall not have the right to participate in the adjustment of any loss which is not in excess of ten percent (10%) of the then outstanding principal balance of the Note.  Lender shall apply any sums received by Lender under this Section 1.6, first, to the payment of all of Lender's costs and expenses (including, but not limited to, legal fees and disbursements) incurred in obtaining those sums, and, then, as follows:

(a)    In the event that less than ten percent (10%) of the Improvements have been taken or destroyed, then if:

(1)    no Default or Event of Default is then continuing hereunder or under any of the other Loan Documents, and

(2)    the Property can, in Lender's reasonable judgment, with diligent restoration or repair, be returned to a condition at least equal to the condition thereof that existed prior to the casualty or partial taking causing the loss or damage within the earlier to occur of (i) six (6) months after the receipt of insurance proceeds or condemnation awards by either Borrower or Lender and (ii) six (6) months prior to the then applicable maturity date of the Note, and

(3)    all necessary governmental approvals can be obtained to allow the timely restoration and repair of the Property as described in Section 1.6(a)(2) above, and the reoccupancy thereof, and

(4)    there are sufficient sums available (through insurance proceeds or condemnation awards and contributions by Borrower, the full amount of which shall, at Lender's option, have been deposited with Lender) for such restoration or repair (including, without limitation, for any costs and expenses of Lender to be incurred in administering said restoration or repair) and for payment of principal and interest to become due and payable under the Note during such restoration or repair, and

(5)    the economic feasibility of the Improvements after such restoration or repair will be such that income from their operation is reasonably anticipated to be sufficient to pay operating expenses of the Property and debt service on the indebtedness secured hereby in full in accordance with Lender's then current underwriting standards, and

(6)       in the event that the insurance proceeds or condemnation awards received as a result of such casualty or partial taking exceed ten percent (10%) of the then outstanding principal balance of the Note, Borrower shall have delivered to Lender, at Borrower's sole cost and expense, an appraisal report in form and substance reasonably satisfactory to Lender appraising the value of the Property as proposed to be restored or repaired to be not less than the appraised value of the Property considered by Lender in Lender's determination to make the loan secured hereby, and

(7)       Borrower so elects by written notice delivered to Lender within five (5) days after settlement of the aforesaid insurance or condemnation claim, then, Lender shall, solely for the purposes of such restoration or repair, advance so much of the remainder of such sums as may be required for such restoration or repair, and any funds deposited by Borrower therefor, to Borrower in the manner and upon such terms and conditions as would be required by a prudent construction lender, including, but not limited to, the prior reasonable approval by Lender of plans and specifications, contractors and form of construction contracts and the furnishing to Lender of permits, bonds, lien waivers, invoices, receipts and affidavits from contractors and subcontractors, in form and substance satisfactory to Lender in Lender's discretion, with any remainder being applied by Lender for payment of the indebtedness secured hereby in whatever order Lender directs in its absolute discretion.

(b)       In all other cases, namely, in the event that ten percent (10%) or more of the Improvements have been taken or destroyed or Borrower does not elect to restore or repair the Property pursuant to clause (a), above, or otherwise fails to meet any of the requirements of subsection (a) above of this Section 1.6, then, in any of such events, Lender may elect, in Lender's absolute discretion and without regard to the adequacy of Lender's security, to do either of the following:  (1) accelerate the maturity date of the Note and declare any and all indebtedness secured hereby to be immediately due and payable and apply the remainder of such sums received pursuant to this Section 1.6(b) to the payment of the indebtedness secured hereby in whatever order Lender directs, in Lender's absolute discretion, with any remainder being paid to Borrower, or, (2) notwithstanding that Borrower may have elected not to restore or repair the Property pursuant to the provisions of Section 1.6(a)(7) above, require Borrower to restore or repair the Property in the manner and upon such terms and conditions as would be required by a prudent construction lender, including, but not limited to:  the deposit by Borrower with Lender, within thirty (30) days after demand therefor, of any deficiency necessary in order to assure the availability of sufficient funds to pay for such restoration or repair, including without limitation Lender's costs and expenses to be incurred in connection therewith; the prior approval by Lender of plans and specifications, contractors and form of construction contracts; and the furnishing to Lender of permits, bonds, lien waivers, invoices, receipt and affidavits from contractors and subcontractors, in form and substance satisfactory to Lender in Lender's discretion, and apply the remainder of such sums toward such restoration and repair, with any balance thereafter remaining being applied by Lender for payment of the indebtedness secured hereby in whatever order Lender directs in Lender's absolute discretion.

Any reduction in the indebtedness secured hereby resulting from Lender's application of any sums received by Lender hereunder shall take effect only when Lender actually receives such sums and elects to apply such sums to the indebtedness secured hereby and, in any event, the unpaid portion of the indebtedness secured hereby shall remain in full force and effect and

Borrower shall not be excused in the payment thereof. Partial payments received by Lender, as described in the preceding sentence, shall be applied, first, to the final payment due under the Note and, thereafter, to installments shall due under the Note in the inverse order of their due date. If Borrower elects or Lender directs Borrower to restore or repair the Property after the occurrence of a casualty or partial taking of the Property as provided above, Borrower shall promptly and diligently, at Borrower's sole cost and expense and regardless of whether the insurance proceeds or condemnation award, as appropriate, shall be sufficient for the purpose, restore, repair, replace and rebuild the Property as nearly as possible to the Property's value, condition and character immediately prior to such casualty or partial taking in accordance with the foregoing provisions and Borrower shall pay to Lender all costs and expenses of Lender incurred in administering said rebuilding, restoration or repair, provided the Lender makes such proceeds or award available for such purpose. Borrower agrees to execute and deliver from time to time such further instruments as may be requested by Lender to confirm the foregoing assignment to Lender of any award, damage, insurance proceeds, payment or other compensation. Lender is hereby irrevocably constituted and appointed the attorney in fact of Borrower (which power of attorney shall be irrevocable so long as any indebtedness secured hereby is outstanding, shall be deemed coupled with an interest, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the date hereof), with full power of substitution, subject to the terms of this <u>Section 1.6</u>, to settle for, collect and receive any such awards, damages, insurance proceeds, payments or other compensation from the parties or authorities making the same, to appear in and prosecute any proceedings therefor and to give receipts and acquittances therefor.

1.7  <u>Mechanics' Liens</u>. Borrower shall pay when due all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Property; <u>provided</u>, <u>however</u>, <u>that</u> Borrower shall have the right to contest in good faith any such claim or demand, so long as Borrower does so diligently, by appropriate proceedings and without prejudice to Lender and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest. In the event Borrower shall contest any such claim or demand, Borrower shall promptly notify Lender of such contest and thereafter shall, upon Lender's request, promptly provide a bond, cash deposit or other security satisfactory to Lender to protect Lender's interest and security should the contest be unsuccessful. If Borrower shall fail to immediately discharge or provide security against any such claim or demand as aforesaid, Lender may do so and any and all expenses incurred by Lender, together with interest thereon at the Default Interest Rate from the date paid by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

1.8  <u>Rents and Profits</u>.

(a)  <u>Collateral Assignment of Rents, Revenues, Income and Profits</u>. Borrower hereby collaterally assigns to Lender all rents, revenues, income and profits and all other "Rents" (as such term is defined in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code) ("<u>Rents and Profits</u>") payable under each Lease now or at any time hereinafter existing, such collateral assignment being upon the terms set forth in this Section 1.8. Each time

Borrower enters into a Lease, such Lease shall automatically become subject to this Section 1.8 without further action.

(b)     Right to Direct Payment of Rents and Profits After an Default.  The collateral assignment of Rents and Profits to Lender shall be upon the following terms: (a) upon receipt from Lender of notice that an Event of Default exists, each Tenant is hereby authorized and directed to pay directly to Lender all Rents and Profits thereafter accruing or payable and receipt of Rents and Profits by Lender shall be a release of such Tenant to the extent of all amounts so paid; (b) Rents and Profits so received by Lender shall be applied by Lender, first to the expenses, if any, of collection and then in accordance with the distribution of foreclosure sale proceeds as described herein hereof; (c) without impairing its rights hereunder, Lender may, at its option, at any time and from time to time, release to Borrower Rents and Profits so received by Lender, or any part thereof; (d) Lender shall not be liable for its failure to collect or its failure to exercise diligence in the collection of Rents and Profits, but shall be accountable only for Rents and Profits that it shall actually receive; (e) the collateral assignment contained in this Article shall terminate upon the release of this Security Instrument, but no Tenant shall be required to take notice of termination until a copy of such release shall have been delivered to such Tenant; and (f) Lender grants to Borrower a license to collect all Rents and Profits and expend same as required and permitted pursuant to the Loan Documents, such Rents and Profits being held by Borrower in trust for the benefit of Lender, until the occurrence of an Event of Default.  Without limiting the foregoing, during such time as Borrower is permitted to collect all Rents and Profits, Borrower shall be entitled to distribute all Rents and Profits, after payment of all of its obligations that are then-due, to its sole member.  Lender shall be without liability for and is hereby released from any loss which may arise from a failure or inability to collect Rents and Profits, proceeds or other payments.

(c)     Remedies.  Should an Event of Default occur, Borrower agrees to deliver to Lender possession and control of all Rents and Profits held by Borrower in trust for the benefit of Lender.  Borrower specifically agrees that Lender may upon the occurrence of any Default or at any time thereafter, personally or through an agent selected by Lender, take or have the Trustee take possession and control of all or any part of the  Property and may receive and collect all Rents and Profits theretofore accrued and all thereafter accruing therefrom until the final termination of this Security Instrument or until the foreclosure of the lien of this Security Instrument, applying so much thereof as may be collected before sale of the Property by the Trustee or judicial foreclosure of this Security Instrument first to the expenses of Lender incurred in obtaining the Rents and Profits and then applying the Rents and Profits so received in accordance with the provisions hereof describing the distribution of foreclosure sale proceeds.  Any such action by Lender shall not operate as a waiver of the default in question, or as an affirmance of any Lease or of the rights of any Tenant in the event title to that part of the Property covered by the Lease or held by the Tenant should be acquired by Lender or other purchaser at foreclosure sale.  Lender, Lender's agent or the Trustee may use against Borrower or any other person such lawful or peaceable means as the person acting may see fit to enforce the collection of any such Rents and Profits or to secure possession of the Property, or any part of it and may settle or compromise on any terms as Lender, Lender's agent or the Trustee sees fit, the liability of any person or persons for any such Rents and Profits.  In particular, Lender, Lender's agent or the Trustee may institute and prosecute to final conclusion actions of forcible entry and detainer, or actions of trespass to try title, or actions for damages, or any other

appropriate actions, in the name of Lender, Borrower, or the Trustee, and may settle, compromise or abandon any such actions as Lender, Lender's agent or the Trustee may see fit; and Borrower binds itself and its successors and assigns to take whatever lawful or peaceable steps Lender, Lender's agent or the Trustee may ask of it or any such person or concern so claiming to take for such purposes, including the institution and prosecution of actions of the character above stated. However, neither Lender, Lender's agent nor the Trustee shall be obligated to collect any such Rents and Profits or be liable or chargeable for failure to do so. Upon any sale of the Property or any part thereof in foreclosure of the lien or security interest created by this Security Instrument, such Rents and Profits so sold which thereafter accrues shall be deemed included in such sale and shall pass to the purchaser free and clear of the assignment made in this Article.

(d)     Lender in Possession; No Liability of Lender.  Lender's acceptance of this collateral assignment shall not, before entry upon and taking possession of the Property by Lender, be deemed to constitute Lender a "Lender in possession," nor obligate Lender to appear in or defend any proceeding relating to any of the Leases or to the Property, take any action hereunder, expend any money, incur any expenses or perform any obligation or liability under the Leases, or assume any obligation under the Leases including the obligation to return any deposit delivered to Borrower by any Tenant. Lender shall not be liable for any injury or damage to person or property in or about the Property. Neither the collection of Rents and Profits due under the Leases herein described nor possession of the Property by Lender shall render Lender liable with respect to any obligations of Borrower under any of the Leases.

(e)     Additional Covenants, Warranties and Representations Concerning Leases and Rents and Profits.  Borrower covenants, warrants and represents that:

(1)     Neither Borrower nor any previous owner affiliated with Borrower has entered into any prior oral or written assignment, pledge or reservation of the Rents and Profits, entered into any prior assignment or pledge of Borrower's landlord interests in any Lease or performed any act or executed any other instruments which remains in force and might prevent or limit Lender from operating under the terms and conditions of this Article;

(2)     Borrower has good title to the Leases and Rents and Profits hereby assigned and the authority to assign same, and no other person or entity has any right, title or interest in and to the landlord's interests therein;

(3)     All existing Leases are valid, unmodified and in full force and effect, except as indicated herein, and no default exists thereunder;

(4)     No Rents and Profits has been, nor does Borrower anticipate that any Rents and Profits will be, waived, released, discounted, set off or compromised, except as disclosed to Lender in writing before the date hereof;

(5)     Except as disclosed to Lender in writing before the date hereof, Borrower has not received any funds or deposits from any tenant for which credit has not already been made on account of accrued Rents and Profits;

(6)    Borrower shall (1) perform all of the terms and conditions of the Leases, (2) upon Lender's request, execute an additional collateral assignment to Lender of all Leases then affecting the Property and all Rents and Profits and other sums due thereunder by collateral assignment(s) in form and substance satisfactory to Lender and (3) at the request of Lender, record such Leases and the collateral assignment(s) thereof to Lender.  Borrower will not, without the prior written consent of Lender, amend, modify, extend, renew, terminate, cancel or surrender any Lease or suffer or permit any of the foregoing, orally or in writing;

(7)    Borrower shall not execute any Lease (or amendment to any Lease) unless the form of the Lease has been approved by Lender and the Tenant under such Lease and the terms of such Lease shall comply with leasing standards for the Property from time to time approved by Lender in writing;

(8)    Borrower shall give immediate notice to Lender of any notice Borrower received from any tenant or subtenant under any Leases specifying any claimed default by any party under such Leases;

(9)    Borrower shall enforce the Tenants' obligations under the Leases;

(10)    Borrower shall defend, at Borrower's expense, any proceeding pertaining to the Leases, including, if Lender so requests, any such proceeding to which Lender is a party;

(11)    Borrower shall neither create nor permit any encumbrance upon its interest as landlord under the Leases, except for this Security Instrument and any other encumbrances permitted by this Security Instrument;

(12)    Borrower shall not encumber or assign, or permit the encumbrance or assignment of, any Leases or Rents and Profits without the prior written consent of Lender;

(13)    Borrower shall not waive or release any obligation of any Tenant under the Leases without Lender's prior written consent;

(14)    Each Lease executed after the date hereof shall contain a statement signed by the Borrower that such Lease is subject to this Security Instrument;

(15)    Borrower shall from time to time furnish to Lender, within thirty (30) days after demand therefor, true, correct and complete copies of all Leases or any portion of the Leases specified by Lender; and

(16)    Borrower shall not in any event collect any Rents and Profits more than one (1) month in advance of the time it will be earned without the prior written consent of Lender (and if Borrower does so, in addition to any other rights or remedies available by reason of such Default, all Rents and Profits so collected more than one (1) month in advance of the time it is earned shall be delivered to Lender to be applied to the secured indebtedness).

(f)  Merger.  There shall be no merger of the leasehold estates created by the Leases with the fee or any other estate in the Property without the prior written consent of Lender.

(g)  Reassignment.  By Lender's acceptance of this Security Instrument, it is understood and agreed that a full and complete release of this Security Instrument shall operate as a full and complete reassignment to Borrower of the Lender's rights and interests under this Article.

(h)  Subordination of Security Instrument to Leases.  It is agreed and understood that Lender hereby reserves the right and shall have the right, at any time and from time to time, without the consent or joinder of any other party, to subordinate this Security Instrument and the liens, assignments and security interests created by this Security Instrument to all or any of the Leases regardless of the respective priority of any of such Leases and this Security Instrument.  Upon doing so and filing evidence of such subordination in the real property records in the county or counties where the Real Property is located, a foreclosure of Lender's liens, assignments and security interests under this Security Instrument shall be subject to and shall not operate to extinguish any of said Leases as to which such subordination is operative.

1.9  Texas Assignment of Rents Act.  Without in any way limiting or restricting any of Lender's other rights, benefits or privileges hereunder, Borrower and Lender hereby expressly agree that Lender shall be entitled to all rights, benefits or privileges provided for in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code.

1.10  Leases and Licenses.  Upon the occurrence of an Event of Default under this Security Instrument, whether before or after the whole principal sum secured hereby is declared to be immediately due or whether before or after the institution of legal proceedings to foreclose this Security Instrument, forthwith, upon demand of Lender, Borrower shall surrender to Lender and Lender shall be entitled to take actual possession of the Property or any part thereof personally, or by Lender's agent or attorneys.  In such event, Lender shall have, and Borrower hereby gives and grants to Lender, the right, power and authority to make and enter into Leases with respect to the Property or portions thereof for such rents and for such periods of occupancy and upon conditions and provisions as Lender may deem desirable in Lender's absolute discretion, and Borrower expressly acknowledges and agrees that the term of any such Lease may extend beyond the date of any foreclosure sale at the Property; it being the intention of Borrower that in such event Lender shall be deemed to be and shall be the attorney-in-fact of Borrower for the purpose of making and entering into Leases of parts or portions of the Property for the rents and upon the terms, conditions and provisions deemed desirable to Lender in Lender's sole discretion and with like effect as if such Leases had been made by Borrower as the owner in fee simple of the Property free and clear of any conditions or limitations established by this Security Instrument.  The power and authority hereby given and granted by Borrower to Lender shall be deemed to be coupled with an interest, shall not be revocable by Borrower so long as any indebtedness secured hereby is outstanding, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the date hereof.  In connection with any action taken by Lender pursuant to this Section 1.9, Lender shall not be liable for any loss sustained by Borrower

resulting from any failure to let the Property, or any part thereof, or from any other act or omission of Lender in managing the Property, nor shall Lender be obligated to perform or discharge any obligation, duty or liability under any Lease covering the Property or any part thereof or under or by reason of this instrument or the exercise of rights or remedies hereunder. Borrower shall, and does hereby, indemnify Lender for, and hold Lender harmless from, any and all claims, actions, demands, liabilities, loss or damage which may or might be incurred by Lender under any such Lease or under this Security Instrument or by the exercise of rights or remedies hereunder and from any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any such Lease, other than those finally determined to have resulted solely from the gross negligence or intentional misconduct of Lender. Should Lender incur any such liability, the amount thereof, including, without limitation, costs, expenses and attorneys' fees, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Nothing in this <u>Section 1.9</u> shall impose on Lender any duty, obligation or responsibility for the control, care, management or repair of the Property, or for the carrying out of any of the terms and conditions of any such Lease nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the Tenants or by any other parties or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property. Borrower hereby assents to, ratifies and confirms any and all actions of Lender with respect to the Property taken under this <u>Section 1.9</u>.

1.11   <u>Payment of Utilities, Assessments, Charges, Etc</u>. Borrower shall pay when due all utility charges which are incurred by Borrower or which may become a charge or lien against any portion of the Property for gas, electricity, water and sewer services furnished to the Land and/or the Improvements and all other assessments or charges of a similar nature, or assessments payable pursuant to any restrictive covenants, whether public or private, affecting the Land and/or the Improvements or any portion thereof, whether or not such assessments or charges are or may become liens thereon.

1.12   <u>Access Privileges and Inspections</u>. Lender and the agents, representatives and employees of Lender shall, subject to the rights of Tenants, have full and free access to the Land and the Improvements and any other location where books and records concerning the Property are kept at all reasonable times for the purposes of inspecting the Property and of examining, copying and making extracts from the books and records of Borrower relating to the Property. Borrower shall lend assistance to all such agents, representatives and employees of Lender. Lender shall have the right to take one (1) asset management trip a year at Borrower's cost and expense, not to exceed One Thousand Dollars ($1,000) per trip.

1.13   <u>Waste; Alteration of Improvements</u>. Borrower shall not commit, suffer or permit any intentional waste on the Property nor take any actions that might invalidate any insurance carried on the Property. Borrower shall maintain the Property in good condition and repair. No part of the Improvements may be removed, demolished or materially altered, without the prior written consent of Lender. Without the prior written consent of Lender, Borrower shall not

commence construction of any improvements on the Land other than improvements required for the maintenance or repair of the Property.

1.14     Zoning.  Without the prior written consent of Lender, Borrower shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Land or the Improvements.  Borrower shall comply with and make all payments required under the provisions of any covenants, conditions or restrictions affecting the Land or the Improvements.  Borrower shall comply with all existing and future requirements of all governmental authorities having jurisdiction over the Property.  Borrower shall keep all licenses, permits, franchises and other approvals necessary for the operation of the Property in full force and effect.  Borrower shall operate the Property in such a manner as to allow the operation thereof as an office project and shall maintain any non-conforming use for so long as the indebtedness secured hereby is outstanding.  Borrower shall not cause or permit any nonconforming use of the Land and the Improvements to be discontinued or abandoned without the prior written consent of Lender.

1.15     Security Interest.  This Security Instrument is also intended to encumber and create a security interest in, and Borrower hereby grants to Lender a security interest in, all sums on deposit with Lender in any of the Reserves set forth herein and all fixtures, chattels, accounts, equipment, inventory, contract rights, General Intangibles and other personal property included within the Property, all renewals, replacements of any of the aforementioned items, or articles in substitution therefor or in addition thereto or the proceeds thereof (all of said property is hereinafter referred to collectively as the "Collateral"), whether or not the same shall be attached to the Land or the Improvements in any manner.  It is hereby agreed that to the extent permitted by law, all of the foregoing Collateral is to be deemed and held to be a part of and affixed to the Land and the Improvements.  The foregoing security interest shall also cover Borrower's leasehold interest in any of the foregoing property which is leased by Borrower. Notwithstanding the foregoing, all of the foregoing property shall be owned by Borrower and no leasing or installment sales or other financing or title retention agreement in connection therewith shall be permitted without the prior written approval of Lender.  Borrower shall, from time to time upon the request of Lender, supply Lender with a current inventory of all of the Collateral in which Lender is granted a security interest hereunder, in such detail as Lender may reasonably require.  Borrower shall promptly replace all of the Collateral subject to the lien or security interest of this Security Instrument when worn or obsolete with Collateral comparable to the worn out or obsolete Collateral when new and will not, without the prior written consent of Lender, remove from the Land or the Improvements any of the Collateral subject to the lien or security interest of this Security Instrument except such as is replaced by an article of equal suitability and value as above provided, owned by Borrower free and clear of any lien or security interest except that created by this Security Instrument and the other Loan Documents and except as otherwise expressly permitted by the terms of this Security Instrument.  All of the Collateral shall be kept at the location of the Land except as otherwise required by the terms of the Loan Documents.  Borrower shall not use any of the Collateral in violation of any applicable statute, ordinance or insurance policy.

1.16     Security Agreement.  This Security Instrument constitutes a security agreement between Borrower and Lender with respect to the Collateral in which Lender is granted a security interest hereunder, and, cumulative of all other rights and remedies of Lender hereunder,

Lender shall have all of the rights and remedies of a secured party under any applicable Uniform Commercial Code. Borrower hereby agrees to execute and deliver on demand and hereby irrevocably constitutes and appoints Lender the attorney in fact of Borrower to execute and deliver and, if appropriate, to file with the appropriate filing officer or office such security agreements, financing statements, continuation statements or other instruments as Lender may request or require in order to impose, perfect or continue the perfection of the lien or security interest created hereby. Except with respect to Rents and Profits to the extent specifically provided herein to the contrary, Lender shall have the right of possession of all cash, securities, instruments, negotiable instruments, documents, certificates and any other evidences of cash or other property or evidences of rights to cash rather than property, which are now or hereafter a part of the Property and Borrower shall promptly deliver the same to Lender, endorsed to Lender, without further notice from Lender. Borrower agrees to furnish Lender with notice of any change in the name, identity, organizational structure, residence, or principal place of business or mailing address of Borrower within ten (10) days of the effective date of any such change (without implying Lender's consent to any such change in violation of the provisions of this Security Instrument). Upon the occurrence of any Event of Default, Lender shall have the rights and remedies as prescribed in this Security Instrument, or as prescribed by general law, or as prescribed by any applicable Uniform Commercial Code, all at Lender's election. Any disposition of the Collateral may be conducted by an employee or agent of Lender. Any person, including without limitation both Borrower and Lender, shall be eligible to purchase any part or all of the Collateral at any such disposition. Expenses of retaking, holding, preparing for sale, selling or the like (including, without limitation, Lender's attorneys' fees and legal expenses), together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Lender shall have the right to enter upon the Land and the Improvements or any real property where any of the Collateral which is the subject of the security interest granted herein is located to take possession of, assemble and collect the same or to render it unusable, or Borrower, upon demand of Lender, shall assemble such Collateral and make it available to Lender at the Land, a place which is hereby deemed to be reasonably convenient to Lender and Borrower. If notice is required by law, Lender shall give Borrower at least ten (10) days' prior written notice of the time and place of any public sale of such Collateral or of the time of or after which any private sale or any other intended disposition thereof is to be made, and if such notice is sent to Borrower, as the same is provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Borrower. No such notice is necessary for any such Collateral which is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market. Any sale made pursuant to the provisions of this Section 1.15 shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the foreclosure sale as provided in Section 3.1 hereof upon giving the same notice with respect to the sale of the Property hereunder as is required under said Section 3.1. Furthermore, to the extent permitted by law, in conjunction with, in addition to or in substitution for the rights and remedies available to Lender pursuant to any applicable Uniform Commercial Code:

(a)     In the event of a foreclosure sale, the Property may, at the option of Lender, be sold as a whole; and

(b)     It shall not be necessary that Lender take possession of the aforementioned Collateral, or any part thereof, prior to the time that any sale pursuant to the provisions of this Section 1.15(b) is conducted and it shall not be necessary that said Collateral, or any part thereof, be present at the location of such sale; and

(c)     Lender may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Lender, including the sending of notices and the conduct of the sale, but in the name and on behalf of Lender.

The name and address of Borrower (as Debtor under any applicable Uniform Commercial Code) is:

> WC 56 EAST AVENUE LLC 401 Congress, 33rd Floor
> Austin, Texas
> Attention:  Nate Paul

The name and address of Lender (as Secured Party under any applicable Uniform Commercial Code) are:

> U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP
> c/o CALMWATER CAPITAL 3, LLC
> 11755 Wilshire Blvd., Suite 1425
> Los Angeles, CA 90025
> Attention: Larry Grantham

1.17    Easements and Rights of Way.  Borrower shall not grant any easement or right of way with respect to all or any portion of the Land or the Improvements without the prior written consent of Lender.  The purchaser at any foreclosure sale hereunder may, at the purchaser's discretion, disaffirm any easement or right of way granted in violation of any of the provisions of this Security Instrument and may take immediate possession of the Property free from, and despite the terms of, such grant of easement or right of way.  If Lender consents to the grant of an easement or right of way, Lender shall be paid a standard review fee of Five Hundred Dollars ($500), together with all other expenses, including, without limitation, attorneys' fees, incurred by Lender in the review of Borrower's request and in the preparation of documents effecting the subordination.

1.18    Compliance with Laws.  Borrower shall at all times comply with all statutes, ordinances, orders, regulations and other governmental or quasi-governmental requirements and private covenants now or hereafter relating to the ownership, construction, use or operation of the Property, including, but not limited to, those concerning employment and compensation of persons engaged in operation and maintenance of the Property and any environmental or ecological requirements, even if such compliance shall require structural changes to the Property; provided, however, that, Borrower may, upon providing Lender with security satisfactory to Lender, proceed diligently and in good faith to contest the validity or applicability of any such

statute, ordinance, regulation or requirement so long as during such contest the Property shall not be subject to any lien, charge, fine or other liability and shall not be in danger of being forfeited, lost or closed. Borrower shall not use or occupy, or allow the use or occupancy of, the Property in any manner which violates any Lease to the Property or any applicable law, rule, regulation or order or which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto.

1.19    Additional Taxes. In the event of the enactment after this date of any law of the state where the Property is located or of any other governmental entity deducting from the value of the Property for the purpose of taxation any lien or security interest thereon, or imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges of liens herein required to be paid by Borrower, or changing in any way the laws relating to the taxation of mortgages or security agreements or debts secured by mortgages or security agreements or the interest of Lender or secured party in the property covered thereby, or the manner of collection of such taxes, so as to adversely affect this Security Instrument or the indebtedness secured hereby or Lender, then, and in any such event, Borrower, upon written demand by Lender, shall pay such taxes, assessments, charges or liens, or reimburse Lender therefor; provided, however, that if in the opinion of counsel for Lender (a) it might be unlawful to require Borrower to make such payment, or (b) the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in either such event, Lender may elect, by notice in writing given to Borrower, to declare all of the indebtedness secured hereby to be and become due and payable in full ninety (90) days from the giving of such notice.

1.20    Contracts. Borrower represents, warrants and covenants to and with Lender that: (a) Borrower shall not make any material changes in or amendments to any of the General Intangibles without the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, that notwithstanding the foregoing, Lender's consent shall not be required with respect to changes in or amendments to any Contract (i) which does not relate to the overall management or operation of the Property, (ii) which is terminable without cause and without payment of any penalty or termination fee on thirty (30) days' notice, and (iii) under which the Contractor either waives its right or does not have any right, by reason of applicable law or otherwise, to assert a lien against the Property which is superior to the lien of this Security Instrument; (b) Borrower shall not tender or accept a surrender or cancellation of any of the General Intangibles without the prior written consent of Lender where such surrender or cancellation would materially or adversely affect the Property or Lender's interest therein or Lender's security or where such surrender or cancellation would violate the terms of any Loan Document; (c) Borrower shall promptly provide to Lender copies of all material changes in or amendments to the Contract whether or not Lender's consent thereto is required pursuant to clause (a) above and Borrower shall promptly notify Lender in writing of any surrender or cancellation of a Contract whether or not Lender's consent thereto is required pursuant to clause (b) above; (d) except as otherwise expressly permitted by the terms of the Loan Agreement, Borrower has not assigned or granted and will not assign or grant a security interest in any of the General Intangibles to anyone other than Lender; (e) Borrower's interest in the General Intangibles is not subject to any claim, setoff, lien, deduction or encumbrance of any nature (other than the encumbrance created hereby, the encumbrance created by this Security Instrument and those subordinate encumbrances, if any, created in connection with any junior encumbrances on the Land expressly permitted by the terms of this Security Instrument);

(f) Borrower has full power and authority to make the assignment set forth herein; (g) Borrower shall make all required payments and otherwise perform their obligations under the General Intangibles; and (h) Borrower shall give immediate notice to Lender of any notice of default served upon Borrower with respect to its obligations under any of the General Intangibles and, at the sole cost and expense of Borrower, shall enforce or secure the performance of each and every material obligation of the Contracting Parties to be kept or performed under the Contracts.

(a)     Borrower agrees and acknowledges that no action or actions on the part of Lender (including, without limitation, any assumption by Lender of the rights and obligations under the General Intangibles pursuant to the provisions of Section 1.20(b) below) shall relieve Borrower of any obligation under the General Intangibles and Borrower shall continue to be solely liable for all obligations thereunder, Borrower hereby agreeing to perform each and all of Borrower's obligations under the General Intangibles. Borrower hereby protects, defends, indemnifies and holds Lender free and harmless from and against any and all loss, cost, liability or expense (including, but not limited to, reasonable attorneys' fees and accountants' fees) resulting from any failure of Borrower to so perform under the General Intangibles.

(b)     Borrower acknowledges that it shall be an Event of Default hereunder upon any failure by Borrower in the performance or observance of any covenant or condition hereof and the continuance of such failure for thirty (30) days (or such shorter period of time specifically provided under any other Loan Document) after notice of such default from Lender (provided that no such notice shall be required if specifically not required under any other Loan Document) within which to cure the same. Upon an Event of Default hereunder or under any of the other Loan Documents, Lender may, but shall not be obligated to, assume any or all of the obligations of Borrower under any or all of the Contracts and/or exercise the rights, benefits and privileges of Borrower under any or all of the General Intangibles.

(c)     Upon the occurrence of an Event of Default hereunder or under any of the other Loan Documents, Lender may give notice to any or all of the Contracting Parties, either requiring the Contracting Party to continue performance under its Contract or, alternatively, terminating the Contract. The assignment of the Contracts set forth herein shall constitute a direction to and full authority to the Contracting Parties under the Contracts to act at Lender's written direction and otherwise perform on Lender's behalf under the Contracts, without proof of the event of default relied upon. The Contracting Parties shall be entitled to rely upon written notice from Lender that Lender has assumed all of the rights and obligations of Borrower under the applicable Contract without any inquiry into whether Borrower is in default hereunder or under any of the other Loan Documents. Such assumption of a Contract by Lender shall be evidenced by written notice from Lender to the applicable Contracting Party. Under no circumstances shall Lender be deemed by any party to have assumed Borrower's rights and obligations under a Contract unless and until such written notice is delivered to the Contracting Party in accordance with the foregoing provision.

(d)     Lender shall have the right at any time, but shall have no obligation, to take in Lender's name or in the name of Borrower, or otherwise, such action as Lender may at any time or from time to time determine to be reasonably necessary to cure any default under the General Intangibles or to protect the rights of Borrower or Lender thereunder. Lender shall incur no liability to Borrower if any action taken by Lender or in Lender's behalf in good faith

pursuant to the assignment set forth herein shall prove to be in whole or in part inadequate or invalid.  Borrower hereby protects, defends, indemnifies and holds Lender and Lender's affiliated entities, free and harmless from and against any and all loss, cost, liability or expense (including, but not limited to, reasonable attorneys' fees and accountants' fees) to which Lender may be exposed, or that Lender may incur, in exercising any of Lender's rights herein, excluding any such loss which is due solely to the gross negligence or willful misconduct of Lender.

(e)       Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact in Borrower's name or in Lender's name, or otherwise, to, from and after the occurrence of an Event of Default by Borrower hereunder or under any of the other Loan Documents to enforce all of the rights of Borrower under the General Intangibles.  It is hereby recognized that the power of attorney herein granted is coupled with an interest and shall not be revocable so long as any sums are outstanding under the loan evidenced by the Note.

(f)       Notwithstanding anything to the contrary contained herein, Lender shall have no right to assume any Contract or to exercise any rights, benefits or privileges of Borrower under any of the other General Intangibles until an Event of Default by Borrower shall have occurred under the terms hereof or the terms of any of the other Loan Documents and such Event of Default shall not have been cured within any applicable grace or cure period.

(g)       Borrower shall promptly obtain and deliver to Lender consents to the terms hereof, in forms reasonably acceptable to Lender, from such Contracting Parties as Lender may request from time to time.  Such consents shall provide that the underlying Contract is subordinate to this Security Instrument and other Loan Documents.  If any Contract does not require such Contracting Party to provide such a consent, Borrower shall only be required to use its reasonable commercial efforts to obtain same for Lender.

(h)       <u>Secured Indebtedness</u>.  It is understood and agreed that this Security Instrument shall secure payment of not only the indebtedness evidenced by the Note but also any and all substitutions, replacements, renewals and extensions of the Note, any and all indebtedness and obligations arising pursuant to the terms hereof and any and all indebtedness and obligations arising pursuant to the terms of any of the other Loan Documents other than (i) the Indemnity and Guaranty Agreement and (ii) the Hazardous Substances Indemnity in favor of Lender, all of which indebtedness is equally secured with and has the same priority as any amounts advanced as of the date hereof. It is agreed that any future advances made by Lender to or for the benefit of Borrower from time to time (including, without limitation), whether made under this Security Instrument or the other Loan Documents or otherwise and whether or not such advances are obligatory or are made at the option of Lender, or otherwise, made for any purpose, and all interest accruing thereon, shall be equally secured by this Security Instrument and shall have the same priority as all amounts, if any, advanced as of the date hereof, although there may be no indebtedness outstanding at the time any such advance is made, and unless otherwise expressly provided in a written instrument executed by Borrower and Lender shall be subject to all of the terms and provisions of this Security Instrument.  It shall be an Event of Default hereunder if Borrower shall file or record a notice limiting the maximum principal amount which may be secured by this Security Instrument.

1.21 <u>Borrower's Waivers</u>. To the full extent permitted by law, Borrower agrees that Borrower shall not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, moratorium or extension, or any law now or hereafter in force providing for the reinstatement of the indebtedness secured hereby prior to any sale of the Property to be made pursuant to any provisions contained herein or prior to the entering of any decree, judgment or order of any court of competent jurisdiction, or any right under any statute to redeem all or any part of the Property so sold. Borrower, for Borrower and Borrower's successors and assigns, and for any and all persons ever claiming any interest in the Property, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily with and upon the advice of competent counsel: (a) waives, releases, relinquishes and forever forgoes all rights of valuation, appraisement, stay of execution, reinstatement and notice of election or intention to mature or declare due the secured indebtedness (except such notices as are specifically provided for herein); (b) waives, releases, relinquishes and forever forgoes all right to a marshalling of the assets of Borrower, including without limitation the Property, to a sale in the inverse order of alienation, or to direct the order in which any of the Property shall be sold in the event of foreclosure of the liens and security interests created hereby and agrees that any court having jurisdiction to foreclose such liens and security interests may order the Property sold as an entirety; and (c) waives, releases, relinquishes and forever forgoes all rights and periods of redemption provided under applicable law. To the full extent permitted by law, Borrower shall not have or assert any right under any statute or rule of law pertaining to the exemption of homestead or other exemption under any federal, state or local law now or hereafter in effect, the administration of estates of decedents or other matters whatever to defeat, reduce or affect the right of Lender under the terms of this Security Instrument to a sale of the Property, for the collection of the secured indebtedness without any prior or different resort for collection, or the right of Lender under the terms of this Security Instrument to the payment of the indebtedness secured hereby out of the proceeds of sale of the Property in preference to every other claimant whatever. Further, Borrower hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, waives, releases, relinquishes and forever forgoes all present and future statutes of limitations as a defense to any action to enforce the provisions of this Security Instrument or to collect any of the indebtedness secured hereby to the fullest extent permitted by law. Borrower covenants and agrees that upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, Borrower shall not seek a supplemental stay or otherwise shall not seek pursuant to 11 U.S.C. §105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law, or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against any guarantor or indemnitor of the secured obligations or any other party liable with respect thereto by virtue of any indemnity, guaranty or otherwise.

1.22 <u>Contractual Statute of Limitations</u>. Borrower hereby agrees that any claim or cause of action by Borrower against Lender, or any of Lender's directors, officers, employees, agents, accountants or attorneys, based upon, arising from or relating to the indebtedness secured hereby, or any other matter, cause or thing whatsoever, whether or not relating thereto, occurred, done, omitted or suffered to be done by Lender or by Lender's directors, officers, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court

of competent jurisdiction by the filing of a complaint within one (1) year after Borrower first acquires or reasonably should have acquired knowledge of the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based and service of a summons and complaint on an officer of Lender or any other person authorized to accept service of process on behalf of Lender, within thirty (30) days thereafter. Borrower agrees that such one (1) year period of time is reasonable and sufficient time for a borrower to investigate and act upon any such claim or cause of action. The one (1) year period provided herein shall not be waived, tolled or extended except by the specific written agreement of Lender. This provision shall survive any termination of this Security Instrument or any of the other Loan Documents.

## ARTICLE II
### EVENTS OF DEFAULT

2.1     Events of Default. "Event of Default" shall have the meaning ascribed to it in the Loan Agreement.

## ARTICLE III
### REMEDIES

3.1     Remedies Available. If there shall occur an Event of Default under this Security Instrument, then the power of sale granted to Trustee under this Security Instrument shall be rendered operative, this Security Instrument is subject to judicial foreclosure or foreclosure by power of sale as provided by law and Lender may, at Lender's option and by or through Lender's nominee, assignee or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights, remedies and recourses, either successively or concurrently:

(a)     Acceleration. Accelerate the maturity date of the Note and declare any or all of the indebtedness secured hereby to be immediately due and payable without any presentment, demand, protest, notice, or action of any kind whatever (each of which is hereby expressly waived by Borrower), whereupon the same shall become immediately due and payable. Upon any such acceleration, payment of such accelerated amount shall constitute a prepayment of the principal balance of the Note and any applicable Yield Maintenance provided for in the Note shall then be immediately due and payable.

(b)     Entry on the Property. Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of Lender's security, enter upon and take possession of the Property, or any part thereof, without force or with such force as is permitted by law and without notice or process or with such notice or process as is required by law unless such notice and process is waivable, in which case Borrower hereby waives such notice and process, and does any and all acts and performs any and all work which may be desirable or necessary in Lender's judgment to complete any unfinished construction on the Land, to preserve the value, marketability or rentability of the Property, to increase the income therefrom, to manage and operate the Property or to protect the security hereof and all sums expended by Lender therefor, together with interest thereon at the Default Interest Rate, shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(c)     Collect Rents and Profits.  With or without taking possession of the Property, sue or otherwise collect the Rents and Profits, including those past due and unpaid.

(d)     Appointment of Receiver.  Upon, or at any time prior or after, initiating the exercise of any power of sale, instituting any judicial foreclosure or instituting any other foreclosure of the liens and security interests provided for herein or any other legal proceedings hereunder, make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as a matter of strict right and without notice to Borrower and without regard to the adequacy of the Property for the repayment of the indebtedness secured hereby or the solvency of Borrower or any person or persons liable for the payment of the indebtedness secured hereby, and Borrower does hereby irrevocably consent to such appointment, waives any and all notices of and defenses to such appointment and agrees not to oppose any application therefor by Lender, but nothing herein is to be construed to deprive Lender of any other right, remedy or privilege Lender may now have under the law to have a receiver appointed, provided, however, that, the appointment of such receiver, trustee or other appointee by virtue of any court order, statute or regulation shall not impair or in any manner prejudice the rights of Lender to receive payment of the Rents and Profits pursuant to other terms and provisions hereof.  Any such receiver shall have all of the usual powers and duties of receivers in similar cases, including, without limitation, the full power to hold, develop, rent, lease, manage, maintain, operate and otherwise use or permit the use of the Property upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances as more fully set forth in Section 3.3 below.  Such receivership shall, at the option of Lender, continue until full payment of all of the indebtedness secured hereby or until title to the Property shall have passed by foreclosure sale under this Security Instrument or deed in lieu of foreclosure.

(e)     Judicial Foreclosure.  Immediately commence an action to foreclose this Security Instrument or to specifically enforce its provisions or any of the indebtedness secured hereby pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statutes in a single parcel or in several parcels at the option of Lender.

(1)     In the event foreclosure proceedings are filed by Lender, all expenses incident to such proceeding, including, but not limited to, attorneys' fees and costs, shall be paid by Borrower and secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  The secured indebtedness and all other obligations secured by this Security Instrument, including, without limitation, interest at the Default Interest Rate (as defined in the Note), any prepayment charge, fee or premium required to be paid under the Note in order to prepay principal (to the extent permitted by applicable law), attorneys' fees and any other amounts due and unpaid to Lender under the Loan Documents, may be bid by Lender in the event of a foreclosure sale hereunder.  In the event of a judicial sale pursuant to a foreclosure decree, it is understood and agreed that Lender or its assigns may become the purchaser of the Property or any part thereof.

(2)     Lender may, by following the procedures and if permitted by applicable law, foreclose on only a portion of the Property and, in such event, said foreclosure

shall not affect the lien of this Security Instrument on the remaining portion of the Property foreclosed.

(f)     Foreclosure by Power of Sale.  Immediately commence an action to foreclose this Security Instrument by power of sale as set forth below to the fullest extent permitted by law.

(1)     In the event of any inconsistencies between the terms and conditions of this subsection 3.1(f) of this Security Instrument and any other terms of this Security Instrument, the terms and conditions of this subsection 3.1(f) shall control and be binding.

(2)     Should Lender elect to foreclose by exercise of the power of sale herein contained, Lender shall notify Trustee and shall deposit with Trustee this Security Instrument and, if necessary, the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.  Upon receipt of such notice from Lender, Trustee shall cause to be recorded, published and/or delivered to Borrower such notice of default and notice of sale as then required by law.  Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after giving of such notice of default and after notice of sale as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items as Lender shall determine, and in such order as Lender may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale.  Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied.  The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof.  Any person, including, without limitation, Borrower or Lender, but excepting Trustee, may purchase at such sale and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers.

(3)     Lender may, in its sole discretion, designate the order in which the Property shall be offered for sale or sold through a single sale or through two or more successive sales, or in any other manner Lender deems to be in its best interest.  If Lender elects more than one sale or other disposition of the Property, Lender may at its option cause the same to be conducted simultaneously or successively, on the same day or at such different days or times and in such order as Lender may deem to be in its best interests, and no such sale shall terminate or otherwise affect the lien of this Security Instrument on any part of the Property not then sold until all indebtedness secured hereby has been fully paid.  If Lender elects to dispose of the Property through more than one sale, Borrower shall pay the costs and expenses of each such sale of its interest in the Property and of any proceedings where the same may be made.  Trustee may postpone the sale of all or any part of the Property by public announcement at such time and place of sale, or in any manner permitted by law from time to time, and without further notice make such sale at the time fixed by the last postponement; or Trustee may, in its discretion, give a new notice of sale.  Lender may rescind or cancel any such notice of default at any time before Trustee's sale by executing a notice of rescission or cancellation and recording the same.  The recordation of such notice shall constitute a cancellation of any prior declaration of default and demand for sale and of any acceleration of maturity of indebtedness affected by any prior declaration or notice of default.  The exercise by Lender of the right of rescission or cancellation

shall not constitute a waiver of any default then existing or subsequently occurring, or impair the right of Lender to execute other declarations of default and demand for sale, or notices of default and of election to cause the Property to be sold, nor otherwise affect the Note or this Security Instrument, or any of the rights, obligations or remedies of Lender or Trustee hereunder.

(4)     In the event of a sale of the Property, or any part thereof, pursuant to this <u>subsection 3.1(f)</u> and the execution of a deed therefor, the recital therein of default, and of giving notice of default and of the elapse of the required time (if any) between the recording and the notice, and of the giving of notice of sale, and of a demand by Lender, or its successors or assigns, that such sale should be made, shall be conclusive proof of such default, recording, election, elapse of time, and giving of such notice, and that the sale was regularly and validly made on due and proper demand by Lender, its successors or assigns.  Any such deed or deeds with such recitals therein shall be effective and conclusive against Borrower, its successors and assigns, and all other persons.  The receipt for the purchase money recited or contained in any deed executed to the purchaser as aforesaid shall be sufficient discharge to such purchaser from all obligations to see to the proper application of the purchase money.

(g)     <u>Other</u>.  Exercise any other right or remedy available hereunder, under any of the other Loan Documents or at law or in equity.

3.2     <u>Application of Proceeds</u>.  To the fullest extent permitted by law, the proceeds of any sale under this Security Instrument shall be applied to the extent funds are so available to the following items in such order as Lender in Lender's discretion may determine:

(a)     To payment of the costs, expenses and fees of taking possession of the Property, and of holding, operating, maintaining, using, leasing, repairing, improving, marketing and selling the same and of otherwise enforcing Lender's right and remedies hereunder and under the other Loan Documents, including, but not limited to, receivers' fees, court costs, attorneys', accountants', appraisers', managers' and other professional fees, title charges and transfer taxes.

(b)     To payment of all sums expended by Lender under the terms of any of the Loan Documents and not yet repaid, together with interest on such sums at the Default Interest Rate.

(c)     To payment of the secured indebtedness and all other obligations secured by this Security Instrument, including, without limitation, interest at the Default Interest Rate and, to the extent permitted by applicable law, any Yield Maintenance, charge or premium required to be paid under the Note in order to prepay principal, in any order that Lender chooses in Lender's sole discretion.

The remainder, if any, of such funds shall be disbursed to Borrower or to the person or persons legally entitled thereto.

3.3     <u>Right and Authority of Receiver or Lender in the Event of Default; Power of Attorney</u>.  Upon the occurrence of an Event of Default hereunder and entry upon the Property pursuant to <u>Section 3.1(b)</u> hereof or appointment of a receiver pursuant to <u>Section 3.1(d)</u> hereof, and under such terms and conditions as may be prudent and reasonable under the circumstances

in Lender's or the receiver's sole discretion, all at Borrower's expense, Lender or said receiver, or such other persons or entities as they shall hire, direct or engage, as the case may be, may do or permit one or more of the following, successively or concurrently: (a) enter upon and take possession and control of any and all of the Property; (b) take and maintain possession of all documents, books, records, papers and accounts relating to the Property; (c) exclude Borrower and Borrower's agents, servants and employees wholly from the Property; (d) manage and operate the Property; (e) preserve and maintain the Property; (f) make repairs and alterations to the Property; (g) complete any construction or repair of the Property, with such changes, additions or modifications of the plans and specifications or intended disposition and use of the Property as Lender may in Lende'rs sole discretion deem appropriate or desirable to place the Property in such condition as will, in Lender's sole discretion, make the Property or any part thereof readily marketable or rentable; (h) conduct a marketing or leasing program with respect to the Property, or employ a marketing or leasing agent or agents to do so, directed to the leasing or sale of the Property under such terms and conditions as Lender may in Lender's sole discretion deem appropriate or desirable; (i) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as Lender may in Lender's sole discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted; (j) execute and deliver, in the name of Lender as attorney-in-fact and agent of Borrower or in Borrower's own name, such documents and instruments as are necessary or appropriate to consummate authorized transactions; (k) enter into such leases, whether of real or personal property, or tenancy agreements, under such terms and conditions as Lender may in Lender's sole discretion deem appropriate or desirable; (l) collect and receive the Rents and Profits from the Property; (m) eject Tenants or repossess personal property, as provided by law, for breaches of the conditions of their Leases; (n) sue for unpaid Rents and Profits, payments, income or proceeds in the name of Borrower or Lender; (o) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent; (p) compromise or give acquittance for Rents and Profits, payments, income or proceeds that may become due; (q) delegate or assign any and all rights and powers given to Lender by this Security Instrument; and (r) do any acts which Lender in Lender's sole discretion deems appropriate or desirable to protect the security hereof and use such measures, legal or equitable, as Lender may in Lender's sole discretion deem appropriate or desirable to implement and effectuate the provisions of this Security Instrument. This Security Instrument shall constitute a direction to and full authority to any Tenant, or other third party who has heretofore dealt or contracted or may hereafter deal or contract with Borrower or Lender, at the request of Lender, to pay all amounts owing under any Lease, contract or other agreement to Lender without proof of the Event of Default relied upon. Any such Tenant or third party is hereby irrevocably authorized to rely upon and comply with (and shall be fully protected by Borrower in so doing) any request, notice or demand by Lender for the payment to Lender of any Rents and Profits or other sums which may be or thereafter become due under its Lease, contract or other agreement, or for the performance of any undertakings under any such Lease, contract, concession, license or other agreement, and shall have no right or duty to inquire whether any Event of Default under this Security Instrument or under any of the other Loan Documents has actually occurred or is then existing. Borrower hereby constitutes and appoints Lender, and Lender's assignees, successors, transferees and nominees, as Borrower's true and lawful attorney-in-fact and agent, with full power of substitution in the Property, in Borrower's name, place and stead, to do or permit any one or

more of the foregoing described rights, remedies, powers and authorities, successively or concurrently, and said power of attorney shall be deemed a power coupled with an interest and irrevocable so long as any indebtedness secured hereby is outstanding. Any money advanced by Lender in connection with any action taken under this <u>Section 3.3</u>, together with interest thereon at the Default Interest Rate from the date of making such advancement by Lender until actually paid by Borrower, shall be a demand obligation owing by Borrower to Lender and shall be secured by this Security Instrument and by every other instrument securing the secured indebtedness.

      3.4    <u>Occupancy After Foreclosure</u>. In the event there is a foreclosure sale hereunder and at the time of such sale, Borrower or Borrower's representatives, successors or assigns, or any other persons claiming any interest in the Property by, through or under Borrower (except Tenants of space in the Improvements subject to Leases entered into prior to the Effective Date), are occupying or using the Property, or any part thereof, then, to the extent not prohibited by applicable law, each and all shall, at the option of Lender or the purchaser at such sale, as the case may be, immediately become the Tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or Tenant, at a reasonable rental per day based upon the value of the Property occupied or used, such rental to be due daily to the purchaser. Further, to the extent permitted by applicable law, in the event the Tenant fails to surrender possession of the Property upon the termination of such tenancy, the purchaser shall be entitled to institute and maintain an action for unlawful detainer of the Property in the appropriate court of the county in which the Land is located.

      3.5    <u>Notice to Account Debtors</u>. Lender may, at any time after an Event of Default notify the account debtors and obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness to Borrower which are included as part of the Property to pay Lender directly. Borrower shall at any time or from time to time upon the request of Lender provide to Lender a current list of all such account debtors and obligors and their addresses.

      3.6    <u>Cumulative Remedies</u>. All remedies contained in this Security Instrument are cumulative and Lender shall also have all other remedies provided at law and in equity or in any other Loan Documents. Such remedies may be pursued separately, successively or concurrently at the sole subjective direction of Lender and may be exercised in any order and as often as occasion therefor shall arise. No act of Lender shall be construed as an election to proceed under any particular provisions of this Security Instrument to the exclusion of any other provision of this Security Instrument or as an election of remedies to the exclusion of any other remedy which may then or thereafter be available to Lender. No delay or failure by Lender to exercise any right or remedy under this Security Instrument shall be construed to be a waiver of that right or remedy or of any Event of Default hereunder. Lender may exercise any one or more of Lender's rights and remedies at Lender's option without regard to the adequacy of Lender's security.

      3.7    <u>Payment of Expenses</u>. Borrower shall pay on demand all of Lender's expenses incurred in any efforts to enforce any terms of this Security Instrument, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, legal fees (including but not limited to appellate fees and fees for all paralegals, legal consultants and other paraprofessionals) and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred by Lender until actually

paid by Borrower at the Default Interest Rate, and the same shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

## ARTICLE IV
## MISCELLANEOUS TERMS AND CONDITIONS

4.1   Time of Essence.  Time is of the essence with respect to all provisions of this Security Instrument and all other Loan Documents.

4.2   Release of Security Instrument.  If all of the secured indebtedness shall be paid, then and in that event only, all rights under this Security Instrument shall terminate except for those provisions hereof which by their terms survive, and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Lender in due form at Borrower's cost.  No release of this Security Instrument or the lien hereof shall be valid unless executed by Lender.

4.3   Certain Rights of Lender.  Without affecting Borrower's liability for the payment of any of the indebtedness secured hereby, subject to the Loan Documents, Lender may from time to time and without notice to Borrower: (a) release any person liable for the payment of the indebtedness secured hereby; (b) extend or modify the terms of payment of the indebtedness secured hereby; (c) accept additional real or personal property of any kind as security or alter, substitute or release any property securing the indebtedness secured hereby; (d) recover any part of the Property; (e) consent in writing to the making of any subdivision map or plat thereof; (f) join in granting any easement therein; or (g) join in any extension agreement of this Security Instrument or any agreement subordinating the lien hereof.

4.4   Waiver of Certain Defenses.  No action for the enforcement of the lien hereof or of any provision hereof shall be subject to any defense which would not be good and available to the party interposing the same in an action at law upon the Note or any of the other Loan Documents.

4.5   Successors and Assigns.  The terms, provisions, indemnities, covenants and conditions hereof shall be binding upon Borrower and the successors and assigns of Borrower, including all successors in interest of Borrower in and to all or any part of the Property, and shall inure to the benefit of Lender, and Lender's directors, officers, shareholders, employees and agents and their respective successors and assigns and shall constitute covenants running with the land (without implying Lender's consent to any transfer of the Property or any interest in Borrower or the Property in violation of this Security Instrument).  All references in this Security Instrument to Borrower or Lender shall be deemed to include all such parties' successors and assigns, and the term "Lender" as used herein shall also mean and refer to any lawful holder or owner, including pledgees and participants, of any of the indebtedness secured hereby.  If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower.

4.6   Severability.  A determination that any provision of this Security Instrument is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and

any determination that the application of any provision of this Security Instrument to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

4.7  Gender.  Within this Security Instrument, words of any gender shall be held and construed to include any other gender, and words in the singular shall be held and construed to include the plural, and vice versa, unless the context otherwise requires.

4.8  Waiver: Discontinuance of Proceedings.  Lender may waive any single Event of Default by Borrower hereunder without waiving any other prior or subsequent Event of Default. Lender may waive any Event of Default by Borrower hereunder without waiving the Event of Default remedied.  Neither the failure by Lender to exercise, nor the delay by Lender in exercising, any right, power or remedy upon any Event of Default by Borrower hereunder shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right, power or remedy at a later date.  No single or partial exercise by Lender of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time.  No modification or waiver of any provision hereof nor consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given.  No notice to nor demand on Borrower in any case shall of itself entitle Borrower to any other or further notice or demand in similar or other circumstances. Acceptance by Lender of any payment in an amount less than the amount then due on any of the secured indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder.  In case Lender shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under the other Loan Documents and shall thereafter elect to discontinue or abandon the same for any reason, Lender shall have the unqualified right to do so and, in such an event, Borrower and Lender shall be restored to their former positions with respect to the indebtedness secured hereby, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the same had never been invoked.

4.9  Section Headings.  The headings of the articles, sections, subsections and paragraphs of this Security Instrument are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect any of the terms hereof.  This Security Instrument shall not be construed more strictly against one party than against the other merely by virtue of the fact that this Security Instrument may have been physically prepared by one of the parties, or such party's counsel, it being agreed that all parties and their respective counsel have mutually participated in the negotiation and preparation of this Security Instrument.

4.10  Counting of Days.  The term "days" when used herein shall mean calendar days. If any time period ends on a Saturday, Sunday or holiday officially recognized by the state within which the Land is located, the period shall be deemed to end on the next succeeding business day.  The term "business day" when used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in Los Angeles, California are authorized by law to be closed.

4.11    Relationship of the Parties.  The relationship between Borrower and Lender is that of a borrower and a lender only and none of those parties is, nor shall it hold itself out to be, the agent, employee, joint venturer or partner of the other party.

4.12    Application of the Proceeds of the Note.  To the extent that proceeds of the Note are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by Lender at Borrower's request and Lender shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released.

4.13    Unsecured Portion of Indebtedness.  If any part of the secured indebtedness cannot be lawfully secured by this Security Instrument or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of such indebtedness, then all payments made shall be applied on said indebtedness first in discharge of that portion thereof which is unsecured by this Security Instrument.

4.14    Interest After Sale.  In the event the Property or any part thereof shall be sold upon foreclosure as provided hereunder, to the extent permitted by law, the sum for which the same shall have been sold shall, for purposes of redemption (pursuant to the laws of the state in which the Property is located), bear interest at the Default Interest Rate.

4.15    Inconsistency with Other Loan Documents.  In the event of any inconsistency between the provisions hereof and the provisions in any of the other Loan Documents, it is intended that the provisions selected by Lender in its sole subjective discretion shall be controlling.

4.16    Construction of this Document.  This document may be construed as a mortgage, security deed, deed of trust, chattel mortgage, conveyance, assignment, security agreement, pledge, financing statement, hypothecation or contract, or any one or more of the foregoing, in order to fully effectuate the liens and security interests created hereby and the purposes and agreements herein set forth.

4.17    No Merger.  It is the desire and intention of the parties hereto that this Security Instrument and the lien hereof do not merge in fee simple title to the Property.  It is hereby understood and agreed that should Lender acquire any additional or other interests in or to the Property or the ownership thereof, then, unless a contrary intent is manifested by Lender as evidenced by an appropriate document duly recorded, this Security Instrument and the lien hereof shall not merge in such other or additional interests in or to the Property, toward the end that this Security Instrument may be foreclosed as if owned by a stranger to said other or additional interests.

4.18    Rights With Respect to Junior Encumbrances.  Any person or entity purporting to have or to take a junior mortgage or other lien upon the Property or any interest therein shall be subject to the rights of Lender to amend, modify, increase, vary, alter or supplement this Security Instrument, the Note or any of the other Loan Documents and to extend the maturity date of the indebtedness secured hereby and to increase the amount of the indebtedness secured hereby and

to waive or forebear the exercise of any of Lender's rights and remedies hereunder or under any of the other Loan Documents and to release any collateral or security for the indebtedness secured hereby, in each and every case without obtaining the consent of the holder of such junior lien and without the lien or security interest of this Security Instrument losing its priority over the rights of any such junior lien. Nothing contained in this <u>Section 4.18</u> shall be deemed to imply Lender's consent to any further encumbering of the Property in violation of this Security Instrument.

4.19   <u>Lender May File Proofs of Claim</u>.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower or the principals or sole member of Borrower, or any of their respective creditors or property, Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the entire secured indebtedness at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower hereunder after such date.

4.20   <u>After-Acquired Property</u>.  All property acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further mortgage, deed of trust, conveyance or assignment become subject to the lien and security interest created by this Security Instrument.  Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further mortgages, deeds of trust, security agreements, financing statements, assignments and assurances, as Lender shall require for accomplishing the purposes of this Security Instrument.

4.21   <u>No Representation</u>.  By accepting delivery of any item required to be observed, performed or fulfilled or to be given to Lender pursuant to the Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance of delivery thereof shall not be or constitute any warranty, consent or affirmation with respect thereto by Lender.

4.22   <u>Counterparts</u>.  This Security Instrument may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.  Any signature page of this Security Instrument may be detached from any counterpart of this Security Instrument without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Security Instrument identical in form hereto but having attached to it one or more additional signature pages.

4.23   <u>Personal Liability</u>.  Notwithstanding anything to the contrary contained in this Security Instrument, the liability of Borrower and Borrower's officers, directors, members, managers, and principals for the indebtedness secured hereby and for the performance of the

other agreements, covenants and obligations contained herein and in the other Loan Documents shall be limited as set forth in Article 3 of the Note.

4.24  Recording and Filing.  Borrower shall cause the Loan Documents and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and re-filed in such manner and in such places as Lender shall reasonably request, and shall pay on demand all such recording, filing, re-recording and re-filing taxes, fees and other charges. Borrower shall reimburse Lender, or Lender's servicing agent, for the costs incurred in obtaining a tax service company to verify the status of payment of taxes and assessments on the Property.

4.25  Entire Agreement and Modification.  This Security Instrument and the other Loan Documents contain the entire agreements between the parties relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.  This Security Instrument and the other Loan Documents may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted.  Any alleged amendment, revision, waiver, discharge, release or termination which is not so documented shall not be effective as to any party.

4.26  Maximum Interest.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by Lender in accordance with applicable law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to Lender in respect of other indebtedness or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Note Rate (as defined in the Note) shall have been received by Lender.  If, for any reason whatever, the Charges paid or received on the Loan produces a rate which exceeds the Maximum Rate, Lender shall credit against the principal of the Loan (or, if such indebtedness shall have been paid in full, shall refund to the payor of such Charges) such portion of said Charges as shall be necessary to cause the interest paid on the Loan to produce a rate equal to the Maximum Rate.  All sums paid or agreed to be paid to the holders of the Loan for the use, forbearance or detention of the Loan shall, to the extent required to avoid or minimize usury and to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Security Instrument, so that the interest rate does not exceed the Maximum Rate.  The provisions of this Section shall control all agreements, whether now or hereafter existing and whether written or oral, between the parties hereto.  On each day, if any, that Texas law establishes the Maximum Rate, the Maximum Rate shall be the "weekly ceiling" (as defined in Chapter 303 of the Texas Finance Code (the "Texas Finance Code")) for that day.  Lender may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code by notice to Borrower, if and to the extent permitted by the Texas Finance Code.  Without notice to Borrower or any other person or entity, the Maximum Rate shall automatically fluctuate upward and

downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates.

    4.27   Further Stipulations. The additional covenants, agreements and provisions set forth in the exhibits attached hereto and made a part hereof, if any, shall be a part of this Security Instrument and shall, in the event of any conflict between such further stipulations and any of the other provisions of this Security Instrument, be deemed to control.

    4.28   Dissemination of Information. If Lender determines at any time to sell, transfer or assign the Note, this Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or to grant participations therein (the "Participations") or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, and/or their respective successors in such Participations and/or Securities (collectively, the "Investor") and/or any Rating Agency rating such Securities, each prospective Investor and each of the foregoing's respective counsel, all documents and information that Lender now has or may hereafter acquire relating to the indebtedness secured hereby and to Borrower, any guarantor, any indemnitor and the Property, which shall have been furnished by Borrower, any guarantor, and/or any indemnitor, as Lender determines necessary or desirable. Without limiting the foregoing, Borrower acknowledges and agrees that any such transfer, assignment, grant or issuance may be completed at any time without any consent from Borrower.

    4.29   Fixture Filing. This Security Instrument shall be effective from the date of its recording as a financing statement filed as a fixture filing with respect to all goods constituting part of the Property which are, or are to become, fixtures for purposes of Chapter 9 of the Uniform Commercial Code of the state where the fixtures are located. Information concerning the security interests herein granted may be obtained at the addresses stated in the introductory paragraph of this Security Instrument. Borrower, for Borrower and Borrower's successors, hereby agrees to warrant and forever defend, all and singular, title to the Property unto Lender, and Lender's successors or substitutes in this trust, forever, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof, subject, however, to the Permitted Exceptions. This Security Instrument shall also be effective as a financing statement to convey any oil, gas or mineral rights or the like and any other portion of the Property as to which a security interst may be perfected by filing in the real poprety receords of the respective counties in which each Property is located.

    4.30   Administrative Fees. Lender shall have the right to charge reasonable administrative fees during the term of the loan evidence by the Note and secured hereby as Lender may determine, in Lender's sole reasonable discretion, in connection with Lender's evaluation, preparation and processing of any servicing, administrative or other requests made by Borrower, including without limitation: processing payments; processing insurance and UCC continuation documentation; processing escrow draws and disbursement requests; review of Leases, Tenant subordination, non-disturbance and attornment agreements and tenant estoppels, requests for transfers or assignments, requests for partial releases and requests for review of new easements). Lender shall also be entitled to reimbursement for professional fees Lender incurs for such administration, including without limitation, those of architects, engineers, consultants

and attorneys (whether (a) employed by Lender or (b) engaged by Lender as independent contractors).

4.31  <u>Waiver of Right of Offset</u>.  No portion of the indebtedness secured hereby shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Lender.

**ARTICLE V**
<u>DEED OF TRUST PROVISIONS</u>

5.1  <u>Concerning the Trustee</u>.  Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.  Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.  Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender.  Lender may remove Trustee at any time or from time to time and select a successor trustee.  In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.  Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.  The procedure provided for in this Section for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

5.2  <u>Trustee's Fees</u>.  Borrower shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

5.3  <u>Certain Rights</u>.  With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Note, this Security Instrument or the other Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys, (iii) to select and employ, in and about the execution of his/her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care,

or for any error of judgment or act done by Trustee in good faith, or be otherwise reasonable or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith, and (iv) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder.  Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property.  Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine.  Trustee shall be entitled to reimbursement for actual expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

5.4    Retention of Money.  All moneys received by Trustee shall, until used or applied as herein provided be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required  by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

5.5    Perfection of Appointment.  Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

5.6    Succession Instruments.  Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

## ARTICLE VI
### STATE SPECIFIC PROVISIONS

In the event of any conflict between the terms set out in this Article VI and the provisions of this Security Instrument or any of the other Loan Documents, the terms set out in this Article VI shall control for all purposes.

6.1    Foreclosure and Other Remedies.  In addition to any and all other rights and remedies set out in this Security, Lender shall also have all of the rights and remedies set out or contemplated in this Article VI.

(a)     <u>Foreclosure</u>.  Upon the occurrence of any Event of Default, Trustee (or any successor or substitute Trustee) is authorized and empowered and it shall be his special duty at the request of Lender to sell the Property or any part thereof situated in the State of Texas at the courthouse of the county in the State of Texas in which such Property is situated, at public venue to the highest bidder for cash between the hours of 10:00 a.m. and 4:00 p.m. on the first Tuesday in any month after having given notice of such sale in accordance with the statutes of the State of Texas then in force governing sales of real estate under powers conferred by deed of trust.  The sale must begin at the time stated in the notice of sale or not later than three hours after that time.  Any sale made by Trustee hereunder may be as an entirety or in such parcels as Lender may request, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law.  Further, any sale made by Trustee hereunder may, in lieu of cash, be upon such other terms and conditions as Lender may from time to time hereafter elect.  The sale by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Property shall be sold and, if the proceeds of such sale of less than the whole of the Property shall be less than the aggregate of the indebtedness secured hereby and the expense of executing this trust as provided herein, this Security Instrument and the lien hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Borrower shall never have any right to require the sale of less than the whole of the Property but Lender shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property.  After each sale, Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Borrower, conveying the property so sold to the purchaser or purchasers in fee simple with general warranty of title, and shall receive the proceeds of said sale or sales and apply the same as herein provided.  Payment of the purchase price to Trustee shall satisfy the obligation of purchaser at such sale therefor, and such purchaser shall not be responsible for the application thereof.  In the event any sale hereunder is not completed or is defective in the opinion of Lender, such sale shall not exhaust the power of sale hereunder and Lender shall have the right to cause a subsequent sale or sales to be made hereunder.  Any and all statements of fact or other recitals made in any deed or deeds given by Trustee as to nonpayment of the indebtedness secured hereby, or as to the occurrence of any Event of Default, or as to Lender having declared all of such indebtedness to be due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of Trustee or any substitute or successor, or as to the appointment of any substitute or successor trustee, or as to any other act or thing having been duly done by Lender or by such Trustee, substitute or successor, shall be taken as conclusive (absent manifest error) evidence of the truth of the facts so stated and recited.  Trustee may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of Trustee.

(b)     <u>Right to Require Proof of Financial Ability</u>.  At any time during the bidding of any sale conducted by Trustee under <u>Section 6.1(a)</u> above, Trustee may require a bidding party (a) to disclose its full name, state and city of residence, occupation, and specific business office location, and the name and address of the principal the bidding party is representing (if applicable); and (b) to demonstrate reasonable evidence of the bidding party's financial ability (or, if applicable, the financial ability of the principal of such bidding party), as a

condition to the bidding party submitting bids at the foreclosure sale. If any such bidding party (the "Questioned Bidder") declines to comply with Trustee's requirement in this regard, or if such Questioned Bidder does respond but Trustee, in Trustee's sole and absolute discretion, deems the information or the evidence of the financial ability of the Questioned Bidder (or, if applicable, the principal of such bidding party) to be inadequate, Trustee may continue the bidding with reservation; and in such event (i) Trustee shall be authorized to caution the Questioned Bidder concerning the legal obligations to be incurred in submitting bids, and (ii) if the Questioned Bidder is not the highest bidder at the sale, or if having been the highest bidder the Questioned Bidder fails to deliver the cash purchase price payment promptly to Trustee, all bids by the Questioned Bidder shall be null and void. Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of Borrower and Lender and elect to sell the Property for credit or for a combination of cash and credit; provided, however, that Trustee shall have no obligation to accept any bid except an all cash bid. In the event Trustee requires a cash bid and cash is not delivered within a reasonable time after conclusion of the bidding process, as specified by Trustee (but in no event later than 3:45 p.m. local time on the date of sale), then said contingent sale shall be null and void, the bidding process may be recommenced, and any subsequent bids or sale shall be made as if no prior bids were made or accepted.

(c)     Judicial Foreclosure. This Security Instrument shall be effective as a mortgage as well as a deed of trust and upon the occurrence of an Event of Default may be foreclosed as to any of the Property in any manner permitted by the laws of the State of Texas, and any foreclosure suit may be brought by Trustee or by Lender. In the event a foreclosure hereunder may be commenced by Trustee, Lender may at any time before the sale of the Property direct the said Trustee to abandon the sale, and may then institute suit for the collection of the Note and the other secured indebtedness, and for this foreclosure of this Security Instrument. It is agreed that if Lender should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Security Instrument, Lender may at any time before the entry of a final judgment in said suit dismiss the same, and require Trustee to sell the Property in accordance with the provisions of this Security Instrument.

(d)     Proceeds of Sale. The proceeds of any sale held by Trustee or any receiver or public officer in foreclosure of the liens evidenced hereby shall be applied:

FIRST, to the payment of all necessary costs and expenses incident to such foreclosure sale, including but not limited to all court costs and charges of every character in the event foreclosed by suit, and a reasonable fee to Trustee acting under the provisions of Section 6.1(a) above if foreclosed by power of sale as provided in said section, not exceeding one percent (1%) of the proceeds of such sale;

SECOND, to the payment in full of the all of the indebtedness and obligations evidenced or secured by the Loan Documents (including specifically without limitation the principal, interest and attorneys' fees due and unpaid on the Note and the amounts due and unpaid and owed to Lender under this Security Instrument and the other Loan Documents) in such order as Lender may elect, in Lender's sole and absolute discretion; and

THIRD, the remainder, if any, there shall be, shall be paid to Borrower or to such other party or parties as may be entitled thereto by law.

(e)  <u>Lender as Purchaser</u>.  Lender shall have the right to become the purchaser at any sale held by any Trustee or by any receiver or public officer, and any Lender purchasing at any such sale shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the indebtedness owing to such Lender, or if such Lender holds less than all such indebtedness, the pro rata part thereof owing to such Lender, accounting to all other Lenders not joining in such bid in cash for the portion of such bid or bids apportionable to such non-bidding Lender or Lenders.

(f)  <u>Uniform Commercial Code</u>.  Upon the occurrence of any Event of Default that is continuing, Lender may exercise its rights of enforcement under the Code with respect to the Collateral, and in conjunction with, in addition to or in substitution for those rights and remedies:

(1)  Lender may enter upon the Property to take possession of, assemble and collect the Collateral or to render it unusable; and

(2)  Lender may require Borrower to assemble the Collateral and make it available at a place Lender designates which is mutually convenient to allow Lender to take possession or dispose of the Collateral; and

(3)  written notice mailed to Borrower as provided herein ten (10) days prior to the date of public sale of the Collateral or prior to  the date after which private sale of the Collateral will be made shall constitute reasonable notice; and

(4)  any sale made pursuant to the provisions of this <u>Section 6.1(f)</u> shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Collateral hereunder as is required for such sale of the Property under power of sale; and

(5)  in the event of a foreclosure sale, whether made by Trustee under the terms hereof, or under judgment of a court, the Collateral and the remainder of the Property may, at the option of Lender, be sold as a whole; and

(6)  it shall not be necessary that Lender take possession of the Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this <u>Section 6.1(f)</u> is conducted and it shall not be necessary that the Collateral or any part thereof be present at the location of such sale; and

(7)  prior to application of proceeds of disposition of the Collateral to the secured indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Lender; and

(8)     any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to non-payment of the indebtedness or as to the occurrence of any Event of Default, or as to Lender having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Lender, shall absent manifest error be taken as conclusive evidence of the truth of the facts so stated and recited; and

(9)     Lender may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Lender, including the sending of notices and the conduct of sale, but in the name and on behalf of Lender.

(g)     Partial Foreclosure.  Upon the occurrence of any Event of Default that is continuing, Lender shall have the right to proceed with foreclosure of the liens and security interests evidenced hereby without accelerating or declaring due all or any portion of the secured indebtedness, and in such event any such foreclosure sale may be made subject to the unmatured part of such indebtedness; and any such sale shall not in any manner affect the unmatured part of the indebtedness, but as to such unmatured part, this Security Instrument shall remain in full force and effect just as though no sale had been made.  The proceeds of any such sale shall be applied as provided in Section 6.1.(d) of this Security Instrument except that the amount paid under subparagraph SECOND thereof shall be only the matured portion of the indebtedness and any proceeds of such sale in excess of those provided for in subparagraphs FIRST and SECOND (modified as provided above) shall be applied to installments of principal of and interest on the Note in the inverse order of maturity.  Several sales may be made hereunder without exhausting the right of sale for any unmatured portion of the indebtedness.

(h)     Waiver.

(1)     To the full extent Borrower may do so, Borrower agrees that Borrower will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force pertaining to the rights and remedies of sureties or providing for any appraisement, valuation, stay, extension or redemption, and Borrower, for Borrower and Borrower's heirs, devisees, representatives, successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the secured indebtedness, notice of intent to accelerate, notice of acceleration (as to each such notice, except as provided in the clause of the Note entitled "Note and Cure Prior to Acceleration"), and all rights to a marshaling of the assets of Borrower, including the Property, or to a sale in inverse order of alienation in the event of foreclosure of the liens and security interests hereby created.

(2)     Borrower shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of

alienation, the exemption of homestead, the administration of estates of decedents whatever to defeat, reduce or affect the right of Lender under the terms of this Security Instrument to a sale of the Property for the collection of the indebtedness without any prior or different resort for collection, or the right of Lender under the terms of this Security Instrument to the payment of such indebtedness out of the proceeds of sale of the Property in preference to every other claimant whatever.

(3)     To the extent that Borrower, any partner thereof or any other entity responsible for the payment of the indebtedness is now, or at any time or from time to time hereafter is, a partnership, Borrower and Lender expressly acknowledge and agree that Lender is not required to comply with Section 3.05(d) of the Texas Revised Partnership Act or any successor statute, as any of them may be amended or modified, or any other or further laws, rules or regulations now or hereafter in effect which may limit the rights and remedies of a creditor to pursue partners of a partnership prior to the pursuit of such creditor's rights and remedies against such partnership.

(4)     If any law referred to in this <u>Section 6.1(h)</u> and now in force, of which Borrower or Borrower's heirs, devisees, representatives, successors and assigns and such other persons claiming any interest in the Property might take advantage despite this section, shall hereafter be repealed and cease to be in force, such law shall not thereafter be deemed to preclude the application of this section.

(i)     <u>Delivery of Possession After Foreclosure</u>.  In the event there is a foreclosure sale and at the time of such sale Borrower or Borrower's heirs, devisees, representatives, successors or assigns or any other persons claiming any interest in the Property by, through or under Borrower are occupying or using the Property, or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser.  In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain an action for forcible entry and detainer of said property in the Justice of the Peace Court in the Justice Precinct in which such property, or any part thereof, is situated.

(j)     <u>Waiver of Deficiency Statute</u>.

(1)     Subject only to the extent of the limitations expressly specified in Section 3 of the Note, in the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Borrower agrees that notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Lender shall be entitled to seek a deficiency judgment from Borrower and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale.  Borrower expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions

of the Texas Property Code which would otherwise permit Borrower and other persons against whom recovery of deficiencies is sought (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Borrower further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, and others against whom recovery of a deficiency is sought.

(2)     Alternatively, in the event the waiver provided for in subsection (1) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i)     Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(ii)     the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(iii)     all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(iv)     the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

(v)     any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

(k)     Lawsuits.  Lender may proceed by a suit or suits in equity or at law, whether for collection of the indebtedness secured hereby, the specific performance of any covenant or agreement herein contained or in aid of the execution of any power herein granted, or for any foreclosure hereunder or for the sale of the Property under the judgment or decree of any court or courts of competent jurisdiction.

(l)     Entry on Property.  Lender is authorized, prior or subsequent to the institution of any foreclosure proceedings, to the fullest extent permitted by applicable law, to enter upon the Property, or any part thereof, and to take possession of the Property and all books and records, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics to the extent the same relate solely thereto or can be identified and segregated independently, and to exercise without interference from Borrower any and all rights which Borrower has with respect to the management, possession, operation, protection or preservation of the Property.  Lender shall not be deemed to have taken possession of the Property or any part thereof except upon the exercise of its right to do so, and then only to the extent evidenced by its demand and overt act specifically for such purpose.  All costs, expenses and liabilities of every character incurred by Lender in managing, operating, maintaining, protecting or preserving the Property shall constitute a demand obligation of Borrower (which obligation Borrower hereby promises to pay) to Lender pursuant to this Security Instrument.  If necessary to obtain the possession provided for above, Lender may invoke any and all legal remedies to dispossess Borrower.  In connection with any action taken by Lender pursuant to this section, Lender shall not be liable for any loss sustained by Borrower resulting from any failure to let the Property or any part thereof, or from any act or omission of Lender in managing the Property unless such loss is caused by the willful misconduct and bad faith of Lender, nor shall Lender be obligated to perform or discharge any obligation, duty or liability of Borrower arising under any lease or other agreement relating to the Property or arising under any Permitted Encumbrance or otherwise arising.  Borrower hereby assents to, ratifies and confirms any and all actions of Lender with respect to the Property taken under this section.

(m)     Exercise of Rights Under Assignment of Leases and Rents.  Lender may exercise and enforce any and all rights or remedies that may be available to Lender under the assignment of rents set out in this Security Instrument.  Without limiting the foregoing, prior or subsequent to taking possession of any portion of the Property or taking any action with respect to such possession, and subject to the terms and provisions of the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code, Lender may: (1) collect and/or sue for the Rents and Profits in Lender's own name, give receipts and releases therefor, and after deducting all expenses of collection, including attorneys' fees and expenses, apply the net proceeds thereof to the secured indebtedness in such manner and order as Lender may elect and/or to the operation and management of the Property, including the payment of management, brokerage and attorney's fees and expenses; and (2) require Borrower to transfer all security deposits and records thereof to Lender together with original counterparts of the Leases.

(n)     Termination of Commitment to Lend.  Upon the occurrence of any Event of Default, Lender may terminate any commitment or obligation to lend or disburse funds under any Loan Document or enter into any other credit arrangement to or for the benefit of Borrower.

(o)     Other Rights and Remedies.  Upon the occurrence of any Event of Default, Lender may exercise any and all other rights and remedies which Lender may have under the Loan Documents, or at law or in equity or otherwise.

6.2     Assignment of Rents.

(a)     Assignment of Rents.  Borrower acknowledges and agrees that the following additional provisions shall apply in connection with the assignments of rents set forth in this Security Instrument:

(a)  in no event shall the rights set out in said Section 1.8  effect or be construed so as to effect a pro tanto reduction of the secured indebtedness, except to the extent, if any, that Lender actually receives, after the occurrence of a default and Lender's election to pursue its rights under said Section 1.8, Property income and other sums directly from any tenant of all or any portion of the Property and applies same, in Lender's discretion, to the indebtedness; and

(b)  Lender need not institute, prosecute or resort to any legal, equitable or other action, nor deliver any notice or demand, nor take any affirmative action whatsoever after the occurrence of a default in order to enforce and obtain the benefits of the provisions set out in said Section 1.8.

Notwithstanding anything to the contrary contained herein or otherwise, Borrower and Lender intend, clearly and without ambiguity, that the provisions set forth in said Section 1.8 relating to directions and notices to tenants are intended solely for the benefit of Lender and each respective tenant and shall never inure to the benefit of Borrower or any person claiming by, through or under Borrower.  The provisions of this Section 6.2 shall be subject to the provisions of the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code.

6.3     Interest Limitation.

(a)     Condition to Any Claim.  Borrower hereby agrees that as a condition precedent to asserting any claim against Lender relating to usury, Borrower shall provide written notice to Lender, apprising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against any indebtedness then owing by Borrower to Lender.  In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to any indebtedness evidenced or secured by any of the Loan Documents.  Notwithstanding anything to the contrary contained herein or in any other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.  To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the maximum lawful rate of interest payable on the secured indebtedness, Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended.  To the extent United States federal law permits Lender to

contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Lender will rely on United States federal law instead of such Chapter 303 for the purpose of determining the maximum lawful rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, utilize any other method of establishing the maximum lawful rate under such Chapter 303 or under applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

      6.4    <u>Miscellaneous.</u>

          (a)    <u>No Partnership</u>.  Notwithstanding anything to the contrary contained herein or otherwise (i) the relationship between Borrower and Lender hereunder and otherwise shall be deemed, construed and treated by Borrower and Lender for all purposes to be solely that of debtor/creditor; (ii) the various consent, approval and other rights afforded to Lender under this Security Instrument have been granted and designed solely to protect the value of the Property and to assure Borrower's payment of the secured indebtedness, and all such rights are customarily granted lenders in secured lending transactions; (iii) Borrower and Lender hereby expressly disclaim any sharing of liabilities, losses, costs or expenses with respect to the ownership or operation of all or any portion of the Property, or otherwise; and (iv) the terms contained herein are not intended by Borrower and Lender and shall not for any purpose be deemed, construed or treated by Borrower and Lender so as (A) to create a partnership or joint venture between Lender and Borrower or between Lender and any other party, or (B) to cause Lender to be or become liable in any way for the debts and obligations of Borrower (including, without limitation, any losses attributable to Borrower's operation of the Property) or any other party.

<u>[REMAINDER OF PAGE INTENTIONALLY BLANK]</u>

(b)     Indemnity.  IT IS THE EXPRESS INTENTION OF BORROWER AND BORROWER HEREBY AGREES THAT THE INDEMNITIES SET FORTH IN THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS (INCLUDING BUT NOT LIMITED TO THOSE SET FORTH IN THE  LOAN AGREEMENT AND IN THAT CERTAIN HAZARDOUS SUBSTANCES INDEMNITY AGREEMENT EXECUTED BY BORROWER AND THE OTHER PARTIES NAMED THEREIN IN FAVOR OF LENDER AND DATED AS OF EVEN DATE HEREWITH) SHALL APPLY TO AND FULLY PROTECT EACH INDEMNIFIED PARTY, EVEN THOUGH ANY CLAIMS, DEMANDS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COSTS AND EXPENSES (INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEYS' FEES) THEN THE SUBJECT OF INDEMNIFICATION MAY HAVE BEEN CAUSED BY, ARISE OUT OF, OR ARE OTHERWISE ATTRIBUTABLE TO, DIRECTLY OR INDIRECTLY, THE NEGLIGENCE IN WHOLE OR IN PART OF SUCH INDEMNIFIED PARTY AND/OR ANY OTHER PARTY, BUT NOT THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY.

Borrower's Initials: _____

(c)     WAIVER OF CONSUMER RIGHTS.  TO THE EXTENT NOW OR HEREAFTER APPLICABLE, BORROWER HEREBY WAIVES BORROWER'S RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CERTAIN CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.  AFTER CONSULTATION WITH AN ATTORNEY OF BORROWER'S OWN SELECTION, BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER.

(d)     TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE:  (A) BORROWER IS REQUIRED TO: (I) KEEP THE PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (II) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS; (B) BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) IF BORROWER FAILS TO MEET ANY REQUIREMENT IN THE FOREGOING CLAUSES (A) OR (B), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT THE BORROWER'S EXPENSE.

**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGES]**

**IN WITNESS WHEREOF**, Borrower has executed this Security Instrument as of the day and year first above written.

"**BORROWER**"

**WC 56 EAST AVENUE, LLC,**
a Delaware limited liability company

By:    WC 56 East Avenue MM, LLC,
       a Delaware limited liability company,
       its Managing Member

       By:                   
       Name:  Natin Paul
       Title:  President

**[SIGNATURE PAGE TO DEED OF TRUST, SECURITY AGREEMENT AND FINANCING STATEMENT]**

**STATE OF** Texas       )

                             ) ss:

**COUNTY OF** Travis     )

On the ___11th___ day of __December__ in the year 2017, before me, the undersigned, personally appeared _____Natin Paul_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846548

_____
Notary Public                   Sign and affix stamp

# EXHIBIT A

## LEGAL DESCRIPTION OF LAND

A 1.118 ACRE, 48,700 SQUARE FEET, TRACT OF LAND OUT OF BLOCK 2, OUTLOT 73, DIVISION "E" OF THE GOVERNMENT OUTLOTS ADJOINING THE ORGINAL CITY OF AUSTIN, TRAVIS COUNTY, TEXAS. HAVING BEEN CONVEYED TO WC 56 EAST A VENUE, LLC BY INSTUMENT OF RECORD IN DOCUMENT NUMBER 2015026718 IN THE OFFICIAL PUBLIC RECORDS OF TRAVIS COUNTY, TEXAS; SAID 1.118 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

POINT OF BEGINNING at a 1/2" iron rod with plastic cap found at the intersection of the south right of way line of River Street with the west right of way line of East A venue, also being the northeast corner of the 1.118 acre tract of land herein described;

THENCE, S 16° 33' 20" W, a distance of 380.28 feet with the west right of way line of East A venue and the east line of said 1.1178 acre tract to a 1/2" iron rod found on the west right-of-way line of East Avenue, the southeast corner of the herein described tract of land and the northeast corner of Lot A, Zoppp Addition, a subdivision recorded in Book 65, Page 56 of the Plat Records of Travis County, Texas having been conveyed to 48 East Ave. LLC by instrument of record in Document Number 2014101790 of the official public records of Travis County Texas;

THENCE, N 73° 43' 47" W, leaving the west right of way line of East Avenue with the south line of said 1.118 acre tract and the north line of said Lot A, a distance of 127.75 feet to a 1/2" iron rod found at the to a 1/2" iron rod found at the southwest corner of the herein described tract of land and the northwest corner of said Lot A also on the east line of a 20' alley;

THENCE, N 16° 28' 21" W, with the west line of the herein described tract of land and the east line of said 20' alley a distance of 380.55 feet to a nail with a washer found at the northwest corner of the herein described tract of land and the intersection of the east right of way line of said 20' alley with the south right of way line of River Street for the northwest corner of the herein described tract of land;

THENCE, S 73° 36' 22" E, with the south right-of-way line of River Street and the north line of the herein described tract of land, a distance of 128.30 feet to the POINT OF BEGINNING and containing 1.118 acres of land.

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
December 13 2017 09:42 AM
FEE: $  226.00  **2017196451**

# **EXHIBIT D**

ELECTRONICALLY RECORDED      2017196452

TRV    **13**    PGS

*:O CTOT 17-334937-rim /KK*

RECORDING REQUESTED BY AND
AFTER RECORDING RETURN DOCUMENT TO:

Safarian Choi & Bolstad LLP
555 South Flower St., Suite 650
Los Angeles, California 90071
Attention: Alex Y. Choi, Esq.

## ASSIGNMENT OF LEASES AND RENTS
### (World Class – 56 East Avenue)

     **THIS ASSIGNMENT OF LEASES AND RENTS** (this "Assignment") made as of December 12, 2017, is by **WC 56 EAST AVENUE LLC**, a Delaware limited liability company ("Assignor"), the address of which is 401 Congress Avenue, 33rd Floor, Austin, Texas 78701, in favor of **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership("Assignee"), whose address is c/o Calmwater Capital, 11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025.

## W I T N E S S E T H :

     THAT, WHEREAS, Assignor has executed that certain (i) Promissory Note dated of even date herewith (the "Note"), payable to the order of Assignee, in the stated principal amount of FIFTEEN MILLION AND NO/100 DOLLARS ($15,000,000.00) (the "Loan") and (ii) Loan Agreement dated of even date herewith (the "Loan Agreement"); and

     WHEREAS, the Note is secured by that certain Deed of Trust, Security Agreement and Financing Statement dated as of the Effective Date (the "Security Instrument") from Assignor, as trustor to the trustee named therein for the benefit of Assignee, encumbering that certain real property situated at 50-56 East Avenue, in the City of Austin, County of Travis, State of Texas, as is more particularly described on Exhibit A attached hereto and incorporated herein by this reference, and all buildings and other improvements now or hereafter located thereon (collectively, the "Improvements") (said real property and the Improvements are hereinafter sometimes collectively referred to as the "Property"); and

     WHEREAS, Assignor is desirous of further assuring the performance of the terms, covenants and agreements hereof and of the Loan Agreement, the Note, the Security Instrument and each other document evidencing, securing, guaranteeing or otherwise relating to the indebtedness evidenced by the Note (the Loan Agreement, the Note, the Security Instrument, between the parties of even date herewith and such other documents, as each of the foregoing may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as the "Loan Documents").

     NOW, THEREFORE, in consideration of the making of the loan evidenced by the Note by Assignee to Assignor, and as an additional source of payment of such loan, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby irrevocably, absolutely and unconditionally transfer, sell, assign, pledge

and convey to Assignee, and Assignee's successors and assigns, all of the right, title and interest of Assignor in and to:

(a)     any and all leases, licenses, rental agreements, concessions and occupancy agreements of whatever form now or hereafter affecting all or any part of the Property and any and all guarantees, extensions, renewals, replacements and modifications thereof (collectively, the "Leases"); and

(b)     all deposits (whether for security or otherwise), rents, issues, profits, revenues, royalties, accounts, rights, benefits and income of every nature of and from the Property, including, without limitation, minimum rents, additional rents, termination payments, forfeited security deposits, liquidated damages following default and all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability due to destruction or damage to the Property, together with the immediate and continuing right to collect and receive the same, whether now due or hereafter becoming due, and together with all rights and claims of any kind that Assignor may have against any Tenant (as defined in the Security Instrument) (collectively, the "Rents").

TO HAVE AND TO HOLD the same unto Assignee, and Assignee's successors and assigns.

IT IS AGREED that, notwithstanding that this instrument is a present, absolute and executed assignment of the Rents and of the Leases and a present, absolute and executed grant of the powers herein granted to Assignee, Assignor is hereby permitted, at the sufferance of Assignee and at Assignee's discretion, and is hereby granted a license by Assignee, to retain possession of the Leases and to collect and retain the Rents unless and until there shall be an Event of Default under the terms of any of the Loan Documents. Upon the occurrence of such Event of Default and the lapse of any applicable notice and cure period the aforementioned license granted to Assignor shall automatically terminate without notice to Assignor, and Assignee may thereafter, without taking possession of the Property, take possession of the Leases and collect the Rents. Further, from and after such termination, Assignor shall be the agent of Assignee in collection of the Rents, and any Rents so collected by Assignor shall be held in trust by Assignor for the sole and exclusive benefit of Assignee, and Assignor shall, within one (1) business day after receipt of any Rents, pay the same to Assignee to be applied by Assignee as hereinafter set forth. Furthermore, from and after such Event of Default and termination of the aforementioned license, Assignee shall have the right and authority, without any notice whatsoever to Assignor and without regard to the adequacy of the security therefor, to: (a) make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as particularly set forth in the Security Instrument, (b) manage and operate the Property, with full power to employ agents to manage the same; (c) demand, collect, receive and sue for the Rents, including without limitation those past due and unpaid; and (d) do all acts relating to such management of the Property, including, but not limited to, negotiation of new Leases, making adjustments of existing Leases, contracting and paying for repairs and replacements to the Improvements and to the fixtures, equipment and personal property located in the Improvements or used in any way in the operation, use and occupancy of the Property as in the sole judgment and discretion of Assignee may be necessary to maintain the same in a tenantable condition, purchasing and paying for such additional furniture and equipment as in the

sole judgment of Assignee may be necessary to maintain a proper rental income from the Property, employing necessary managers and other employees, purchasing fuel, providing utilities and paying for all other expenses incurred in the operation of the Property, maintaining adequate insurance coverage over hazards customarily insured against and paying the premiums therefor. Assignee may apply the Rents received by Assignor from the Property, after deducting the costs of collection thereof, including, without limitation, attorneys' fees and a reasonable management fee for any management agent so employed, against amounts expended for repairs, upkeep, maintenance, service, fuel, utilities, taxes, assessments, insurance premiums and such other expenses as Assignee incurs in connection with the operation of the Property and against interest, principal, required escrow deposits and other sums which have or which may become due, from time to time, under the terms of the Loan Documents, in such order or priority as to any of the items so mentioned as Assignee, in Assignee's sole subjective discretion, may determine. The exercise by Assignee of the rights granted Assignee in this paragraph, and the collection of, the Rents and the application thereof as provided herein, shall not be considered a waiver by Assignee of any Event of Default under the Loan Documents or prevent foreclosure of any liens on the Property nor shall such exercise make Assignee liable under any of the Leases, Assignee hereby expressly reserving all of Assignee's rights and privileges under the Security Instrument and the other Loan Documents as fully as though this Assignment had not been entered into.

Without limiting the rights granted hereinabove, in the event Assignor shall fail to make any payment or to perform any act required under the terms hereof and such failure shall not be cured within any applicable grace or cure period, then Assignee may, but shall not be obligated to, without prior notice to or demand on Assignor, and without releasing Assignor from any obligation hereof, make or perform the same in such manner and to such extent as Assignee may deem necessary to protect the security hereof, including specifically, without limitation, appearing in and defending any action or proceeding purporting to affect the security hereof or the rights or powers of Assignee, performing or discharging any obligation, covenant or agreement of Assignor under any of the Leases, and, in exercising any of such powers, paying all necessary costs and expenses, employing counsel and incurring and paying attorneys' fees. Any sum advanced or paid by Assignee for any such purpose, including, without limitation, attorneys' fees, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date paid or advanced by Assignee until repaid by Assignor, shall immediately be due and payable to Assignee by Assignor on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

IT IS FURTHER AGREED that this Assignment is made upon the following terms, covenants and conditions:

1. This Assignment shall not operate to place responsibility for the control, care, management or repair of the Property upon Assignee, nor for the performance of any of the terms and conditions of any of the Leases, nor shall this Assignment operate to make Assignee responsible or liable for any waste committed on the Property by the Tenants or any other party or for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control of the Property unless and until Assignee takes actual possession of the Property. Assignee shall not be liable for any loss sustained by Assignor

3

resulting from Assignee's failure to let the Property or from any other act or omission of Assignee in managing the Property in the absence of Assignee's gross negligence or willful misconduct. Assignor shall and does hereby indemnify and hold Assignee harmless from and against any and all liability, loss, claim, demand or damage which may or might be incurred by reason of this Assignment, including, without limitation, claims or demands for security deposits from Tenants of space in the Improvements deposited with Assignor, and from and against any and all claims and demands whatsoever which may be asserted against Assignee by reason of any alleged obligations or undertakings on Assignee's part to perform or discharge any of the terms, covenants or agreements contained in any of the Leases. Should Assignee incur any liability by reason of this Assignment or in defense of any claim or demand for loss or damage as provided above, the amount thereof, including, without limitation, costs, expenses and attorneys' fees, together with interest thereof at the Default Interest Rate from the date paid or incurred by Assignee until repaid by Assignor, shall be immediately due and payable to Assignee by Assignor upon demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Notwithstanding the foregoing, Assignor shall have no obligation to indemnify Assignee for any matter that arises out of Assignee's gross negligence or willful misconduct.

2.     This Assignment shall not be construed as making Assignee a mortgagee in possession.

3.     Assignee is obligated to account to Assignor only for such Rents as are actually collected or received by Assignee.

4.     Assignor hereby further presently and absolutely assigns to Assignee subject to the terms and provisions of this Assignment:  (a) any award or other payment which Assignor may hereafter become entitled to receive with respect to any of the Leases as a result of or pursuant to any bankruptcy, insolvency or reorganization or similar proceedings involving the Tenants under such Leases; and (b) any and all payments made by or on behalf of any Tenant of any part of the Property in lieu of Rent. Assignor hereby irrevocably appoints Assignee as Assignee's attorney-in-fact to, from and after the occurrence of an Event of Default by Assignor hereunder or under any of the other Loan Documents which has not been cured within any applicable grace or cure period, appear in any such proceeding and to collect any such award or payment, which power of attorney is coupled with an interest by virtue of this Assignment and is irrevocable so long as any sums are outstanding under the loan evidenced by the Note.

5.     Assignor represents, warrants and covenants to and for the benefit of Assignee: (a) that Assignor now is (or with respect to any Leases not yet in existence, will be immediately upon the execution thereof) the absolute owner of the landlord's interest in the Leases, with full right and title to assign the same and the Rents due or to become due thereunder; (b) that, other than this Assignment, there are no outstanding assignments of the Leases or Rents; (c) that no Rents have been anticipated, discounted, released, waived, compromised or otherwise discharged except for prepayment of rent of not more than one (1) month prior to the accrual thereof; (d) that there are no defaults now existing under any of the Leases by the landlord or Tenant, and there exists no state of facts which, with the giving of notice or lapse of time or both, would constitute a default under any of the Leases by the landlord or Tenant, except as disclosed in writing to Assignee; (e) that Assignor has and shall duly and punctually observe and perform all

4

covenants, conditions and agreements in the Leases on the part of the landlord to be observed and performed thereunder; and (f) the Leases are in full force and effect and are the valid and binding obligations of Assignor, and, to the knowledge of Assignor, are the valid and binding obligations of the Tenants thereto.

6. Assignor covenants and agrees that Assignor shall not, without the prior written consent of Assignee: (a) exclusive of security deposits, accept any payment of Rent or installments of Rent for more than one (1) month in advance; (b) cancel or terminate any Lease (other than for non-payment of Rent or other material breach thereof) or amend or modify any Lease; (c) take or omit to take any action right or option which would permit the Tenant under any Lease to cancel or terminate said Lease; (d) anticipate, discount, release, waive, compromise or otherwise discharge any Rents payable or other obligations under the Leases; (e) further pledge, transfer, mortgage or otherwise encumber or assign the Leases or future payments of Rents or incur any indebtedness, liability or other obligation to any Tenant under the Leases; or (f) permit any Lease to become subordinate to any lien other than the lien of the Security Instrument; provided, however, that Assignor may take any of the actions described in subsection (b) or (d) above so long as no Event of Default has occurred and so long as such actions are taken by Assignor in the ordinary course of business and are consistent with sound customary leasing and management practices for similar properties.

7. Assignor covenants and agrees that Assignor shall, at Assignor's sole cost and expense, appear in and defend any action or proceeding arising under, growing out of, or in any manner connected with the Leases or the obligations, duties or liabilities of the landlord or Tenant thereunder, and shall pay on demand all costs and expenses, including, without limitation, attorneys' fees, which Assignee may incur in connection with Assignee's appearance, voluntary or otherwise, in any such action or proceeding, together with interest thereon at the Default Interest Rate from the date incurred by Assignee until repaid by Assignor.

8. At any time, Assignee may, at Assignee's option, notify any Tenants or other parties of the existence of this Assignment. Assignor does hereby specifically authorize, instruct and direct each and every present and future Tenant of the whole or any part of the Property to pay all unpaid and future Rents to Assignee upon receipt of demand from Assignee to so pay the same and Assignor hereby agrees that each such present and future Tenant may rely upon such written demand from Assignee to so pay said Rents without any inquiry into whether there exists an Event of Default hereunder or under the other Loan Documents or whether Assignee is otherwise entitled to said Rents. Assignor hereby waives any right, claim or demand which Assignor may now or hereafter have against any present or future Tenant by reason of such payment of Rents to Assignee, and any such payment shall discharge such Tenant's obligation to make such payment to Assignor.

9. Assignee may take or release any security for the indebtedness evidenced by the Note, may release any party primarily or secondarily liable for the indebtedness evidenced by the Note, may grant extensions, renewals or indulgences with respect to the indebtedness evidenced by the Note and may apply any other security therefor held by Assignor to the satisfaction of any indebtedness evidenced by the Note without prejudice to any of Assignor's rights hereunder.

10.     The acceptance of this Assignment and the collection of the Rents in the event Assignor's license is terminated, as referred to above, shall be without prejudice to Assignee. The rights and remedies of Assignee hereunder and at law are cumulative and concurrent, may be pursued separately, successively or together and may be exercised as often as occasion therefor shall arise, it being agreed by Assignor that the exercise of any one or more of the rights provided for herein shall not be construed as a waiver of any of the other rights or remedies of Assignee, at law or in equity or otherwise, so long as any obligation under the Loan Documents remains unsatisfied.

11.     All rights of Assignee hereunder shall inure to the benefit of Assignee's successors and assigns (without implying Assignor's consent to any transfer of any of the Property in violation of the Loan Agreement or any of the other Loan Documents); and all obligations of Assignor shall bind Assignor's successors and assigns and any subsequent owner or owners of the Property. All rights of Assignee in, to and under this Assignment shall pass to and may be exercised by any assignee of such rights of Assignee. Assignor hereby agrees that if Assignee gives notice to Assignor of an assignment of said rights, upon such notice the liability of Assignor to the assignee of the Assignee shall be immediate and absolute. Assignor will not set up any claim against Assignee or any intervening assignee as a defense, counterclaim or setoff to any action brought by Assignee or any intervening assignee for any amounts due hereunder or for possession of or the exercise of rights with respect to the Leases or the Rents.

12.     It shall be an Event of Default hereunder (a) if any representation or warranty made herein by Assignor is determined by Assignee to have been false or misleading in any material respect at the time made, or (b) upon any failure by Assignor to comply with the provisions of Section 6 above, or (c) upon any failure by Assignor in the performance or observance of any other covenant or condition hereof and, to the extent such failure described in this subsection (c) is susceptible of being cured, the continuance of such failure for thirty (30) days after written notice thereof from Assignee to Assignor; provided, however, that if such default described in this subsection (c) is susceptible of cure but such cure cannot be accomplished with reasonable diligence within said period of time, and if Assignor commences to cure such default promptly after receipt of notice thereof from Assignee, and thereafter prosecutes the curing of such default with reasonable diligence, such period of time shall be extended for such period of time as may be necessary to cure such default with reasonable diligence, but not to exceed an additional sixty (60) days. Any such default not so cured shall be a default or an Event of Default, as applicable, under each of the other Loan Documents, entitling Assignee to exercise any or all rights and remedies available to Assignee under the terms hereof or of any or all of the other Loan Documents, and any Event of Default or default under any other Loan Document which is not cured within any applicable grace or cure period shall be deemed an Event of Default hereunder subject to no grace or cure period, entitling Assignee to exercise any or all rights provided for herein.

13.     Failure by Assignee to exercise any right which Assignee may have hereunder shall not be deemed a waiver thereof unless so agreed in writing by Assignee, and the waiver by Assignee of any default hereunder shall not constitute a continuing waiver or a waiver of any other default or of the same default on any future occasion. No collection by Assignee of any Rents pursuant to this Assignment shall constitute or result in a waiver of any default then existing hereunder or under any of the other Loan Documents.

14.     If any provision under this Assignment or the application thereof to any entity, person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Assignment and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

15.     This Assignment may not be amended, modified or otherwise changed except by a written instrument duly executed by Assignor and Assignee.

16.     This Assignment shall be in full force and effect continuously from the date hereof to and until the Security Instrument shall be released of record, and the release of the Security Instrument shall, for all purposes, automatically terminate this Assignment and render this Assignment null and void and of no effect whatsoever.

17.     All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be given and become effective as provided in the Loan Agreement.

18.     This Assignment shall be governed by and construed in accordance with the laws of the State of Texas, except to the extent that any of such laws may now or hereafter be preempted by Federal law, in which case such Federal law shall so govern and be controlling; and provided however, that the laws of the State of Texas shall govern as to the creation, priority and enforcement of liens and security interests property located in such state.

19.     This Assignment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Assignment may be detached from any counterpart of this Assignment without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Assignment identical in form hereto but having attached to it one or more additional signature pages.

20.     In addition to, but not in lieu of, any other rights hereunder, Assignee shall have the right to institute suit and obtain a protective or mandatory injunction against Assignor to prevent a breach or default, or to reinforce the observance, of the agreements, covenants, terms and conditions contained herein, as well as the right to damages occasioned by any breach or default by Assignor.

21.     This Assignment shall continue and remain in full force and effect during any period of foreclosure with respect to the Property.

22.     Assignor hereby covenants and agrees that Assignee shall be entitled to all of the rights, remedies and benefits available by statute, at law, in equity or as a matter of practice for the enforcement and perfection of the intents and purposes hereof. Assignee shall, as a matter of absolute right, be entitled, upon application to a court of applicable jurisdiction, and without notice to Assignor, to the appointment of a receiver to obtain and secure the rights of Assignee hereunder and the benefits intended to be provided to Assignee hereunder.

23.     Notwithstanding anything to the contrary contained in this Assignment, the liability of Assignor and Assignor's officers, directors, general partners, managers, members and principals for the indebtedness secured hereby and for the performance of the other agreements, covenants and obligations contained herein and in the other Loan Documents shall be limited as set forth in Section 3 of the Note.

24.     In connection with any action arising from or in connection with this Assignment, the prevailing party shall be entitled to an award of its costs and expenses, including attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and disbursements, incurred or paid before and at trial or any other proceeding which may be instituted, at any tribunal level, and whether or not suit or any other proceeding is instituted.

25.     ASSIGNOR, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF CALIFORNIA OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS ASSIGNMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE COUNTY OF LOS ANGELES, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) AGREES THAT ASSIGNOR WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM WITH RESPECT TO THIS ASSIGNMENT (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF ASSIGNEE TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM); PROVIDED, HOWEVER, ASSIGNEE MAY BRING AN ACTION IN ANY COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY WHERE THE PROPERTY IS LOCATED TO THE EXTENT NECESSARY TO EXERCISE ITS RIGHTS HEREUNDER.  ASSIGNOR FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO THE ASSIGNOR AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 12.4 OF THE LOAN AGREEMENT, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

26.     EACH OF ASSIGNOR AND ASSIGNEE HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS ASSIGNMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS ASSIGNMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR

OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. ANY PARTY TO THIS ASSIGNMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

27.    This Assignment shall not be construed more strictly against one party than against the other merely by virtue of the fact that this Assignment may have been physically prepared by one of the parties, or such party's counsel, it being agreed that all parties and their respective counsel have mutually participated in the negotiation and preparation of this Assignment.

28.    All rights and remedies granted to Assignor under the Loan Documents shall be in addition to and cumulative of all rights and remedies granted to Assignor hereunder.

29.    ASSIGNOR ACKNOWLEDGES THE RECEIPT OF A COPY OF THIS DOCUMENT AT THE TIME IT WAS SIGNED.

**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGE(S)]**

**IN WITNESS WHEREOF**, Assignor has executed this Assignment as of the day and year first above written.

**"ASSIGNOR"**

**WC 56 EAST AVENUE, LLC,**
a Delaware limited liability company

By:    WC 56 East Avenue MM, LLC,
        a Delaware limited liability company,
        its Managing Member

        By:
        Name:  Natin Paul
        Title:   President

**STATE OF** Texas )
) ss:
**COUNTY OF** Travis )

On the 11th day of December in the year 2017, before me, the undersigned, personally appeared Natin pavl , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846548

_____
Notary Public                    Sign and affix stamp

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

A 1.118 ACRE, 48,700 SQUARE FEET, TRACT OF LAND OUT OF BLOCK 2, OUTLOT 73, DIVISION "E" OF THE GOVERNMENT OUTLOTS ADJOINING THE ORGINAL CITY OF AUSTIN, TRAVIS COUNTY, TEXAS. HAVING BEEN CONVEYED TO WC 56 EAST A VENUE, LLC BY INSTUMENT OF RECORD IN DOCUMENT NUMBER 2015026718 IN THE OFFICIAL PUBLIC RECORDS OF TRAVIS COUNTY, TEXAS; SAID 1.118 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

POINT OF BEGINNING at a 1/2" iron rod with plastic cap found at the intersection of the south right of way line of River Street with the west right of way line of East A venue, also being the northeast corner of the 1.118 acre tract of land herein described;

THENCE, S 16° 33' 20" W, a distance of 380.28 feet with the west right of way line of East A venue and the east line of said 1.1178 acre tract to a 1/2" iron rod found on the west right-of-way line of East Avenue, the southeast corner of the herein described tract of land and the northeast corner of Lot A, Zoppp Addition, a subdivision recorded in Book 65, Page 56 of the Plat Records of Travis County, Texas having been conveyed to 48 East Ave. LLC by instrument of record in Document Number 2014101790 of the official public records of Travis County Texas;

THENCE, N 73° 43' 47" W, leaving the west right of way line of East Avenue with the south line of said 1.118 acre tract and the north line of said Lot A, a distance of 127.75 feet to a 1/2" iron rod found at the to a 1/2" iron rod found at the southwest corner of the herein described tract of land and the northwest corner of said Lot A also on the east line of a 20' alley;

THENCE, N 16° 28' 21" W, with the west line of the herein described tract of land and the east line of said 20' alley a distance of 380.55 feet to a nail with a washer found at the northwest corner of the herein described tract of land and the intersection of the east right of way line of said 20' alley with the south right of way line of River Street for the northwest corner of the herein described tract of land;

THENCE, S 73° 36' 22" E, with the south right-of-way line of River Street and the north line of the herein described tract of land, a distance of 128.30 feet to the POINT OF BEGINNING and containing 1.118 acres of land.

EXHIBIT A

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS



DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
December 13 2017 09:42 AM
FEE: $  74.00   **2017196452**

# __EXHIBIT E__



**Brian T. Cumings**
512.480.5626
512.536.9926(fax)
bcumings@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 78767-9998

October 9, 2019

**Certified Mail/Return Receipt Requested
and First Class Mail**                            70190160000003454730

c/o World Class
814 Lavaca Street
Austin, Texas 78701
Attn: Natin Paul

**Certified Mail/Return Receipt Requested
and First Class Mail**                            70190160000003454747

c/o World Class Capital Group, LLC
401 Congress, 33rd Floor
Austin, Texas 78701
Attention: Nate Paul

**Certified Mail/Return Receipt Requested
and First Class Mail**                            70190160000003454754

c/o World Class
767 Fifth Avenue, 16th Floor
New York, New York 10153
Attention: Legal Department

**Certified Mail/Return Receipt Requested
First Class Mail and e-mail**                      70190160000003454761

Natin Paul
401 Congress, 33rd Floor
Austin, TX 78701
Email: npaul@wccapitalgroup.com

**Certified Mail/Return Receipt Requested
and First Class Mail**                            70190160000003454778

Cogency Global Inc.
1601 Elm Street
Suite 4360
Dallas, Texas 75201

October 10, 2019
Page 2

Re:     *Promissory Note dated December 12, 2017 executed by WC 56 East Avenue LLC ("Borrower") and payable to the order of U.S. Real Estate Credit Holdings III-A, LP, predecessor in interest to U.S. Real Estate Credit Holdings III, LP ("Lender") in the original principal amount of $15,000,000.00 (the "Note")*

To Whom It May Concern:

This Firm represents the Lender in connection with the loan (the **"Loan"**) evidenced by the above-referenced Note and Loan Agreement dated December 12, 2017 between Borrower and Lender (the **"Loan Agreement"**), and secured by the Deed of Trust recorded as Document No. 2017196451 in the Official Public Records of Travis County, Texas (the **"Deed of Trust"**) (the Note, Loan Agreement, and Deed of Trust are collectively referred to as the **"Loan Documents"**). For purposes of this letter, capitalized terms shall be used with the meanings given such terms in the Loan Documents. The amount now due on the Loan as of October 9, 2019 is as follows:

| | |
|---|---|
| Outstanding Principal: | $15,000,000.00 |
| Interest accrued and unpaid to date: | $34,921.88 |
| Servicing Fee: | $362.90 |
| Exit Fee: | $75,000.00 |
| Attorney's Fees: | $2,777.50 |
| **TOTAL:** | **$15,113,062.28** |

It has come to our attention that you have violated Section 9.10(a), (b), and (c) of the Loan Agreement by acquiring additional property other than the Property as described in the Loan Documents. Due to this Event of Default, Lender has elected to exercise its right to accelerate the maturity of the Loan and declare the above amount immediately due and payable pursuant to Section 11.2 of the Loan Agreement and Section 3.1(a) of the Deed of Trust. Lender also intends to institute appropriate legal proceedings for the collections of all sums due to Lender and for the enforcement of Lender's rights and remedies under the Loan Documents.

Interest continues to accrue at the rate of $3,880.21 each day. You may obtain current payoff figures by contacting Claire Liu at Calmwater Capital by phone at 310-405-7481 or by e-mail at claire@calmwatercapital.com.

Nothing herein shall be deemed to be a waiver of any Defaults or Events of Default, whether described above or not, existing or arising under the Loan Documents, or a waiver or abandonment of any rights or remedies available to the Lender (whether against you or any other person, or any collateral or any other property), each of which rights and remedies is hereby specifically reserved. This notice is being given as a matter of courtesy and shall not be deemed to establish by implication, course of dealing or otherwise, any right to this or any other notice in the future.

3515048.v2

October 10, 2019
Page 3

       This notice is not intended to advise you of your legal rights or obligations.    It is recommended that you consult an attorney of your choice to protect your interests.

              Sincerely,

              Brian T. Cumings

**GD**
**HM**
GRAVES
DOUGHERTY
HEARON &
MOODY

401 Congress Avenue
Suite 2700
Austin, Texas 78701

AUSTIN
TX 787
10 OCT '19
PM 5 T



NEOPOST          FIRST-CLASS MAIL
10/10/2019
US POSTAGE $000.50⁰

ZIP 78701
041M11283167

Cogency Global Inc.
1601 Elm Street
Suite 4360
Dallas, Texas 75201

75201-725499

# **EXHIBIT F**



**GRAVES**
**DOUGHERTY**
**HEARON &**
**MOODY**

**Brian T. Cumings**
512.480.5626
512.536.9926 (fax)
bcumings@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX  78767-9998

October 15, 2019

**Certified Mail/Return Receipt Requested**
**and Fed Ex**

c/o World Class
814 Lavaca Street
Austin, Texas 78701
Attn: Natin Paul

**Certified Mail/Return Receipt Requested**
**and Fed Ex**

c/o World Class Capital Group, LLC
401 Congress, 33rd Floor
Austin, Texas 78701
Attention: Nate Paul

**Certified Mail/Return Receipt Requested**
**and Fed Ex**

c/o World Class
767 Fifth Avenue, 16th Floor
New York, New York 10153
Attention: Legal Department

**Certified Mail/Return Receipt Requested,**
**Fed Ex and e-mail**

Natin Paul
401 Congress, 33rd Floor
Austin, TX 78701
Email: npaul@wccapitalgroup.com

**Certified Mail/Return Receipt Requested**
**and Fed Ex**

Cogency Global Inc.
1601 Elm Street
Suite 4360
Dallas, Texas 75201

3516360.v1

*Re: Notice of Foreclosure (Travis County)*

Dear Borrower and Guarantor:

Reference is here made to the Deed of Trust (the "Deed of Trust") dated December 12, 2017, to Cyrus N. Ansari, Esq., Trustee, recorded as Document No. 2017196451 of the Official Records of Travis County, Texas, executed by WC 56 East Avenue LLC ("Grantor" or "Borrower"), for the benefit of U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership, whose successor in interest is U.S. Real Estate Credit Holdings III, LP, an Irish limited partnership ("Beneficiary").

The Deed of Trust secures the obligations therein described including the payment of the promissory note (the "Note") dated December 12, 2017, in the original principal amount of FIFTEEN MILLION DOLLARS 00/100 ($15,000,000.00) executed by Grantor and payable to the order of the Beneficiary (the "Note").

Brian T. Cumings is the duly appointed Substitute Trustee pursuant to the Deed of Trust.

This letter and the enclosed copy of the notice styled "Notice of Substitute Trustee's Sale" are being sent to you as the obligor on the indebtedness evidenced by the Note. **You are informed that the public auction of the property described in the enclosed notice is scheduled for Tuesday, November 5, 2019, no earlier than 10:00 A.M. and will begin within three hours of that time.** Mr. Brian T. Cumings is the substitute trustee.

You will be able to prevent the foreclosure by paying the Beneficiary before the foreclosure sale the total amount owed that is secured by the Deed of Trust, including principal, interest that accrues to the date of payment, outstanding fees, and all attorney's fees incurred by the Beneficiary in collecting the indebtedness. You may obtain current figures by contacting Claire Liu at Calmwater Capital, by phone at (310) 405-7481 or via email to claire@calmwatercapital.com.

Sincerely,

Brian T. Cumings

Enclosure
cc:     U.S. Real Estate Credit Holdings III, LP
        c/o Calmwater Capital
        11755 Wilshire Blvd., Suite 1425
        Los Angeles, CA 90025

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*
Dana DeBeauvoir, County Clerk
Travis County, Texas
Oct 15, 2019 02:45 PM     Fee: $46.00
**2019160894**
*Electronically Recorded*

# This page is intentionally added for electronic file stamp.

## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

THE STATE OF TEXAS

COUNTY OF TRAVIS

KNOW ALL PERSONS BY THESE PRESENTS:

### RECITALS:

**A.** WC 56 EAST AVENUE LLC, ("Grantor" or "Borrower") executed that certain Deed of Trust, Security Agreement, and Financing Statement (the "Deed of Trust") executed by the Grantors, dated December 12, 2017, and recorded as Document No. 2017196451 of the Official Public Records of Travis County, Texas, which covers and effects, among other property, that certain real property and related property interests ("Property") described in **Exhibit A** hereto.

**B.** The Deed of Trust conveyed the Property to Cyrus N. Ansari, Esq. (the "Trustee") in favor of U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership (the "Original Beneficiary").

**C.** Beneficiary (as defined below) is the present legal and equitable owner and holder of the Note, the Deed of Trust, and the Liens.

**D.** Brian T. Cumings is the duly appointed Substitute Trustee ("Substitute Trustee").

**E.** The Deed of Trust secures, among other indebtedness and obligations described therein, the payment of a Promissory Note ("Note") dated December 12, 2017 in the stated principal sum of $15,000,000.00, executed by the Grantor and payable to the order of the Beneficiary.

**F.** The Note is due and payable and Beneficiary has demanded payment of all parties obligated to pay the Note according to the records of Beneficiary, and intends to have the power of sale set forth in the Deed of Trust enforced.

**G.** To further secure the Note, Grantor also executed and delivered to Original Beneficiary an Assignment of Leases and Rents (World Class - 56 East Avenue) (the "Assignment of Leases"). The Assignment of Leases was recorded as Document No. 2017196452 of the Official Public Records of Travis County, Texas. The liens, security interests and assignment of the Deed of Trust, the Assignment of Leases and of all other documents and instruments now or hereafter governing,

3516361.v2

evidencing, guaranteeing, or securing or otherwise relating to payment of all or any part of the indebtedness evidence by the Note (collectively, the "Loan Documents") are hereinafter collectively called the "Liens". By this reference, the Deed of Trust and the Assignment of Leases are hereby incorporated herein for all purposes.

     **H.**    Original Beneficiary transferred and assigned the Note, the Deed of Trust, the Assignment of Leases, the other Loan Documents and the Liens to U.S. Real Estate Credit Holdings III, LP, an Irish limited partnership (the "Beneficiary") pursuant to (i) that certain Assignment of Deed of Trust, Security Agreement, and Financing Statement dated February 22, 2018, recorded as Document No. 2018027847 of the Official Public Records of Travis County, Texas, (ii) that certain Assignment of Assignment of Leases and Rents dated February 22, 2018, recorded as Document No. 2018027846 of the Official Public Records of Travis County, Texas, and (iii) that certain UCC-3 Financing Statement, recorded as Document No. 2018028676 of the Official Public Records of Travis County, Texas.

     **I.**    Beneficiary has directed that I, as Substitute Trustee, enforce the power of sale under the Deed of Trust for the purpose of collecting the indebtedness set forth therein after giving notice of the time, place and terms of said sale, and the property to be sold, pursuant to the Deed of Trust and the laws of the State of Texas, on account of one or more defaults in obligations secured by the Deed of Trust.

     NOW, THEREFORE, in consideration of the foregoing, I hereby give notice as follows:

<b>NOTICE:</b>

     I, Brian T. Cumings, Substitute Trustee, after due posting, filing and service of this Notice, as required by the Deed of Trust and by the laws of the State of Texas, will sell the Property at public auction to the highest bidder or bidders for cash in Travis County, Texas (the County in which the real property covered and affected by the Deed of Trust is situated). The sale will be conducted at the west steps of the Travis County Courthouse at 1000 Guadalupe Street, Austin, Texas, that being the location designated by the Travis County Commissioners Court for sales of real property under powers of sale conferred by deeds of trust and other contract liens. The sale shall be conducted on the first Tuesday in November, 2019, the same being November 5, 2019. The sale will occur no earlier than 10:00 a.m. and will begin no later than three (3) hours after that time. At such public auction, I will sell the real property described in Exhibit A attached hereto. Notice is also hereby given that in accordance with the provisions of the Texas Business and Commerce Code and Deed of Trust, all furniture, equipment, machinery, and other items of personal property, tangible and intangible, and all rights, privileges,

appurtenances thereto described in Exhibit A attached hereto, subject to the security interest of the Deed of Trust, shall also be sold together with such real property. The sale of the Property shall be made on an AS IS basis. NO WARRANTIES, EITHER EXPRESS OR IMPLIED, ARE OR SHALL BE MADE AS TO MERCHANTABILITY, HABITABILITY, FITNESS FOR PURPOSE, WORKMANSHIP OR QUALITY. No policy of title insurance will be furnished to the purchaser.

EXECUTED on October 15, 2019.

_____
Brian T. Cumings, Substitute Trustee

**Address of Substitute Trustee:**

c/o Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
Telephone: 512.480.5626
Fax: 512.536.9926
bcumings@gdhm.com

**Address of Beneficiary:**

U.S. Real Estate Credit Holdings III, LP
c/o Calmwater Capital
11755 Wilshire Blvd., Suite 1425
Los Angeles, California 90025

3516361.v2

STATE OF TEXAS

COUNTY OF TEXAS

This instrument was acknowledged before me on October 15, 2019 by Brian T. Cumings.

JENNIFER THOMAS
NOTARY PUBLIC
ID# 12950950-2
State of Texas
Comm. Exp. 03-20-2022

_____
Notary Public, State of Texas

## EXHIBIT A

A 1.118 ACRE (48,702 SQUARE FEET) TRACT OF LAND ON LOT BLOCK 2 OUTLOT 73 DIVISION "F" OF THE GOVERNMENT OR OUTLOTS ADJOINING THE ORIGINAL CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, HAVING BEEN CONVEYED TO WC 56 EAST AVENUE, LLC BY INSTRUMENT OF RECORD IN DOCUMENT NUMBER 2015026718 IN THE OFFICIAL PUBLIC RECORDS OF TRAVIS COUNTY, TEXAS; SAID 1.118 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

POINT OF BEGINNING at a 1/2" iron rod with plastic cap found at the intersection of the south right of way line of River Street with the west right of way line of East Avenue, also being the northeast corner of the 1.118 acre tract of land herein described;

THENCE, S 16° 33' 20" W, a distance of 480.28 feet with the west right of way line of East A venue and the east line of said 1.1178 acre tract to a 1/2" iron rod found on the west right-of-way line of East Avenue, the southeast corner of the herein described tract of land and the northeast corner of Lot A, Zoppp Addition, a subdivision recorded in Book 65, Page 56 of the Plat Records of Travis County, Texas having been conveyed to 48 East Ave. LLC by instrument of record in Document Number 2014101790 of the official public records of Travis County, Texas;

THENCE, N 73° 43' 47" W, leaving the west right of way line of East Avenue with the south line of said 1.118 acre tract and the north line of said Lot A, a distance of 172.75 feet to a 1/2" iron rod found at the to a 1/2" iron rod found at the southwest corner of the herein described tract of land and the northwest corner of said Lot A also on the east line of a 20' alley;

THENCE, N 16° 28' 23" W, with the west line of the herein described tract of land and the east line of said 20' alley a distance of 480.55 feet to a rod with a washer found at the northwest corner of the herein described tract of land and the intersection of the east right of way line of said 20' alley with the south right of way line of River Street for the northwest corner of the herein described tract of land;

THENCE, S 73° 36' 22" E, with the south right-of-way line of River Street and the north line of the herein described tract of land, a distance of 128.30 feet to the POINT OF BEGINNING and containing 1.118 acres of land.

3516361.v2

US POSTAGE $007.60²

ZIP 7879
041M112837

7013 1710 0001 4091 5622

GRAVES DOUGHERTY HEARON & MOODY
A PROFESSIONAL CORPORATION
401 CONGRESS AVENUE
SUITE 2700
AUSTIN, TEXAS 78701-3790

Cogency Global Inc.
1601 Elm Street
Suite 4360
Dallas, Texas 75201

# **EXHIBIT G**

# WC 56 EAST AVENUE, LLC

814 Lavaca Street, Austin Texas 78701

October 16, 2019

Brian T. Cumings                                 *Via FedEx and email*
Graves Dougherty Hearon & Moody
PO Box 89
Austin, Texas 78767-9998
Email: *bcumings@gdhm.com*

U.S. Real Estate Credit Holdings III-A, LP       *Via FedEx and email*
c/o Calmwater Capital
Attention: Larry Grantham, Managing Director
11755 Wilshire Blvd, Suite 1425
Los Angeles, CA 90025
Email: *larry@calmwatercapital.com*

Safarian, Choi & Bolstad LLP                     *Via FedEx and email*
555 South Flower St., Suite 650
Los Angeles, California 90071
Attention: Alex Y Choi, Esq.
Email: *achoi@safrianchoi.com*

## DEAMND TO RESCIND AND WITHDRAW WRONGFUL ACCELLERATION AND FORECLOSURE

Mr. Cumings:

This letter is on behalf of WC 56 East Avenue, LLC ("Borrower") related to that certain Loan Agreement by and between Borrower and U.S. Real Estate Credit Holdings III-A, LP ("Lender") dated December 12, 2017, as amended ("Loan Agreement"). **Borrower is not in default of Sections 9.10(a), (b) and (c) of the Loan Agreement** and demands that Lender immediately rescind its letter dated October 9, 2019 (received October 15, 2019) purporting to accelerate the Loan ("Acceleration Notice"), and immediately cancel and withdraw the notice of foreclosure wrongfully posted on October 15, 2019 ("Notice of Foreclosure").

Borrower has not acquired additional property other than the Property as described in the Loan Documents. The unsupported accusation in the Acceleration Notice is incorrect and reckless. Accordingly, Lender's purported acceleration of the Loan is without authority under the Loan Documents, wrongful and made in bad faith for the improper purpose of harming Borrower.

On October 15, 2019, Mr. Cumings forwarded to our attention three documents supposedly in support of Lender's accusation, namely an Original Petition for Condemnation, an Order Appointing a Special Commissioner, an estimate of value for a condemnation proceeding. Not one of these establishes that Borrower has acquired any additional property other than the Property as described in the Loan Documents.

U.S. Real Estate Credit Holdings III-A, LP
October 16, 2019
Page 2


Moreover, as easily verified and supported by public records, we refer you to your document titled Estimated Appraisal Value which attaches a number of exhibits. Pages two through five of the document each repeatedly and clearly identifies the property in dispute as **0.9702 AC PART OF LOT 3-7 BLK 54 & 55 DIV O ELM GROVE ADDN** and further repeatedly and clearly identifies the owner of such property, as **CITY OF AUSTIN**.

For the forgoing reason, Borrower **DEMANDS** that Lender immediately rescind and withdraw its notice of acceleration and Notice of Foreclosure.

Please be advised that Borrower will pursue all rights and remedies against U.S. Real Estate Credit Holdings III-A, LP, and its parent company, if Lender chooses to try and enforce any remedies that are clearly not available to Lender at this juncture, and Borrower reserves all rights with regard to the foregoing wrongfully pursued remedies.


Regards,

Brian Elliott
Corporate Counsel

# **EXHIBIT H**

# WC 56 EAST AVENUE, LLC

814 Lavaca Street, Austin Texas 78701

October 22, 2019

Brian T. Cumings                                   *Via FedEx and email*
Graves Dougherty Hearon & Moody
PO Box 89
Austin, Texas 78767-9998
Email: *bcumings@gdhm.com*

U.S. Real Estate Credit Holdings III-A, LP        *Via FedEx and email*
c/o Calmwater Capital
Attention: Larry Grantham, Managing Director
11755 Wilshire Blvd, Suite 1425
Los Angeles, CA 90025
Email: *larry@calmwatercapital.com*

Safarian, Choi & Bolstad LLP                       *Via FedEx and email*
555 South Flower St., Suite 650
Los Angeles, California 90071
Attention: Alex Y Choi, Esq.
Email: *achoi@safarianchoi.com*

## SECOND DEMAND TO RESCIND AND WITHDRAW WRONGFUL ACCELERATION AND FORECLOSURE

Mr. Cumings:

This letter is on behalf of WC 56 East Avenue, LLC ("Borrower") related to that certain Loan Agreement by and between Borrower and U.S. Real Estate Credit Holdings III-A, LP ("Lender") dated December 12, 2017, as amended ("Loan Agreement").

Lender has not been able to produce any information showing that Borrower is in default of Sections 9.10(a), (b) and (c) of the Loan Agreement. **Accordingly, Borrower repeats its DEMAND that Lender immediately rescind its letter dated October 9, 2019 purporting to accelerate the Loan ("Acceleration Notice"), and further again DEMANDS that Lender immediately cancel and withdraw the notice of foreclosure wrongfully posted on October 15, 2019 ("Notice of Foreclosure").**

As verified in our letter of October 16, 2019, Borrower has not acquired additional property. The purported "Deed Without Warranty," dated March 20, 2019 is not a valid conveyance of real property. The fee owner of the tract in question is the City of Austin today, and was the City of Austin on March 20, 2019. This plain fact can be easily and quickly verified by public records and should have been verified by Lender before wrongfully noticing a foreclosure. We have asked for Lender to disclose any other information that it may have showing any relevant transfer of real property away from the City of Austin and to the Borrower, and we have received none.

U.S. Real Estate Credit Holdings III-A, LP
October 22, 2019
Page 2

Enclosed here is a full title report with attachments showing that the <u>only fee owner</u> of the tract in question since 1953 has been the City of Austin.

What is more disturbing is that it is our understanding is that Lender is in possession of this information, chose to ignore it, and clearly acted in bad faith to improperly notice a default in violation of the Loan Documents and has knowingly wrongfully notice a foreclosure.

 Accordingly, Borrower again **DEMANDS** that Lender immediately rescind and withdraw its Acceleration Notice and Notice of Foreclosure. The failure to do so immediately will force Borrower to exercise its right to initiate legal proceedings to halt the improper foreclosure and Borrower will look to Lender, and its parent company, for any and all damages it has or will incur for Lender's bad faith actions, including attorneys' fees. Finally, any lawyer or law firm that has counselled their client to proceed without any good faith basis or without reasonable inquiry may be sanctioned under TRCP 13.

Regards,

Brian Elliott
Corporate Counsel

# **EXHIBIT I**

ELECTRONICALLY RECORDED          2019039863
                        TRV      **5**      PGS

## DEED WITHOUT WARRANTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL PERSONS BY THESE PRESENTS: |
| COUNTY OF TRAVIS | § | |

That **AUSTIN-TRAVIS COUNTY MENTAL HEALTH MENTAL RETARDATION d/b/a INTEGRAL CARE and f/d/b/a AUSTIN TRAVIS COUNTY INTEGRAL CARE** ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration to the undersigned paid by the Grantee herein named, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, SOLD and CONVEYED, and by these presents does GRANT, SELL and CONVEY unto **WC 56 EAST AVENUE, LLC** ("Grantee") all of Grantor's right, title and interest, if any, in and to the following-described real property in Travis County, Texas, to wit:

> Being all of that certain tract or parcel of land containing 0.252 of an acre, more or less, situated in DIVISION "O" ORIGINAL CITY OF AUSTIN, Travis County, Texas, according to the Plat on file at the General Land Office of the State of Texas, same being more particularly described by metes and bounds shown on **Exhibit "A"** attached hereto and made a part hereof for all purposes (the "Property");

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its successors and assigns forever, so that neither Grantor, nor Grantor's successors and assigns shall at any time hereafter have, claim or demand any right or title to the Property, or any part thereof.

Grantor, for the consideration and subject to any and all easements, covenants, leases, rights-of-way, conditions, restrictions, outstanding mineral interests and royalty

interests, if any, relating to the Property, to the extent, and only to the extent, that the same may still be in force and effect, and either shown of record in the office of the County Clerk of the County, in the State of Texas in which the Property is located, or which are apparent on the Property, conveys to Grantee the Property without express or implied warranty, and all warranties that might arise by common law and the warranties in § 5.023 of the Texas Property Code (or its successor) are excluded.

EXECUTED this the 20th day of March , 2019.

**AUSTIN-TRAVIS COUNTY MENTAL HEALTH MENTAL RETARDATION d/b/a INTEGRAL CARE and f/d/b/a AUSTIN TRAVIS COUNTY INTEGRAL CARE**

By: _____

Name: David Evans

Title: CEO

Address for Grantee:

401 Congress Avenue
33rd Floor
Austin, TX 78701

THE STATE OF TEXAS          §
COUNTY OF TRAVIS            §

This instrument was acknowledged before me on March 20 , 2019, by David Evans , CEO of **AUSTIN-TRAVIS COUNTY MENTAL HEALTH MENTAL RETARDATION d/b/a INTEGRAL CARE and f/d/b/a AUSTIN TRAVIS COUNTY INTEGRAL CARE**, on behalf of said entity.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 20th day of March , 2019.

Mesha Barnes

NOTARY PUBLIC, State of Texas
Printed Name: Mesha Barnes
My Commission Expires: 05-07-22

Seal

MESHA LASHELL BARNES
Notary Public, State of Texas
Comm. Expires 05-07-2022
Notary ID 129811887

**AFTER RECORDING, RETURN TO:**

11-GF# 2015022263 BKH
RETURN TO: HERITAGE TITLE
401 CONGRESS, SUITE 1500
AUSTIN, TEXAS  78701



# EXHIBIT "A"

**SURVEY PLAT OF 0.252 ACRES OF LAND (10,983 SQUARE FEET OF LAND) BEING A PART OF DIVISION "O" ORGINAL CITY AUSTIN OF THE GOVERNMENT OUTLOTS, ACCORDING TO THE MAP ON FILE IN THE TEXAS GENERAL LAND OFFICE IN TRAVIS COUNTY, TEXAS AND BEING MORE PARTICULARLY A PART OF WEST ONE-HUNDRED FEET (100') OF EAST AVENUE, A STREET IN THE SAID CITY OF AUSTIN, AS DEPICTED ON THE MAP OF THE SAID GOVERNMENT OUTLOTS AND BEING A PORTION OF THAT CALLED 0.9702 ACRES OF LAND AS DESCRIBED IN THAT CERTAIN DECLARATION OF DEPARTMENTAL TRANSFER OF OPERATIONS AND MAINTENANCE OBLIGATIONS AS DESCRIBED IN DOCUMENT NUMBER 2012178335 OFFICIAL PUBLIC RECORDS TRAVIS COUNTY, TEXAS, THE HEREIN DESCRIBED 0.252 ACRES OF LAND BEING SHOWN ON A PLAT PREPARED HEREWITH AND BEING MORE PARTICULARY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:**

**COMMENCING** for reference at a one-half inch inside diameter pipe found at the apparent intersection of the northwest right-of-way line of the said East Avenue with the southwest right-of-way line of River Street, a street, in the said City of Austin according to the map of said Government Out Lots, same being the northeast corner of that called 1.1178 acres described to WC 56 East Avenue, LLC, in that certain Special Warranty Deed With Vendor's Lien as recorded Document Number 2015026718, Official Public Records Travis County, Texas;

**THENCE** South 73°29'33" East, a distance of 66.00 feet crossing over the said East Avenue to a capped iron rod set for the northwest corner and **POINT OF BEGINNING** of the herein described 0.252 acres of land, same being the northwest corner of the said 0.9702 acres of land;

**THENCE** South 73°29'33" East, a distance of 33.92 feet and coincident with the northeast line of the said 0.9702 acres to a capped one half-inch iron rod set for the northeast corner of the herein described 0.252 acres of land, same being a point on the center line of the said East Avenue and a point on the northeast line of the said 0.9702 acres of land;

**THENCE** South 16°27'59" West, a distance of 324.20 feet and coincident with the center line of the said East Avenue and crossing over and severing from the said 0.9702 acres of land to a capped one-half inch iron rod set for the southeast corner of the herein described 0.252 acres of land, same being a point on the center line of the said East Avenue and a point on the southwest line of the said 0.9702 acres of land;

**THENCE** North 68°24'25" West, a distance of 34.29 feet and coincident with the southwest line of the said 0.9702 acres of land and crossing over the said East Avenue to a capped one-half inch iron rod set for the southwest corner of the herein described 0.252 acres of land and the said 0.9702 acres of land and from this point a one-half inch iron rod found for the southeast corner of the said WC 56 East Avenue, LLC, 1.1178 acres bears South 64°39'29" West, a distance of 88.60 feet crossing over the said East Avenue for the northeast corner of Lot A, Zopp Addition, a

subdivision in Travis County, Texas, according to the plat recorded in Volume 65, Page 56, Plat Records Travis County, Texas;

**THENCE** North 16°30'27" East, a distance of 321.16 feet and coincident with the northwest line of the said 0.9702 acres of land and crossing over the said East Avenue to the **POINT OF BEGINNING** and containing 0.252 acres of land or (10,983 square feet) of land more or less.

**BASIS OF BEARINGS: GRID NORTH, UNITED STATES STATE PLANE COORDINATE SYSTEM, TEXAS CENTRAL ZONE 4203, NAD83.**

I hereby certify that these field notes were prepared from an on the ground survey made by me.

_____ 5/02/2018
Robert C. Steubing                          Date
Registered Professional Land Surveyor No. 5548

Page 2 of 2
H:\\Surveying\Survey\Substations\Rainy St\Legal\West Part East Avenue Vacation 5-01-2018.doc

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
March 22 2019 10:46 AM
FEE: $ 42.00    **2019039863**